UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Jawaun Fraser,<br><br>                Plaintiff,<br><br>    -against-<br><br>The City of New York, Undercover Officer Number 84, Detective Matthew Regina, and Detective Jason Deltoro, Individually and as Members of the New York City Police Department,<br><br>                Defendants. | **COMPLAINT**<br><br>Index No. 20-cv-4926<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jawaun Fraser ("Plaintiff" or "Fraser"), by his attorneys, the Law Offices of Joel B. Rudin, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary damages for Plaintiff Jawaun Fraser because he spent two years wrongfully incarcerated based upon a robbery charge that a team of New York City narcotics police officers fabricated.

2.     Plaintiff's damages also resulted from the failure of the police officers, and prosecutors, in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose that members of the narcotics team who arrested Fraser had been sued for fabricating evidence and other constitutional violations at least *38 times.*

3.     A New York State Supreme Court Justice overturned Fraser's conviction on the basis that civil lawsuit information had been wrongfully withheld from the defense, but not until he had endured the trauma of his prosecution, two years in state custody, and another year on strict parole supervision.

4.      The City of New York is liable to Plaintiff for the damages caused by the *Brady* violation because it foreseeably resulted from the unlawful or deliberately indifferent policies, customs, and practices of the New York City Police Department ("NYPD") and the New York County District Attorney's Office ("DANY" or "Manhattan DA's Office").

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as the events giving rise to the claim occurred in Manhattan.

8.      This action is timely because it was commenced within three years of the time that Fraser's federal causes of action accrued.

9.      Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.      Plaintiff, Jawaun Fraser, is a citizen and resident of the State of New Jersey and the United States. He resides within the District of New Jersey.

11.      Defendant City of New York ("City"), of which New York County is a subdivision, is a municipal corporation of the State of New York and is a resident of the Southern District of New York. DANY and the NYPD are agencies of the City.

12.      Defendant Matthew Regina ("Regina") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

13.     Defendant Undercover Officer Number 84 ("UC 84") was at all relevant times an undercover narcotics officer employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

14.     Defendant Jason Deltoro ("Deltoro") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

15.     Defendants Regina, UC 84, and Deltoro will be referred to herein as "the individual defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Fabricated Allegation of Robbery

16.     At about 8 p.m. on October 21, 2014, Plaintiff Jawaun Fraser was walking to a store on the Lower East Side of Manhattan to buy some items for his mother.

17.     Fraser was 18 years old at the time of this incident.

18.     He had recently started working as a paid union apprentice for the Sheet Metal Workers Local 28.

19.     Undercover Officer 84 approached Fraser near Avenue D and 8th Street.

20.     UC 84 was accompanied by a woman and secretly backed up by a team of plainclothes narcotics officers who were part of a "buy and bust operation."

21.     Fraser recognized this woman from the neighborhood as a drug addict.

22.     UC 84 asked to buy narcotics from Fraser.

23.     UC 84 told Fraser that he had money and needed a "fix."

24.     Fraser refused, denying that he was selling drugs.

25.     UC 84 was insistent.

26.     UC 84 told Fraser that he was not a police officer and that he knew Fraser's mother because he used to live in the neighborhood.

27.     UC 84, still insistent on buying drugs, handed Fraser his photo identification to prove his claim of identity.

28.     Fraser used his iPhone to take a photograph of UC 84's identification.

29.     When Fraser took the photo, UC 84 grabbed his wrist and the ID fell.

30.     Several plainclothes officers from Narcotics Borough Manhattan South, including Detective Regina and Detective Deltoro, then rushed towards Fraser.

31.     Surprised and fearful, Fraser fled.

32.     Regina and other officers with him chased and apprehended Fraser.

33.     They searched Fraser and found that he did not possess any narcotics.

34.     To justify Fraser's arrest, UC 84, Regina, and Deltoro manufactured the false story that Fraser had robbed UC 84 of the latter's driver's license and $20 in marked buy money and that Regina had found UC 84's identification on Fraser's person when he was arrested.

35.     UC 84, Regina, and Deltoro caused various police records to be created documenting this false story.

36.     They did so knowing these records would be transmitted to the Manhattan District Attorney's Office and would be relied on to formulate and pursue criminal charges against Plaintiff, and this was their intent.

37.     Regina and Deltoro created a property voucher and an invoice for a photocopy of UC 84's driver's license, which falsely indicated that the driver's license was arrest evidence that had been found in Fraser's possession.

38.     UC 84 created an expense report for the money that he falsely claimed Fraser stole from him.

39.     UC 84 also wrote a complaint follow-up form, or DD5, giving his false version of events.

40.     Regina swore to an affidavit for a warrant to search Fraser's cell phone that contained the false version of events.

41.     Under penalty of perjury, Regina signed a Criminal Court complaint falsely accusing Fraser of robbery in the second degree.

42.     Regina said in this criminal complaint that the robbery allegation was based upon what he had been told by UC 84.

**Pre-Trial Proceedings**

43.     Fraser was arraigned in the Manhattan Criminal Court on the robbery charge.

44.     Based upon the false allegations of the police, the judge set bail at $2,500 and, in lieu of bail, ordered Fraser detained.

45.     Fraser was held in jail for about three days before making bail and obtaining his release.

46.     As a condition of his pretrial release, besides posting bail of $2,500, Fraser had to check in once a week, and was not allowed to travel outside of New York State.

47.     On October 29, 2014, based upon the "evidence" that the Defendants had fabricated, Fraser was indicted for robbery in the second degree, N.Y. Penal Law 160.10(1).

48.     Regina and UC 84 testified in the grand jury in support of this indictment, repeating the false story they had manufactured.

49.     Fraser retained a private criminal defense attorney to represent him at trial and paid this attorney a total of about $11,000.

50.     Plaintiff appeared in court on his case about a dozen times before trial and then each day during a week-long trial.

51.     Each time, he had to miss work and lost income because he was not paid during his absence from work.

52.     As a result of his arrest and his frequent court appearances for this case, Fraser lost his job.

## The Trial Proceedings

53.     Plaintiff's trial commenced with jury selection on November 17, 2015, in the Supreme Court, New York County.

54.     Assistant District Attorney Gregory Sangermano was the assigned prosecutor.

55.     Before trial, ADA Sangermano provided Fraser's defense counsel with the names and index numbers of two civil rights lawsuits that had been filed against the testifying officers in the United States District Court, Southern District of New York: (1) *Penn v. City of New York*, 10-cv-4907 (RJS); and (2) *Baynes v. City of New York*, 12-cv-5903 (RJS).

56.     UC 84 was a defendant in the *Penn* case.

57.     Both UC 84 and Regina were defendants in the *Baynes* case.

58.     ADA Sangermano did not disclose any additional lawsuits that had been filed against any of the testifying officers.

59.     UC 84 and Regina testified at a suppression hearing and then again at trial.

60.     On each occasion, UC 84 and Regina testified to the fabricated stories they had provided the District Attorney's Office to cause Plaintiff's arrest and prosecution.

61.     Knowing of only the two civil lawsuits against UC 84 and Regina, Plaintiff's criminal defense counsel decided not to cross-examine the officers about them at trial.

62.     UC 84 falsely testified at trial that Fraser had threatened him and forcibly taken his identification card and the $20 in marked buy money.

63.     Detective Regina falsely testified to observing some of these events and that he had found UC 84's driver's license in Fraser's possession.

64.     Detective Deltoro testified that he and other officers moved in to arrest Fraser after UC 84 gave a non-verbal distress signal, falsely claimed that he saw UC 84 and Fraser "grappling," and stated that he participated in the police chase of Fraser.

65.     Deltoro admitted that he later searched the area for the marked $20 bill that UC 84 claimed Fraser had stolen from him but could not find it.

66.     Three other members of the narcotics team were present for all or part of the incident involving Plaintiff and assisted the individual defendants.

67.     These three officers included Undercover Officer 17, who was working as the "ghost" officer, Detective Hoiping Lee, who was assigned to the prisoner van, and Lieutenant John Patane, who supervised the entire buy and bust team. Regina testified that Lee and Patane were the officers who apprehended Fraser.

68.     After a presentation of evidence that lasted one full day and two mornings (including the summations and jury charge), the jury deliberated for a full day.

69.     At one point, the jury sent the trial judge a note indicating that it "appear[ed] to be at a deadlock," leading the judge to read the jury a modified *Allen* charge urging it to try to reach an unanimous verdict.

70.     On November 24, 2015, the jury found Fraser not guilty of robbery in the second degree but found him guilty of the lesser-included offense of robbery in the third degree.

71.     After the jury verdict, Fraser was remanded to jail.

72.     Fraser had obtained a new position as a union apprentice while out on bail pending trial, but after he was convicted he lost this job and his spot in the union apprenticeship program.

### Sentencing, Prison, and Reentry

73.     At sentencing on January 13, 2016, the court sentenced Fraser to a term of two to six years in prison.

74.     Fraser spent about two years in custody, at which point he was released on parole.

75.     Fraser then spent one year under strict parole supervision.

76.     During this time, he had to report regularly to his parole officer, strictly observe a 9 p.m. curfew, refrain from traveling outside of New York City without permission, and attend and pay for a substance abuse program.

77.     He was discharged early from parole supervision for good behavior in 2018.

78.     Fraser was able to rejoin the Sheet Metal Workers Local 28 apprenticeship program, but he was forced to restart this program at the beginning and is presently at a lower pay scale than he would have been had his apprenticeship not been interrupted by his conviction and imprisonment.

### The 440 Motion

79.     In May 2019, Fraser's assigned appellate counsel, the Center for Appellate Litigation (CAL), moved under New York Criminal Procedure Law § 440.10 to vacate Fraser's conviction.

80.     The basis for this motion was that, at the time of the trial, the prosecution, in violation of Fraser's constitutional right to disclosure of evidence favorable to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963), had disclosed only two of the 35 civil lawsuits that CAL discovered had been filed against members of the team of narcotics officers who arrested Fraser.

81.     Of these 35 lawsuits, no less than *ten* named UC 84 as a defendant.

82.     Sixteen of the lawsuits named Regina as a defendant.

83.     Three of these lawsuits named Deltoro as a defendant.

84.     In his response to CAL's 440 motion, ADA Sangermano admitted that, prior to trial, a paralegal for the Manhattan DA's Office had conducted a "*Garrett* search"[1] and found 13 lawsuits against the officers involved in the arrest—11 suits against Regina, one suit against UC 84 (*Penn*), and one suit against both of them (*Baynes*).

85.     However, with the exception of *Penn* and *Baynes*, Sangermano had not disclosed these lawsuits to defense counsel at trial.

86.     In the 440 proceedings, CAL presented undisputed evidence that other prosecutors in the Manhattan DA's Office knew about some of the additional 22 lawsuits.

87.     ADA Sangermano had not disclosed any of these 22 suits to the defense either.

88.     On December 6, 2019, Justice Robert M. Stoltz of the New York County Supreme Court granted Fraser's motion and vacated his conviction for robbery in the third degree. *See People v. Fraser*, Ind. No. 4844/14 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019), attached as Exhibit A.

89.     Justice Stoltz found that ADA Sangermano's failure to fully disclose the prior civil lawsuits to the defense violated Plaintiff's due process rights under *Brady*.

---

[1] This is a reference to *People v. Garrett*, 23 N.Y.3d 878 (N.Y. 2014).

90.    Under the technicalities of New York law, the vacatur of the conviction meant that the third-degree robbery count was dismissed and the prosecution, if it wished to prosecute plaintiff any further for robbery, was required to seek a new indictment from a new grand jury.

91.    The prosecution decided not to do so, and so the robbery charge was terminated in Fraser's favor.

92.    The prosecution required Plaintiff to plead guilty to some offense in order to fully close the case.

93.    In order to end his prosecution, Fraser pleaded guilty to disorderly conduct, N.Y. Penal Law § 240.20, a violation that is not a criminal offense.

### Damages and Injuries

94.    Plaintiff's injuries and damages include, but are not limited to, his:

   a.   Wrongful arrest, prosecution, and conviction for robbery;

   b.   Loss of or restrictions on his liberty including three days of incarceration following his initial arraignment, pretrial bail restrictions, and, after his conviction, two years of incarceration followed by a year of parole supervision;

   c.   Loss of the services, society, companionship, and consortium of his family and friends;

   d.   Past and future mental and emotional suffering;

   e.   Fees paid to a private criminal defense attorney of approximately $11,000; and

   f.   Past and future loss or diminution of employment earnings in an amount to be determined.

10

## FIRST CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Liberty, Due Process, and a Fair Trial Under the Fourth, Fifth, Sixth, and Fourteenth Amendments by the Individual Defendants)**

95.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 94 of this Complaint.

96.     Defendants UC 84, Regina, and Deltoro, individually, acting in concert, and/or aiding and abetting one another, deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, manufactured false evidence against Plaintiff, including the allegations that Fraser had threatened UC 84 and stolen UC 84's identification card and marked $20 bill, and caused such false allegations to be documented in police reports and other police paperwork and in a sworn Criminal Court complaint.

97.     The false evidence was material to Plaintiff's prosecution for robbery in that it was the only evidence of guilt and it was reasonably likely to influence a jury to convict Fraser.

98.     UC 84, Regina, and Deltoro forwarded, caused to be forwarded, or aided and abetted the forwarding of, this false evidence to the Manhattan DA's Office.

99.     UC 84, Regina, and Deltoro knew that the evidence of robbery they had fabricated and caused to be transmitted to the DA's Office was likely to influence the decision by prosecutors whether to prosecute Fraser, the decision by the court concerning whether and on what conditions to release him on bail, the decision by the grand jury whether to indict him, and the decision by a trial jury whether to convict him.

100.     In fact, the fabricated evidence was a substantial and proximate cause of Plaintiff's deprivation of liberty and other injuries, including but not limited to his prosecution,

detention, release on restrictive bail conditions, indictment, conviction, imprisonment in state prison, and time on parole supervision.

101.    The prosecution for robbery caused by the fabricated evidence was terminated in Plaintiff's favor.

102.    The individual defendants are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments by the Individual Defendants)

103.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 102 of this Complaint.

104.    UC 84, Regina, and Deltoro knowingly, willfully and with actual malice initiated, or caused the initiation and continuation of, Fraser's prosecution for robbery, without probable cause.

105.    They caused Fraser to be deprived of his liberty.

106.    The prosecution for robbery was terminated in Fraser's favor.

107.    The individual defendants' conduct was outrageous and shocking to the conscience.

108.    Their conduct was a substantial and proximate cause of the deprivation of Plaintiff's right to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution, as well as his right to substantive and procedural due process under the Fifth and Fourteenth Amendments.

109.    The individual defendants are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial
Under the Fifth and Fourteenth Amendments by the
Individual Defendants)**

110.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 109 of this Complaint.

111.    At the time of Fraser's trial, the six officers who made up the narcotics team that arrested Fraser had been named as defendants in at least 38 lawsuits alleging civil rights violations.

112.    At least 23 of these suits alleged that police officers had fabricated evidence.

113.    ADA Sangermano disclosed only two of these 38 lawsuits to the defense.

114.    At the time of trial, Regina knew that he had been sued at least 14 times.

115.    He did not disclose any of these lawsuits to the prosecution.

116.    ADA Sangermano was unaware of at least the following two lawsuits against Regina:

   a.   In *Gaymon v. City of New York*, 06-cv-26-RJD-RML (E.D.N.Y.), the plaintiff
        alleged that Regina and other officers falsely arrested him for possession of
        marijuana, then falsely told a prosecutor that he had possessed marijuana.

   b.   In *Bumbrey v. City of New York*, 10-cv-5188-ENV-RML (E.D.N.Y.), the
        plaintiffs alleged that Regina and other officers falsely arrested them in their

home, destroyed their personal property, made false allegations under oath in the criminal complaint, and falsely testified in the grand jury.

117. At the time of trial, UC 84 knew that he had been sued at least eight times.

118. He did not disclose any of these lawsuits to the prosecution.

119. ADA Sangermano was unaware of at least the following six lawsuits against UC 84:

    a.  In *Cook v. City of New York*, 09-cv-10238-CM (S.D.N.Y.), the plaintiff alleged that police officers had falsely arrested him and then falsely told a prosecutor that the plaintiff had possessed and sold "fake" cocaine.

    b.  In *Best v. City of New York*, 11-cv-5611-CM (S.D.N.Y.), the complaint alleged that UC 84 was part of a group of officers who falsely arrested the plaintiff, roughing him up in the process, and then misrepresented to prosecutors that the plaintiff sold and possessed marijuana, signing a false criminal court complaint to this effect.

    c.  In *Parris v. City of New York*, 13-cv-6686-NRB (S.D.N.Y.), the complaint alleged that UC 84 was part of a team of officers that illegally searched plaintiff and then made a false sworn statement that he had sold narcotics.

    d.  In *Bahadur v. City of New York*, 15-cv-978-AJN (S.D.N.Y.), the complaint alleged that UC 84 persistently attempted to purchase drugs from the plaintiff; when plaintiff refused to sell him drugs, UC 84 and another officer punched him and then falsely claimed that the plaintiff tried to strike an officer.

    e.  In *Pieralisi v. City of New York*, 15-cv-3785-RA (S.D.N.Y.), the complaint alleged that UC 84 was part of a team of officers that illegally searched

14

plaintiff and then made a false sworn statement that he had possessed and sold narcotics, even though they had found no contraband during the search.

f. In *Wright v. City of New York*, 15-cv-4498-VSB (S.D.N.Y.), the plaintiff alleged that he was standing with another individual when UC 84 approached and asked to buy drugs; even though he walked away rather than participating in the drug sale, plaintiff was arrested and the police officers prepared false or misleading reports that were forwarded to the district attorney's office.

120. At the time of trial, Deltoro knew that he had been sued at least five times.

121. He did not disclose any of these lawsuits to the prosecution.

122. ADA Sangermano was unaware of any of these five lawsuits against Deltoro.

123. At least three of these suits alleged that the police fabricated evidence:

a. In *Loglisici v. City of New York*, 09-cv-1220-SHS (S.D.N.Y.), the complaint alleged that Deltoro and other officers falsely arrested the plaintiff during a narcotics "buy- and-bust operation" even though he had committed no crime.

b. In *Murray v. City of New York*, Index No. 307520/2009 (Sup. Ct. Bronx Cty.), the complaint alleged that Deltoro and another officer falsely arrested the plaintiff, filed or caused the filing of a felony complaint falsely accusing him of crimes, and provided false or misleading information to prosecutors.

c. In *Nunez v. City of New York*, 09-cv-8789-DLC (S.D.N.Y.), the complaint alleged that Deltoro and other officers falsely arrested the plaintiffs for criminal possession of a weapon and criminal possession of a forged instrument, even though the plaintiffs had neither a weapon nor a forged instrument.

124.     Under New York law, the defense in a criminal case may cross-examine police officers about the specific allegations contained in unrelated civil lawsuits in order to impeach their general credibility, demonstrate their dishonesty and disrespect for the law, or show a pattern of similar behavior.

125.     Allegations that the police officers involved in this case had previously been accused of fabricating evidence and other dishonest or illegal behavior would have assisted Fraser and his attorney in impeaching their credibility and showing Fraser's innocence and thus was favorable to the defense under *Brady*.

126.     UC 84, Regina, and Deltoro had a constitutional duty to inform the prosecution of information known to them that was favorable to a criminal defendant under *Brady* and potentially material to the outcome of the trial so that the prosecutor could disclose such information to the defense.

127.     This obligation included the civil lawsuits that had been filed against them.

128.     The information they failed to disclose was material to the outcome of the trial because, had such information been timely disclosed, there is a reasonable probability that Plaintiff would have been acquitted of all charges or achieved a more favorable outcome to the trial.

129.     The individual defendants' failure to disclose information about prior civil lawsuits was a substantial and proximate cause of Plaintiff's injuries, including his conviction, incarceration in state prison, and time on parole supervision.

130.     The individual defendants failed to disclose such civil lawsuits to the prosecutor knowingly, willfully, intentionally, recklessly, negligently, or with deliberate indifference to their obligation to do so.

131.   Regina, UC 84, and Deltoro are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### FOURTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City of New York for *Brady* Violations by the NYPD)**

132.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 129 of this Complaint.

133.   Prior to Plaintiff's trial, policymaking officials of the NYPD, due to their deliberate indifference to the *Brady* rights of criminal defendants, implemented inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the duty of police officers to make timely disclosure to prosecutors of material evidence or information favorable to criminal defendants, including evidence or information impeaching the credibility of prosecution witnesses, including the police officers themselves.

134.   This disclosure was necessary so that prosecutors could determine whether to provide such information to criminal defendants and their counsel under *Brady*.

135.   More specifically, policymaking officials at the NYPD knew that members of the force often acted as essential witnesses in criminal prosecutions and that many of them face, or have faced, lawsuits alleging they engaged in various types of misconduct, including fabricating evidence, stealing, other acts of dishonesty, and making arrests without probable cause.

136.   Even though such civil lawsuit allegations may have a crucial bearing on the credibility of such police witnesses, at the time of Fraser's trial in November 2015 the NYPD had adopted no policy, practice or procedure requiring such police witnesses to provide such civil lawsuit information to District Attorneys or Assistant District Attorneys.

17

137.     Prior to Plaintiff's trial, the NYPD failed to even generally train or instruct members of the service concerning their *Brady* obligations, including their obligation to disclose civil lawsuits and other evidence impeaching their own credibility, and failed to supervise such members to ensure they fulfilled their obligation under the law to make such disclosures.[2]

138.     Even though the issue of whether to disclose various forms of *Brady* material, including civil lawsuit information, regularly arises, NYPD policymaking officials issued no Patrol Guide provision or other directive to officers concerning when, if at all, to disclose such information to prosecutors.

139.     Moreover, at all times relevant to this case, the NYPD failed to discipline members of service for failing to provide *Brady* material, including impeachment evidence and/or civil lawsuit information, to prosecutors.

140.     As a result of the NYPD's inadequate training, supervisory and disciplinary policies and practices, the individual defendants failed to disclose to prosecutors in Plaintiff's case the existence of the civil lawsuits against them accusing them of fabricating evidence and other dishonest activities, and this was a substantial cause of the prosecutor's failure to fully disclose such information to the defense and of Plaintiff's conviction and resultant injuries.

141.     The Police Commissioner and/or other municipal policymakers knew or should have known that whether to disclose impeachment and other evidence favorable to a criminal defendant, including civil lawsuits against police witnesses, presents the kind of difficult or non-obvious choice that instruction, training, supervision, and discipline would make less difficult.

---

[2] Counsel for Plaintiff has deposed numerous police officers, detectives, supervisors, and higher-level personnel in numerous lawsuits involving events that occurred from the mid-1980s to the present and virtually every one testified to having received no *Brady* training and to being unaware of its disclosure requirements. Depositions taken of 30(b)(6) witnesses have confirmed the lack of training in this area and the absence of any discipline for officers who have violated the *Brady* rule.

142.     The Police Commissioner and/or other municipal policymakers knew or should have known that the failure of police officers to disclose such material impeachment evidence would frequently cause the deprivation of the constitutional rights of criminal defendants.

143.     Under the principles of municipal liability for federal civil rights violations, the Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the constitutional requirements governing the disclosure of *Brady* material.

144.     The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with their *Brady* obligations.

145.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the due process and fair trial rights of criminal defendants and of other members of the public.

146.     The *Brady* violations in this case were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities by the New York City Police Department.

147.     By virtue of the foregoing, Defendant City is liable, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that its unlawful conduct caused and for attorneys' fees, costs, and expenses.

## FIFTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City of New
York for *Brady* Violations by the Manhattan D.A.'s Office)**

148.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs
1 through 113, 116, 119, and 123 to 125 of this Complaint.

149.    Prosecutors under the *Brady* rule have a constitutional obligation to disclose to the
defense information that is favorable to the defense, that is potentially material to the outcome of
the trial, and that is within the possession, custody or control of the prosecutor's office as well as
law enforcement agencies involved in the investigation or prosecution of the matter.

150.    Under binding legal authority, "the individual prosecutor has a duty to learn of
*any* favorable evidence known to the others acting on the government's behalf in the case,
including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (emphasis added).

151.    A prosecutor's office and its employees may not "get around *Brady* by keeping
itself in ignorance." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984).

152.    The *Brady* rule extends to information that might impeach the credibility of a
prosecution witness, including police officers.

153.    Civil lawsuit allegations that an officer-witness in a case has engaged in dishonest
or unlawful activities, including but not limited to fabricating evidence or allegations, lying,
stealing, coercing false statements, or making unlawful searches or arrests, are relevant to the
credibility of the witness and generally must be disclosed under *Brady.*.

154.    At all times relevant to this case, DANY had an unlawful policy, practice, or
custom for prosecutors to refrain from asking police officer-witnesses about civil suits or
allegations of misconduct against them unrelated to the prosecution at hand.

155.     The purpose of this policy, practice, or custom was to avoid obtaining actual knowledge of information that such prosecutors would be obligated under *Brady* to disclose, and as such it was an unlawful policy, practice, or custom.

156.     DANY's policy, practice, or custom of avoiding learning about civil lawsuit impeachment information signaled to trial prosecutors that the Office was indifferent to disclosure of such information generally and encouraged a lax attitude about disclosing such information even when prosecutors knew about it.

157.     As a result of DANY's aforementioned unlawful policies, customs and practices, ADA Sangermano failed to learn about and/or to disclose at least 36 instances in which the prosecution witnesses against Plaintiff and other members of their narcotics team were sued for violating the rights of criminal suspects or defendants.

158.     These lawsuits contained factual allegations, favorable to the defense in Plaintiff's criminal case, that the prosecution witnesses or members of their undercover team, sometimes acting in concert with others, fabricated evidence, lied, caused individuals to be searched, arrested, or prosecuted without probable cause, covered up each other's misconduct, or otherwise engaged in illegal or dishonest activities.

159.     In addition to the lawsuits alleged in paragraphs116, 119, and 123, the lawsuits against the narcotics team who arrested Fraser that were not disclosed to the defense included:

     a.   *A.T. v. City of New York*, 12-cv-04146-JSR (S.D.N.Y.), in which the complaint alleged that Deltoro and other officers handcuffed and interrogated a 15-year-old female while she was naked in her own home. She was falsely arrested and charged with an unspecified felony, which was later dismissed.

21

b.  *Green v. Doe*, 11-cv-09690-PGG (S.D.N.Y.), which alleged that Deltoro and another officer punched and kicked plaintiff without provocation, and Deltoro searched plaintiff by inserting a finger into his rectum.

c.  *Peterson v. Regina*, 10-cv-01692-JSR-GWG (S.D.N.Y.), which alleged that Regina arrested the plaintiff for drug sales even though plaintiff did not sell any drugs to an undercover officer who approached him, and did not possess any drugs or pre-recorded buy money.

d.  *Canelo v. City of New York*, 11-cv-00052-WFK-MDG (E.D.N.Y.), which alleged that Regina was part of a group of officers who, following an unlawful seizure of plaintiff from a vehicle, searched plaintiff's rectal area, choked and slammed him to the ground, kneed him on the back, pepper-sprayed him, and refused to provide him medical attention. To cover up this abuse of authority, the officers initiated a prosecution of the plaintiff on a false charge, based on false statements made by one of them.

e.  *Butler v. City of New York*, 09-cv-02559-ILG-VVP (E.D.N.Y.), which alleged that Regina and other officers falsely arrested the plaintiff for criminal trespass when he was lawfully waiting for someone in the lobby.

f.  *Drennon v. City of New York*, 05-cv-02486-CBA-KAM (E.D.N.Y.), which alleged that Regina and other officers falsely arrested and charged the plaintiffs with selling and possessing a controlled substance (though neither plaintiff possessed or sold such a controlled substance), and then made false statements to the prosecutor resulting in the plaintiffs' prosecution.

g. *Hackshaw v. City of New York*, 10-cv-06005-BMC (E.D.N.Y.), which alleged that Regina and other officers threatened to shoot the plaintiff when he ran away, jumped on plaintiff's back and struck him on his head and body while he was on the ground (including with a hard object and while he was restrained with handcuffs), illegally searched him, injured his wrists by tight and prolonged handcuffing, and delayed his medical treatment.

h. *Walker v. City of New York.*, 12-cv-00385-CBA-LB (E.D.N.Y.), which alleged that Regina and other officers stopped and searched a car in which the plaintiff was a passenger without a lawful basis for doing so.

i. *Molina v. City of New York*, 10-cv-01370-VM (S.D.N.Y.), which alleged that Regina and other police officers handcuffed plaintiff and searched him, failing to find any contraband, yet falsely arrested and charged him with criminal possession of a controlled substance, filling out false and misleading police reports forwarded to prosecutors, and repeatedly giving false and misleading testimony regarding the incident.

j. *Bell v. City of New York*, 11-cv-01885-KAM-RML (E.D.N.Y.), which alleged that Regina and another police officer stopped, without reasonable suspicion, a car in which three of the plaintiffs were traveling, ordered them to exit their vehicle, and illegally searched them and the car.

k. *Stewart v. City of New York*, 12-cv-00750-PKC-CLP (E.D.N.Y.), which alleged that Regina and other officers unlawfully stopped and detained plaintiff, searched him but failed to find contraband, arrested him, and then made false statements leading to the plaintiff's prosecution.

l.  *Boyd et al. v. City of New York*, 10-cv-02096-SLT-RML (E.D.N.Y.), which alleged that Regina and other police officers broke open a door, handcuffed the plaintiffs, and detained them in a vehicle and at the precinct, before eventually releasing them without charging them.

m.  *Hogarth v. City of New York*, 05-cv-04850-RJD-RML (E.D.N.Y.), which alleged that Regina was part of a group of officers who, in the course of arresting plaintiff, handcuffed him too tightly, threw him to the ground, maced him, struck him on his back and face, slammed his head into a police car and into the door of a jail cell, and unlawfully strip-searched him.

n.  *Cubero v. City of New York*, 07-cv-02640-VM (S.D.N.Y.), which alleged that Detective Lee and other officers fabricated criminal charges against the plaintiff, repeatedly struck him, and strip-searched him.

o.  *Vera v. City of New York*, 12-cv-06925-NRB (S.D.N.Y.), which alleged that Detective Lee and other officers stopped the plaintiff's car, strip-searched him, and then falsely charged him with reckless driving.

p.  *Finney v. City of New York*, 04-cv-09929-VM (S.D.N.Y.), which alleged that Detective Lee and other officers arrested plaintiff for operating an illegal, unlicensed after-hours club, and for criminal possession of a weapon, falsely alleging that he threw a firearm behind a vending machine.

q.  *Tingling v. City of New York*, 10-cv-00874-HB (S.D.N.Y.), which alleged that Detective Lee and other officers threw plaintiff to the ground and struck him repeatedly in the face, leaving him with a facial fracture and causing loss of consciousness.

r.   *Gonzalez v. City of New York*, 10-cv-09039-PKC (S.D.N.Y.), which alleged
that Detective Lee and other officers falsely arrested plaintiffs and then
created police reports falsely alleging that the plaintiffs had sold drugs,
forwarding such misrepresentations to the District Attorney's Office.

s.   *McKnight v. City of New York*, 06-cv-03220-PAC (S.D.N.Y.), which alleged
that after a search of plaintiff by another officer that yielded no contraband,
Detective Lee held plaintiff in custody for four hours without probable cause
and plaintiff was strip-searched. Lee issued plaintiff a Desk Appearance
Ticket, and he was charged with criminal possession of marijuana.

t.   *McIlwain v. City of New York*, 10-cv-07946-PAC (S.D.N.Y.), which alleged
that Detective Lee and other officers subjected plaintiff to an illegal strip
search that yielded no contraband, yet nonetheless falsely charged him with
criminal possession of a controlled substance, preparing false police reports
that were provided to the District Attorney's Office, and giving false
testimony concerning the circumstances of his arrest.

u.   *Robinson v. City of New York*, 15-cv-05850-LGS (S.D.N.Y.), which alleged
that Detective Lee and other officers falsely arrested and illegally searched
plaintiff and then made false statements to a prosecutor, including a statement
that Lee recovered two ten-dollar bills that plaintiff had dropped, causing him
to be charged with criminal possession of a controlled substance.

v.   *Arnold v. City of New York*, 06-cv-02729-AKH (S.D.N.Y.), which alleged that
Lieutenant Patane and other officers stopped the car in which plaintiff was a
passenger and, without provocation from the plaintiff, punched plaintiff in the

face several times, hit him in the face with their radio(s), pepper-sprayed him once he was handcuffed, dragged him out of the vehicle and to the floor, and beat him. The officers then falsely charged him with resisting arrest, attempted assault and harassment in the second degree.

w. *McAvoy v. City of New York*, 11-cv-04819-ALC-DCF (S.D.N.Y.), which alleged that Lieutenant Patane stole money from an arrestee during the execution of a search warrant, and then retaliated against the plaintiff, a retired NYPD detective, for reporting Patane's theft.

x. *Henderson v. City of New York*, 11-cv-01611-HB (S.D.N.Y.), which alleged that Lieutenant Patane approved an unlawful cavity search of the plaintiff, who had been arrested for a misdemeanor drug offense.

y. *Williams v. City of New York*, 11-cv-02619-JGK (S.D.N.Y.), which alleged that Undercover Officer Number 17 and other officers arrested plaintiff without probable cause, strip-searched him, and commenced his prosecution by forwarding false information to the District Attorney's Office.

160.    ADA Sangermano's failure to learn about and/or to disclose the 36 civil lawsuits discussed in paragraphs 116, 119, 123, and 159 violated his constitutional duty to do so under *Brady*.

161.    His conduct was knowing, deliberate, intentional, reckless, or with deliberate indifference to his constitutional disclosure obligations.

162.    It was a substantial cause of Plaintiff's conviction and subsequent injuries.

163.    But for ADA Sangermano's failure to obtain and to disclose the aforementioned civil lawsuit information, there is a reasonable probability that Plaintiff would have been acquitted of all charges or achieved a more favorable outcome.

164.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for promulgating his office's policies, customs, and practices including, but not limited to, the duties of line prosecutors to meet their *Brady* obligations.

165.    The Manhattan District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures with respect to his Office's performance of its duties.

166.    The Manhattan District Attorney, at all relevant times, was and is an elected officer of New York County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

167.    The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law; New York has provided by statute that Defendant City's constituent counties (including New York County), and hence Defendant City itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and the City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

168.    The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

169.     During all times relevant to this Complaint, the Manhattan District Attorney owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by his subordinates violating the aforementioned constitutional rights of criminal defendants.

170.     By virtue of the foregoing, Defendant City is liable, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that its unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

    a.   For compensatory damages of not less than $6 million;

    b.   For punitive damages of not less than $2 million;

    c.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

    d.   For pre-judgment interest as allowed by law; and

    e.   For such other and further relief as this Court may deem just and proper.

Law Offices of Joel B. Rudin, P.C.

_____/s/_____

By:   Joel B. Rudin
Matthew A. Wasserman
Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for the Plaintiff*

Dated: New York, New York
June 26, 2020