SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: CRIMINAL TERM

------------------------------------------------------------------------x

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | : | NOTICE OF |
| | : | MOTION TO |
| Respondent, | : | VACATE |
| | : | JUDGMENT |
| -against- | : | PURSUANT |
| | : | C.P.L. § 440.10 |
| JAWAWN FRASER, | : | |
| | : | Ind. No. |
| Defendant. | : | 4844/14 |

------------------------------------------------------------------------x

PLEASE TAKE NOTICE that upon the annexed affirmation of JACQUELINE

MEESE-MARTINEZ and the exhibits thereto, the annexed memorandum of law, and

all prior proceedings had herein, the undersigned will move this Court, at a term for

motions thereof as soon as counsel may be heard, at the Courthouse, 100 Centre Street,

New York, New York, at a date and time to be set by the Court, for an order, pursuant

to C.P.L. §§ 440.10(1)(h), directing that defendant's conviction be set aside and a new

trial held or, in the alternative, that a hearing be held on the matter.

Dated: New York, New York
        May 1, 2019

ROBERT S. DEAN
Attorney for Defendant
Center for Appellate Litigation
120 Wall Street – 28th Floor
New York, New York 10005

JACQUELINE MEESE-MARTINEZ
*Of Counsel*
(212) 577-2523, *ext.* 552
jmeese-martinez@cfal.org

To:    MOTIONS CLERK
Supreme Court, Criminal Term
100 Centre Street
New York, New York 10013

HON. CYRUS R. VANCE
New York County District Attorney's Office
One Hogan Place
New York, New York 10013

MR. JAWAWN FRASER
749 FDR Rd., Apt 2F
New York, New York
10009

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: CRIMINAL TERM
------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     :

                                      :    AFFIRMATION

              Respondent,               :

                                        :

            -against-                  :    Ind. No. 4844/14

                                        :

JAWAWN FRASER,                          :

                                        :

              Defendant.              :

------------------------------------------------------------------------x

STATE OF NEW YORK       )
                            ) ss.:
COUNTY OF NEW YORK    )

      JACQUELINE MEESE-MARTINEZ, an attorney at law, duly admitted to

practice in the Courts of the State of New York, hereby affirms, under penalty of perjury,

that the following statements are true, or, if stated on information and belief, that she

believes them to be true:

      1.  I am associated with the law office of Robert S. Dean, Center for Appellate

Litigation, who was assigned, November 15, 2016, to represent defendant Jawawn Fraser

on his appeal from a judgment of the Supreme Court, New York County, on January 13,

2016, convicting him, after a jury trial, of robbery in the third degree (Penal Law §

160.05), and sentencing him to an indeterminate sentence of two to six years

incarceration (Zweibel, J., at hearing, trial, and sentence). See Exhibit A: Order of

Assignment.

Fraser 000752

2.  I make this affirmation in support of Mr. Fraser's motion to vacate the judgment, pursuant to C.P.L. §§ 440.10(1)(h), on the grounds that the Manhattan District Attorney's Office failed to comply with its obligations pursuant to Brady v. Maryland, 373 U.S. 83 (1963), thus violating Mr. Fraser's state and federal due process rights.

3.  Mr. Fraser was arrested after confronting an undercover officer, who had been participating in an unsuccessful buy-and-bust operation outside of Mr. Fraser's home. The undercover officer alleged that Mr. Fraser forcibly stole the undercover officer's fake license with assistance of other people nearby, and Mr. Fraser was charged with second-degree robbery. At trial, Mr. Fraser's defense was that the officers were not telling the truth, i.e. that they fabricated the facts because Mr. Fraser had revealed the undercover officer's true identity. The jury acquitted Mr. Fraser of second-degree robbery but convicted him of third-degree robbery as a lesser included offense.

4.  On direct appeal, Mr. Fraser challenged the validity of his conviction, arguing that the conviction was against the weight of the credible evidence. He pointed out that his conviction rested upon the undercover officer's testimony, which was both internally inconsistent and improbable. The direct appeal was argued before the Appellate Division, First Department, on December 5, 2018, and a decision is still pending.

5.  I have become aware that the undercover officer and other members of the field team that conducted the operation, including the lieutenant, have been accused at

least thirty-five times in civil lawsuits of engaging in egregious misconduct, including false arrests, malicious prosecution, illegal strip searches, and excessive force.

6.   In response to an unrelated C.P.L. § 440.10 motion, the Manhattan District Attorney's office previously admitted that it was aware of at least some of these civil suits around the time of Mr. Fraser's trial. Namely, in <u>People v. Gary Harris</u>, the defendant was arrested by some of the same officers who arrested Mr. Fraser, and he brought a successful C.P.L. § 440.10 motion after discovering the many civil lawsuits. <u>See</u> Exhibit B: Dec. & Order, People v. Gary Harris, N.Y. Ind. 4781/13 (N.Y. Cnty. Sup. Ct. Oct. 15, 2018) (Ward, J.) In opposing Mr. Harris's motion, the Manhattan District Attorney's Office acknowledged that it was aware of a number of these civil suits, but did not provide them to Mr. Harris because they were not "favorable or material." <u>See</u> Exhibit C: People's Opp. to Gary Harris C.P.L. § 440.10 Motion, at 8; <u>see also</u> Exhibit D: People's Status Letter in Gary Harris C.P.L. § 440.10 Motion. Thereafter, Justice Ward granted Mr. Harris's C.P.L. § 440.10 motion, holding that the People suppressed evidence favorable to Mr. Harris. <u>See</u> Ex. B. In so ruling, the court reasoned that materiality is decided by the trial court, not by the People, and that the People erred in withholding the cases on that ground. <u>Id.</u>

7.   Here, the People also deprived Mr. Fraser of powerful evidence for his defense by failing to turn over the vast majority of these same lawsuits, of which the Manhattan District Attorney's office had institutional knowledge. Instead, the trial prosecutor

Fraser 000754

cherry-picked two of thirty-five lawsuits to make a partial <u>Garrett</u> disclosure, thereby misleading defense counsel by failing to comply fully with the mandates of <u>Brady</u>. Therefore, Mr. Fraser's state and federal due process rights were violated, and his conviction must be set aside and a new trial ordered.

The Original Proceedings

<u>The Indictment and Pre-Trial Motions</u>

8.    New York County Indictment 4844/14 charged defendant Jawawn Fraser with second-degree robbery based on allegations that, on October 21, 2014, he demanded to see an undercover officer's identification by stating "give me your money and ID or I'll fuck you up" (<u>see</u> Court File: Felony Complaint).[1] Mr. Fraser was also alleged to have called six people over to him assist (<u>id.</u>).

9.    On November 30, 2014, defense counsel filed an omnibus motion requesting, *inter alia*, discovery pursuant to C.P.L. § 240.20. In the accompanying demand to produce, counsel requested "[a]nything required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the constitution of this State or of the United States," and cited <u>Brady v. Maryland</u> (373 U.S. 83 (1963)) (<u>see</u> Court File: Omnibus Mot., at 3).

---

[1] The citations will be: "Court File" refers to court file from the trial-level proceedings; "S.H." refers to the transcript of the suppression hearing; "H.H." refers to the transcript of the Hinton Hearing; "T." refers to the transcript of the trial; "S." refers to the transcript of sentencing; and "A." refers to the Defendant's Appendix provided in connection with this motion.

Fraser 000755

10.   The People's answer to the omnibus motion contained two responsive items. First, the People declared that the officers' personnel files were "not discoverable absent a showing of 'some factual predicate which would make it reasonably likely' that the files contain impeachment material" quoting <u>People v. Gissendanner</u> (48 N.Y.2d 543, 550 (1979)) and citing Civil Rights Law § 50a (<u>see</u> Court File: Omnibus Resp., at ¶ 9). Second, the People offered the boilerplate response that they were "aware of their continuing duty under <u>Brady</u> to disclose exculpatory evidence to the defense" and would "honor that obligation" (<u>id.</u> at ¶ 14).

<u>Suppression Hearing</u>

11.   On Friday, November 13, 2015, the court commenced a <u>Mapp</u>/<u>Dunaway</u> hearing (H. 1). The People initially called one witness, Detective Matthew Regina. However, after Justice Zweibel informally advised the prosecutor that he had failed to meet his burden, the People were permitted to reopen the hearing the following Monday, recalling Regina and calling Undercover Officer #84 ("UC84") (H. 39, 43).[2]

<u>The People's Hearing Evidence</u>

12.   The evening of October 21, 2014, the Manhattan South Narcotics Borough was was conducting a buy-and-bust operation on the Lower East Side in Manhattan, near Avenue D and East 8th Street (S.H. <u>Regina</u>: 4). Some of the officers involved were

---

[2]  The suppression court allowed UC84 to testify anonymously after a <u>Hinton</u> hearing (S.H. 56; H.H. 14-16).

Fraser 000756

<u>Detective Matthew Regina</u>, <u>UC84</u>, Lieutenant John Patane, Detective Jason Deltoro, and Detective Hoi Lee (S.H. 5-6, 12, 15, 24).

13.  The operation centered around UC84 attempting to purchase narcotics in a NYCHA housing courtyard (S.H. 5-6). Regina observed UC84, watching as he interacted with a woman on the walkway between two of the NYCHA buildings (S.H. 6-7, 15-16). UC84 was attempting to purchase crack-cocaine from that woman, giving her $50 to coordinate the drug sale (S.H. 59-60). The woman left her purse with UC84 as collateral for the drug purchase (S.H. 75).

14.  While UC84 was waiting for the drugs, Mr. Fraser approached and asked whether UC84 was a police officer (S.H. 7, 60). Approximately three weeks earlier, UC84 had been publicly confronted about being a police officer during another undercover buy-and-bust operation in that same NYCHA courtyard (H.H. 11-12).

15.  UC84 denied that he was a police officer and claimed that he was looking for "krills," <u>i.e.</u> crack-cocaine (S.H. 61, 73). Five or six other people in the courtyard were approximately three feet away from Mr. Fraser and UC84 (S.H. 8).

16.  At some point, Mr. Fraser asked the woman who was selling the drugs whether she knew UC84 (S.H. 75). She then gave UC84 the $50 back, retrieved her purse, and walked away (S.H. 75). The woman was never apprehended (S.H. 6-7).

17.  Mr. Fraser asked to see UC84's driver's license and still wanted to know if UC84 was a police officer (S.H. 61). A group of people were nearby Mr. Fraser and

Fraser 000757

UC84 and were encouraging Mr. Fraser "to fuck [UC84] up and to punch [UC84]" (H. 61-62). Mr. Fraser again demanded to see UC84's license and said he would punch UC84 if he did not show Mr. Fraser some identification (S.H. 62, 76).

18.   UC84 eventually showed Mr. Fraser a New York driver's license with a fictitious name (S.H. 63).  He kept the license in his hand, with $20 of pre-recorded buy money folded up behind it, so that Mr. Fraser could see only the license (S.H. 63, 73). As UC84 was taking the license out of his pocket, Mr. Fraser also demanded money (H. 76).[3] Mr. Fraser then took the license and money out of UC84's hand (S.H. 63, 77).  Mr. Fraser read the license and proceeded to take a picture of it using his cell phone (H. 63). Mr. Fraser then put the license and money in his own pants pocket (S.H. 63, 78).

19.   Regina could not hear this interaction, but rather watched what he believed to be a conversation (S.H. 7-8). Regina did not see Mr. Fraser hit UC84 (S.H. 21).

20.   Approximately four minutes after Mr. Fraser approached, UC84 issued a non-verbal distress signal (S.H. Regina: 9, 19; UC84: 63-64, 79). This distress signal was used to inform observing officers that UC84 was "in trouble" or that "something bad [was] going to happen" (S.H. Regina: 9). Regina agreed this signal "cover[ed] a wide range of activity," and the team did not know why UC84 needed back up (S.H. 21, 41, 48).

---

[3]  UC84 did not testify that Mr. Fraser demanded any money until cross-examination. The testimony is unclear whether UC84 had the folded up $20 bill behind the license before Mr. Fraser demanded money or whether UC84 handed over the money in response to the demand (H.76).

Fraser 000758

21.   Upon observing the signal, Regina radioed the rest of the team to move in on UC84's location, although he "didn't know what was happening at that point" (S.H. 8, 49). Regina did not see any evidence that a crime had been committed, and he walked quickly—but did not run—over to the scene (S.H. 10, 22, 50).

22. UC84 saw Regina and Deltoro walking towards him in response to the distress signal (S.H. 64). One of the people standing nearby yelled "the cops" (S.H. 64). Mr. Fraser then said that he was "going to get [UC84] good" and reached into his sweatpants (S.H. 65). UC84 felt threatened and prepared to draw his weapon, but did not do so after realizing that Mr. Fraser did not pull anything out of his pants (S.H. 65, 82). At no point did UC84 indicate that he was a police officer (S.H. 83).

23.  UC84 testified that Mr. Fraser approached UC84's right side and a "struggle" then ensued: "I grabbed the defendant, the defendant grabbed me. We started struggling" (S.H. 65, 81).[4]

24.  At the first suppression hearing, Regina testified that UC84 and Regina were "almost struggling" when he approached the two men, but said nothing more (S.H. 13, 22). However, at the second suppression hearing, he stated that the he observed the two men "tugging" on each other and "pulling each other back and forth" (S.H. 45). At both suppression hearings, Regina made clear that Mr. Fraser did not strike UC84 (S.H. 50).

---

[4] UC84 initially testified on cross-examination that he grabbed Mr. Fraser first (H. 80-81), but then later could not recall who grabbed whom first (S.H. 83). UC84 eventually claimed that the men grabbed each other "pretty much simultaneously" (S.H. 83).

Fraser 000759

25.  When he was close enough, Regina attempted to "grab" Mr. Fraser, but failed to do so (S.H. 10, 23). Deltoro had also moved in on the scene and grabbed Mr. Fraser from behind (S.H. 10, 23). Deltoro announced himself as police and put both of his hands on Mr. Fraser's back and shoulders (S.H. 24).

26.  Mr. Fraser escaped Deltoro's grasp and ran away through the courtyard (S.H. Regina: 10; UC84: 66). UC84, Regina, and Deltoro all chased after Mr. Fraser (S.H. UC84: 66). Regina never saw Mr. Fraser throw anything on the ground as he ran away from the officers (S.H. 25, 30).

27.  Patane and Lee eventually apprehended Mr. Fraser near East 10th Street (S.H. Regina:10-11; UC84: 67-68, 84).When Regina caught up, Mr. Fraser had already been handcuffed and placed near the police van (S.H. 25).  As the designated arresting officer for that night, Regina took custody of Mr. Fraser and searched him (S.H. 12). Regina recovered UC84's fake license from Mr. Fraser's pants pocket, as well as a cell phone and approximately $100 cash (S.H. 12, 14, 26).

28.  After Mr. Fraser had been seized and searched, Regina spoke with UC84 to find out what happened and retraced Mr. Fraser's route to look for discarded items (S.H. Regina: 13, 26, 30; UC84: 86, 87-88). The officers were looking for drugs, weapons, or other contraband, but the search did not turn up anything (S.H. 30).

Fraser 000760

Suppression Ruling

29.  The court denied suppression, finding the officers credible and reasoning that Regina's observations established probable cause (S.H. 102-05).

Trial

30.  Mr. Fraser's jury trial commenced on November 18, 2015 (T. 1). He proceeded on the only charge in the indictment, robbery in the second degree (T. 11-12).

Opening Statements

31.  Defense counsel's opening statement focused on the improbability of the People's story (T. 23). Specifically, he argued that it was implausible that Mr. Fraser would steal a license from someone he believed to be a police officer, particularly after Mr. Fraser had already taken a picture of the license (T. 23). He further pointed out that UC84 offered to show Mr. Fraser the license, and that Mr. Fraser likely took the license from his hand to inspect it in the dark but had no intent to keep it (T. 25).

The People's Case

32.  The People intended to call or mention UC84, Regina, Deltoro, Patane, and Lee at trial. See Exhibit E: Witness List. However, Patane and Lee did not testify.

33.  UC84 again testified, but many of his statements internally inconsistent (T. 29). Additionally, UC84's trial testimony contradicted his statements at the suppression hearing. He claimed that he had not reviewed his field notes prior to the suppression

Fraser 000761

hearing and conceded that he gave confident answers despite failing properly prepare (T. 101-02).

### UC84's Inconsistent Trial Testimony

34.   <u>The Failed Drug Transaction</u>: UC84 testified at trial that he negotiated a drug purchase with an unknown woman: he gave this woman $50 of pre-recorded buy money, and she left her purse with him as collateral while she phoned someone for the drugs (T. 37-38). He further testified that she subsequently retrieved her purse and walked away with the $50 UC84 had given her (T. 80). The field team later looked for this woman in an attempt to retrieve the $50 (T. 81-82). However, at the suppression hearing, UC84 testified that the woman returned the $50 back to him(T. 81).

35.   <u>The Fake License</u>: UC84 twice stated that he volunteered to show the license to Mr. Fraser (T. 40, 43, 82).[5] He further noted that the threat of physical violence did not occur until after he turned over the license: "I asked for my I.D. back, and <u>that's when he told me he would punch me in the face</u>" (T. 84 (emphasis added)). Thereafter, on redirect, UC84 indicated that Mr. Fraser asked to see identification (T. 97). He further

---

[5]  Specifically, UC84 stated during direct examination:

> [T]he defendant was still in my face still asking me to prove I wasn't a cop. <u>I told him I had I.D. on me. I would should him I wasn't a cop.</u> The defendant—I then took an I.D. out of my pocket. The defendant was threatening to punch me. To beat me up. I showed—as I took the I.D. from my pocket, I had $20 which I keep folded up next to my I.D. which is, you know, I just took it all out of my pocket at one time, and showed the defendant still holding my I.D., <u>Look. See. I have an I.D. A cop wouldn't show you I.D.</u> as he was yelling at me.

(T.  43 (emphasis added)).

Fraser 000762

explained that Mr. Fraser made the request as a means for UC84 to prove that he was not a cop because Mr. Fraser wanted to know who UC84 was (T. 97).

36.   <u>Stolen Pre-Recorded Buy Money</u>: UC84 initially made no indication on direct or cross-examination that Mr. Fraser demanded money, but rather stated that Mr. Fraser inadvertently took the money that was folded up behind the license (T. 43-44). On redirect, however, UC84 testified that Mr. Fraser asked for money from him (T. 97). Thereafter, during re-cross, UC84 testified that Mr. Fraser demanded money before taking the license out of his hand (T. 102-03). UC84 tried to reconcile these inconsistencies by saying that "[t]his was a long conversation" (T. 103). He subsequently testified that Mr. Fraser asked for the money at the same time he asked to the see license (T. 104). UC84 did not understand the demand for money to be an offer to sell him drugs, but also was not an outright demand for UC84 to turn all of his money over to Mr. Fraser (T. 104-05).

37.   Defense counsel directly asked UC84 whether he believed that Mr. Fraser was robbing him (T. 104). UC84 responded: "I thought he wanted me just to give him the money and he was going to walk away" (T. 104).

> Additional Testimony

38.   <u>Detective Regina</u> essentially testified as he did at the suppression hearing, but provided one piece of conflicting testimony (T. 107). At trial, Regina also testified that UC84 informed him after the arrest that Mr. Fraser had stolen some of the pre-recorded

Fraser 000763

buy money (T. 129). Yet, at the suppression hearing he stated that UC84 did not tell him that any money had been stolen (T. 131).

39.  The People also called <u>Undercover Officer #17</u> ("UC17") and <u>Detective Jason Deltoro</u> (T. 142, 165). UC17 could not remember the night's events and provided little useful testimony, while Deltoro testified to a version of events similar to Regina's testimony at the hearing and trial (T. 161, 166-84).

40. <u>Boris Vestfrid</u>, a computer forensic analyst for the Manhattan District Attorney's office, testified that he received an iPhone in connection with this case, but he was unable to access it because it was passcode protected (T. 200, 205). He attempted to run a program on the phone to crack the passcode, but this was unsuccessful (T. 206). As such, the purported photograph of the license was never entered into evidence.

<u>Defense Case</u>

41.  Mr. Fraser did not testify at trial. Upon information and belief, he made this decision because he did not want to be confronted on the facts of his prior youthful offender adjudication.

<u>Charge Conference</u>

42.  The People requested that the jury be charged on third-degree robbery as a lesser included offense (T. 210). Defense counsel opposed the application, but the court agreed to give the charge (T. 210).

Fraser 000764

Summation

43.  Defense counsel's summation focused on characterizing the police officers as incredible (T. 211). Specifically, defense counsel argued that the whole case was built on UC84's implausible story: "This was a single person story that these charges ride on. The story is not supported by common sense, not by the evidence, and it clearly, at the end of all this, is tainted by a bias because Mr. Fraser interfered with [UC84's]  work" (T. 212). He further pointed out to the jury that UC84 was "textbook unreliable" because his story kept changing (T. 214-15, 19). He repeatedly implored the jury to find that the story did not make sense, highlighting the lack of corroborating evidence (T. 212-16).

44.  The People responded by repeatedly attempting to resolve the inconsistencies in the officers' testimony by asserting that they were credible (T. 238-242). Specifically, the prosecutor asserted that if the officers were lying, they would have come up with a better story:

> Why would we get this kind of piecemeal testimony that we got. Wouldn't [UC]17 say she watched what happened. Wouldn't Regina say I saw him toss the money. Wouldn't Deltoro? Wouldn't they all tell you a perfectly in sync story that made the defendant sound as bad as humanly possible? Wouldn't they all say I heard them say, Give me your money, or I'm going to fuck you up. Wouldn't they at least say that? They didn't say that because they're not lying to you (T. 245).

Fraser 000765

Deliberations & Verdict

45.   The jury commenced deliberations on November 23, 2015 (T. 274). Over the course of two days, the jury twice requested to hear UC84's testimony read back to them (T. 276, 287; see also Court File: Ct. Ex. III, V).

46.   Thereafter, the jury reached its verdict, acquitting Mr. Fraser of second-degree robbery but finding him guilty of third-degree robbery (T. 296).

Sentencing

47.   Mr. Fraser received an indeterminate sentence of two to six years' imprisonment (S. 18). He was nineteen years old at the time of sentencing (S. 13). He has since completed his sentence and was discharged from parole in December 2018.

Direct Appeal

48.   On June 18, 2018, Mr. Fraser perfected his direct appeal. He raised two appellate arguments: 1) that the suppression court erred in reopening the hearing and that suppression should have been granted; and 2) that his conviction was against the weight of the evidence because UC84 did not testify credibly (A.568-628).

49.   On December, 5, 2019, the Appellate Division, First Department, heard oral argument. As of April 30, 2019, that court has yet to issue a decision.

Post-Conviction Investigation

50.   Shortly before oral argument on Mr. Fraser's direct appeal, I became aware that Justice Laura Ward had granted my office's C.P.L. § 440.10 motion for another

Fraser 000766

client, Mr. Gary Harris, based the Manhattan District Attorney's office's failure to provide Mr. Harris's trial counsel with civil lawsuits against the police officers who arrested him. See Ex. B. I further learned that UC84 and Regina were also involved in Mr. Harris's arrest.

51. During the course of Mr. Harris's C.P.L. § 440.10 litigation, the trial prosecutor admitted that the Manhattan District Attorney's office was in possession of the lawsuits against Regina and UC84. See Ex. D (conceding possession of the lawsuits against Detective Rivera, who was sued together with UC84 two times). However, the People contended that it had determined the lawsuits were not "favorable material" to Mr. Harris and, therefore, did not require disclosure. See Ex. C at 8.

52. In light of Mr. Harris's C.P.L. § 440.10 motion, I conducted independent research on all of the officers in Mr. Fraser's case: UC84, Regina, Deltoro, UC17, Patane, and Lee. I discovered thirty-five lawsuits against the officers involved in Mr. Fraser's arrest, as well as one internal disciplinary proceeding and one suit by a former NYPD officer who alleged unlawful retaliation after reporting Patane's misconduct. Each of these officers has had multiple false arrest and other misconduct claims asserted against him, many of which the City settled for significant sums.

Lawsuits against UC84

53. UC84 was named as a defendant under this shield number in at least ten civil lawsuits that commenced before the trial here. In one of those case, UC84 was named

Fraser 000767

together with Regina. <u>See</u> Am. Compl., Baynes v. City of N.Y., et al., No. 12-cv-05903 (S.D.N.Y. Nov. 26, 2012) (A. 378). According to the complaint, UC84 approached the plaintiff, looking to buy drugs, and Mr. Baynes answered that he did not have any drugs and could not help the undercover. UC84 then purchased drugs from another individual nearby and tried to hand them to Mr. Baynes, who threw them on the ground and walked away. The field team, including Detective Regina, then apprehended Mr. Baynes nearby and violently cuffed him. At the precinct, he alleged, he was subjected to an unlawful strip search. Mr. Baynes was later charged with criminal sale of a controlled substance, but the grand jury declined to return a true bill and all charges against him were dismissed. <u>Id.</u> (A. 382). The case later settled (A. 392-93) for a sum, upon information and belief, of approximately $25,000.

54. These types of allegations against UC84 are not unique. For instance, in December 2009, UC84 was alleged to have fabricated evidence when an unlawful strip search did not turn up any contraband. <u>See</u> Compl., Cook v. City of N.Y., et al., No. 09-cv-10238 (S.D.N.Y. Dec. 12, 2009) (A. 104). All charges against Mr. Cook were eventually dismissed, and the civil lawsuit settled for $12,500 in September 2010. <u>Id.</u> at Docket Sheet Entry 10 (A. 110).

55. Similarly, in June 2010, UC84 was alleged to have participate in the unlawful arrest of Mr. Frederick Penn. <u>See</u> Compl., Penn v. City of N.Y., et al.,10-cv-4907 (S.D.N.Y. June 23, 2010); <u>see also</u> <u>id.</u> at Docket Sheet Entry 10 (A. 159, 177). All

Fraser 000768

charges against Mr. Penn were dismissed, and the civil lawsuit settled for $45,000 in February 2011. Id. at Stipulation (A. 178-79).

56. In March 2012, the City settled an excessive force lawsuit against UC84 for $22,500. See Stip. of Settlement, Best v. City of N.Y., 11-cv-05611 (S.D.N.Y. Mar. 14, 2012) (A. 296-98). There, Mr. Best alleged that UC84 both arrested him without probable cause and used excessive force to do so, i.e. UC84 slammed Mr. Best to the ground, punched him, and obstructed his breathing by placing a knee on his back. Id. at Compl. (A. 290). All of the misdemeanor marijuana charges were dismissed on speedy trial grounds. Id. (A. 291).

57. Thereafter, in August 2013, UC84 was alleged to have arrested another man without probable cause, as well as to have provided false information to the District Attorney's office. See Compl., Parris v. City of N.Y., et al., 13-cv-06696 (S.D.N.Y. Sept. 20, 2013) (A. 405). Although Mr. Parris was charged with undisclosed crimes, all of the charged were eventually dismissed. Id. (A. 407). The civil lawsuit was settled in June 2014 for an undisclosed amount. Id. at Stip. of Settlement (A. 413).

58. During the period after Mr. Fraser's arrest in October 2014 and the beginning of his trial in November 2015, four more false arrest and malicious prosecution lawsuits were filed against UC84. See Compl., Bahadur v. City of N.Y., et al., 15-cv-978 (S.D.N.Y. Feb. 10, 2015); Compl., Pieralisi v. City of N.Y., et al., 15-cv-3785 (S.D.N.Y. May 15, 2015); Compl., Wright v. UC84, et al., 15-cv-4498 (S.D.N.Y. June 10, 2015); Compl.,

Fraser 000769

Vasquez v. City of N.Y., et al., 15-cv-9207 (S.D.N.Y. Nov. 23, 2015) (A. 413, 419, 433, 451). In each of these cases, the allegations against UC84 are substantially similar, i.e. that he participated in the unlawful arrests of the plaintiffs and fabricated charges.

Lawsuits against Regina

59.   In addition to the lawsuit in which he was named with UC84, Regina has been a named defendant in at least fifteen other lawsuits, which the City has settled for an aggregate total of over $245,000 (A. 1-8).

60.   Many of these suits allege that Regina participated in both the unlawful arrests of and the falsifying of criminal complaints against the plaintiffs. The most notable of these lawsuits is Peterson v. Regina, in which Mr. Alvin Peterson alleged that Regina personally swore out a false complaint as the arresting officer in his false arrest. See Compl., Peterson v. Regina, et al., 10-cv-0162 (S.D.N.Y. Jan. 22, 2010) (A. 111). Mr. Peterson proceeded to trial on the charges in Regina's felony complaint, and he was acquitted. See id. (A. 114). The lawsuit settled for $10,000 in May 2013 (A. 119-23).

61.   Additionally, in February 2012, Regina was alleged to have personally pulled over a vehicle without reasonable cause and, thereafter, forcibly removed three men from the car to search them without lawful reason to do so. See Am. Compl., Bell, et al. v. City of N.Y., et al., 11-cv-01885 (E.D.N.Y. Feb. 17, 2012) (A. 289). After detaining the men for an unreasonable amount of time, Regina released them without charging them of violating any law. Id. This lawsuit included allegations of two other similar incidents

Fraser 000770

carried out by Regina's squad members. Id. The lawsuit was eventually settled, upon information and belief, for $17,500 (A. 323).

62.   As with UC84, these types of allegations against Regina are not unique. For instance, in June 2009, Regina was alleged to have arrested Mr. Bless Butler for criminal trespass while he was lawfully waiting for his foster brother in the lobby of his foster mother's apartment building. See Compl., Butler v. City of N.Y., et al., 09-cv-02559 (E.D.N.Y June 15, 2009) (A. 61). The criminal trespass charges were eventually dismissed, and the civil lawsuit settled for $15,000. Id. at Stip. of Settlement (A. 64, 73). Similarly, in May 2010, Mr. Jason Molina alleged that Regina participated in his false arrest, as well as the swearing out of a false complaint against him. See Am. Compl., Molina v. City of N.Y., et al., 10-cv-01379 (S.D.N.Y. June 15, 2010) (A. 141). The charges against Mr. Molina were likewise dismissed, and the civil lawsuit was settled for $10,000 in July 2010. Id.; see also id. at Stip. of Settlement (A. 153). Two years later, Regina was again alleged to have participated in the unlawful arrest of Mr. Sean Stewart, who was handcuffed in the back of a police cruiser for over an hour. See Am. Compl., Stewart v. City of N.Y., et al., 12-cv-0750 (E.D.N.Y. July 20, 2012) (A. 336). Thereafter, the officers provided false statements to the District Attorney's office, but no charges were ever filed against Mr. Stewart. Id. Upon information and belief, the City settled Mr. Stewart's lawsuit for $50,000 on June 2, 2014. See id. at Stip. of Settlement (A. 349).

Fraser 000771

63.  Twice, Regina has been alleged to have entered unlawfully into plaintiffs' homes. In May 2010,  Ms. Tetee Boyd and Mr. Edward Dossantos alleged that Regina entered their shared home without probable cause to do so. See Compl., Boyd, et al. v. City of N.Y., et al., 10-cv-02096 (E.D.N.Y. May 07, 2010) (A. 124). No charges were ever filed against the couple, and the civil lawsuit was settled for $14,000 in April 2012. See id.; see also id. at Stipul. of Settlement (A. 138). Over two years later, Regina again participated in the unlawful entry into a home, this time with weapons drawn. See Am. Compl., Bumbrey, et al. v. City of N.Y., et al., 10-cv-05188 (E.D.N.Y. Aug. 10, 2012) (A. 351). The officers destroyed the plaintiffs' personal property and charged them with undisclosed crimes, although all charges were eventually dismissed and sealed. Id. The City settled this lawsuit for an undisclosed amount on April 1, 2013. See id. at Stip. of Settlement (A. 374).

64.  In at least four lawsuits, Regina was alleged to have participated in the use of excessive force to effectuate unlawful arrests. See Am. Compl., Canelo v. City of N.Y., et al., 11-cv-00052 (E.D.N.Y. June 29, 2011); see also Compl., Hackshaw v. City of N.Y., et al., 10-cv-06006 (E.D.N.Y. July 8, 2011); Am. Compl., Walker v. City of N.Y., et al., 12-cv-00385 (E.D.N.Y. May 8, 2012); Am. Compl., Baynes v. City of New York, et al., No. 12-cv-05903 (S.D.N.Y. Nov. 26, 2012) (A. 223, 250, 325, 378).

Fraser 000772

Lawsuits against Deltoro

65.  Deltoro has also been a named defendant in three civil rights lawsuits, which the City settled for an aggregate total of $80,000. In one of these lawsuits, Patane was also a named defendant. See Am. Compl., Loglisci v. City of N.Y., et al., 09-cv-01220 (S.D.N.Y. June 9, 2009) (A. 77). There, Mr. Joseph Loglisci alleged that Deltoro participated in his unlawful arrest, during which officers left him handcuffed in the police car for five hours, strip-searched him at the precinct, and kept him in custody for six days. Id. Patane supervised this arrest and authorized charging Mr. Loglisci with Third-Degree Criminal Sale of a Controlled Substance, even though he was not in possession of any drugs. Id. Eventually, all charges were dismissed upon the District Attorney's motion, and the City settled the civil lawsuit for $50,000. Id.; see also id. at Stip. of Settlement (A. 88).

66.  In October 2009, Deltoro was alleged to have unlawfully entered into an NYCHA apartment, which was in the same housing complex where Mr. Fraser lives. See Compl., Nunez, et al. v. City of N.Y., et al., 09-cv-08798 (S.D.N.Y. Oct. 8, 2009) (A. 91). Despite not having a search warrant, the officers entered the apartment, with weapons drawn, and announced they were looking for someone who did not reside there. Id. Instead, the officers arrested the residents of the apartment, Ms. Miriam Nunez and Ms. Meagan Rivera. Id. The officers attempted to charge the women with weapons

Fraser 000773

possession, but the District Attorney's office declined to prosecute. Id. Thereafter, the City settled the lawsuit for $30,000. See id. at Stip. of Settlement (A. 101).

67.  Deltoro was also a named defendant in a lawsuit in which the plaintiff's leg was amputated after another officer repeatedly kicked plaintiff's already-injured leg, and Deltoro did not intervene. See Compl., Randolph v. City of N.Y., et al., 15-cv-9518 (S.D.N.Y. Dec. 4, 2015) (A. 470). The lawsuit—which was filed shortly before Mr. Fraser's trial began—further alleged that the officers used excessive force with Mr. Randolph after he "tried to blow [an undercover officer's] cover." Id. The civil lawsuit was eventually dismissed as duplicative of a state court action, which is still pending. See id. at Order of Dismissal (A. 481).

Lawsuit against UC17

68.  UC17 was named defendant in one civil lawsuit. See Compl., Williams v. City of N.Y., et al., 11-cv-02619 (S.D.N.Y. July 18, 2011) (A. 247). There, UC17 participated in the unlawful arrest of Mr. Anthony Williams, who was playing chess in Washington Square Park. Id. Mr. Williams was subject to a strip-search at the precinct, and the officers subsequently provided false information to the District Attorney's office. Id. Mr. Williams settled the lawsuit with the City for $5,000 on September 9, 2011. See id. at Stip. of Settlement (A. 285).

Fraser 000774

Lawsuits against Lee

69.  Lee was a named defendant in at least four lawsuits, which the City settled for an aggregate total of $100,000 (A. 1-8). As with other officers on his team, Lee was alleged to have participated in false arrests and malicious prosecutions, as well as to have used excessive force (A. 1-8).

70.  For instance, in March 2007, Lee used his weapon to unlawfully arrest Mr. Jesus Cubero while on plainclothes patrol, and Lee never announced himself as NYPD. See Compl., Cubero v. City of N.Y., et al., 07-cv-027640 (S.D.N.Y. Mar. 29, 2007) (A. 43). Thereafter, Lee and the other officers beat Mr. Cubero with their radio so severely that Mr. Cubero was transported to the hospital while still in police custody. Id. All of the charges against Mr. Cubero were eventually dismissed, and City settled the civil lawsuit for $45,000 in November 2007. See Stip. of Settlement, id. (A. 58).

71.  Additionally, on three occasions before trial in Mr. Fraser's case, Lee was alleged to have participated in the fabrication of false charges against plaintiffs who had not committed any crimes. See Compl., McIlwain v. City of N.Y., et al., 10-cv-07964 (S.D.N.Y. Oct. 15, 2010); Compl., Gonzalez, et al. v. City of N.Y., et al., 10-cv-09039 (S.D.N.Y May 17, 2011); Compl., Vera v. City of N.Y., et al., 12-cv-06925 (S.D.N.Y. Feb. 8, 2013) (A. 181, 207, 394). In each of these cases, the underlying criminal charges with either dismissed or the grand jury refused to return a true bill. Id.

Fraser 000775

Lawsuits & Other Allegations of Misconduct against Patane

72.  In addition to the lawsuit in which he was named with Deltoro, Patane was a named defendant in at least two other lawsuits (A. 1-8). In both, Patane was alleged to have supervised officers who used excessive force or unlawfully strip-searched the plaintiffs. See Compl., Arnold v. City of N.Y., et al., 06-cv-02729 (S.D.N.Y. Apr. 7, 2006); see also Compl., Henderson v. City of N.Y., et al., 11-cv-01611 (S.D.N.Y. Mar. 7, 2011) (A. 19, 198). The City settled these lawsuits for an aggregate total of $50,651. See Settlement Stip., Arnold, supra; see also Settlement Stip., Henderson, supra (A. 30-31, 203-04).

73.  Moreover, five weeks after Mr. Fraser's arrest, Patane was subject to censure by the Internal Affairs Bureau for failing to report misconduct by another member of his team. See Disposition of Disciplinary Proceedings (A. 567). Additionally, IAB concluded that Patane failed both to maintain properly his activity log and to ensure that evidence was properly vouchered (A. 567). The imposed penalty was a forfeiture of twenty-five vacation days (A. 567).

74.  Lastly, another NYPD detective named Patane as a defendant in a lawsuit, in which the detective alleged that the NYPD retaliated against him for reporting Patane's misconduct. See Dec. & Order, McAvoy v. City of N.Y., et al., 11-cv-04819 (S.D.N.Y. July 19, 2013) (A. 547). Specifically, the officer informed the NYPD that Patane stole $5,000 from a suspect's home while executing a search warrant. Id.

Fraser 000776

*****

75. A chart summarizing these claims has been provided in the Appendix accompanying this motion (A. 1-9).

### Discussions with Defense Counsel

76. On November 27, 2018, I contacted Mr. Fraser's trial counsel, Geoffrey Stewart, to determine whether the People had withheld these civil suits in Mr. Fraser's case, as they did in Mr. Gary Harris's case. On November 30, 2018, Mr. Stewart informed me that he did not recall being provided with any lawsuits but that he would check his trial file.

77. After multiple attempts to follow-up with Mr. Stewart, he informed via email on March 25, 2018, that the People turned over two of these lawsuits prior to trial, namely Penn and Baynes.

78. Thereafter, on March 26, 2018, Mr. Stewart and I spoke by phone, and he informed me that he mistakenly believed that these were the only two lawsuits against the officers. He assumed that, if the prosecutor was making a Garrett disclosure, then he would have provided all of the lawsuits against the officers.

79. Had Mr. Stewart been provided with all thirty-five of the lawsuits against the officers, he advised me that he would have sought to use the allegations in those suits to impeach the officers. He believed that the sheer number of lawsuits would have lent itself to effective cross-examination and would have persuaded the jury that the officers

Fraser 000777

were not being truthful.  Instead, Mr. Stewart did not use the two lawsuits to impeach UC84 and Regina because he did not want to "quibble" with them about the allegations—Mr. Stewart believed that he would ask the officers about the allegations in Penn and Baynes, and they would deny the allegations or give evasive answers. However, Mr. Stewart believed that the officers could not have done this if he been able to confront the officers with the totality of the civil lawsuits against them.

WHEREFORE, for the reasons stated herein and in the accompanying Memorandum of Law, Mr. Fraser's judgment of conviction should be vacated and a new trial held.


DATED: New York, New York
          May 1, 2019                        _____

                                                    Jacqueline Meese-Martinez

Fraser 000778