**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

JAWAUN FRASER,

                Plaintiff,

    -against-

                                     No. 20-cv-04926 (CM)

CITY OF NEW YORK; UNDERCOVER OFFICER
NUMBER 84; MATTHEW REGINA; AND JASON
DELTORO

                Defendants

_____

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

McMahon, C.J.:

Following an altercation on the evening of October 21, 2014, several narcotics officers from the New York Police Department – three of whom are defendants in this lawsuit – arrested Plaintiff Jawaun Fraser for robbery. Fraser was indicted and convicted at trial; the principal evidence against him was the testimony of these officers. He served two years in prison for the conviction.

In 2019, Fraser sought post-conviction relief in New York state court, after learning that the Manhattan District Attorney's Office had failed to disclose that members of the narcotics team had been sued no fewer than thirty-five times in federal court for allegedly falsifying evidence, making false statements, and making unlawful arrests. (Compl. at ¶ 80). The three defendant officers in this action, who had testified against Fraser, had been sued no fewer than twenty-nine times. (Compl. at ¶ 81–83). Had he known about these lawsuits, Fraser claims, he could have used them to impeach the officers' testimony, which might have led to an acquittal.

1

The New York Supreme Court granted Fraser's motion, holding that the civil lawsuits were material exculpatory evidence, and that the Manhattan DA had violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose them. The court vacated Fraser's robbery conviction. He was not retried.

Fraser now brings suit under 42 U.S.C. § 1983 against the three officers who had arrested him and testified against him, arguing that they violated their *Brady* obligations as police officers. He also sues the City of New York based on the policies of the NYPD and the Manhattan DA's Office that purportedly led to his conviction.

The defendants have filed a motion for a judgment on the pleadings on Fraser's *Brady*-dependent claims, arguing that Fraser's complaint does not state a claim upon which relief can be granted. That motion is denied.

## I.   BACKGROUND

### A.  The Parties

Plaintiff Jawaun Fraser is a resident of New Jersey.

The three individual defendants: Matthew Regina, Jason Deltoro, and Undercover Officer Number 84 ("UC 84"), were at all relevant times employed as narcotics officers with the NYPD.

Fraser has also sued New York City under a theory of municipal liability for the actions of the NYPD and the Manhattan DA's Office. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978).

### B.  Allegations

Jawaun Fraser was arrested on the evening of October 21, 2014 following an interaction with UC 84 on the Lower East Side of Manhattan. Fraser claims that UC 84 approached him that evening in plainclothes and asked to purchase narcotics because he needed a "fix." (Compl. at ¶¶

19–23). Fraser refused, and denied that he was selling drugs. But UC 84 was insistent and handed Fraser his photo identification to prove that he was not a police officer. Fraser alleges that when he took out his iPhone to take a picture of the I.D., UC 84 suddenly grabbed his wrist, causing Fraser to be alarmed and to drop the I.D. to the ground. Several other plainclothes police officers – among which included defendants Regina and Deltoro – then then rushed towards Fraser, further increasing his alarm and causing him to flee. (Compl. at ¶ 31). After the officers apprehended Fraser, they searched him but did not find any narcotics. (Compl. at ¶ 32).

Fraser alleges that – in order to justify the arrest – UC 84, Regina, and Deltoro created an entirely false story about how Fraser had robbed UC 84 of his I.D. and $20 in cash. (Compl. at ¶ 34). According to Fraser, Regina falsely claimed that he had found UC 84's I.D. on Fraser's person when he was arrested, even though the I.D. had fallen to the ground earlier. All three defendants also created false documents to support the story and Regina and UC 84 testified falsely to the grand jury to support an indictment. (Compl. at ¶¶ 35, 37, 48). These actions resulted in an indictment against Fraser for second-degree robbery on October 29, 2014, in violation of N.Y. Penal Law 160.10(1). (Compl. at ¶ 47).

Prior to trial, Fraser's defense counsel made a general request for *Brady* material.  As part of the disclosures, Assistant District Attorney Gregory Sangermano provided Fraser with the names of two federal civil rights lawsuits that had been filed against some of the testifying officers: *Penn v. City of New York*, 10-cv-4907 (RJS); and *Baynes v. City of New York*, 12-cv-5903 (RJS). UC 84 was a defendant in the *Penn* case, and both UC 84 and Regina were defendants in the *Baynes* case. (Compl. at ¶¶ 56–57). Like Fraser's allegations, the plaintiffs in both lawsuits claimed

that the defendant officers had fabricated stories to support otherwise unlawful arrests and prosecutions. Both cases settled soon after they had been filed.[1]

Trial began on November 17, 2015, where UC 84, Regina, and Deltoro all testified.

UC 84 testified that Fraser had threatened him and had forcibly taken his I.D., as well as $20 in marked buy money that UC 84 was carrying as part of the narcotics operation. (Compl. at ¶ 62). Regina testified that he observed the events described by UC 84, and that he found UC 84's I.D. in Fraser's possession. (Compl. at ¶ 63). Deltoro testified about how he and other officers moved in to arrest Fraser after UC 84 gave a non-verbal distress signal, and how he saw UC 84 and Fraser "grappling" with each other. (Compl. at ¶ 64).

Following the presentation of evidence, the jury deliberated for a full day and had to be read an *Allen* charge to alleviate an apparent deadlock. On November 24, 2015, it found Fraser not guilty of robbery in the second degree but found him guilty of the lesser-included offense of robbery in the third degree, in violation of N.Y. Penal Law 160.05. (Compl. at ¶ 70).

On January 13, 2016, Fraser was sentenced to a term of two to six years in prison and served approximately two years in custody before being released on parole. (Compl. at ¶¶ 74–75).

In May 2019, Fraser's appellate counsel moved to vacate Fraser's conviction under New York Criminal Procedure Law § 440.10, on the basis that the prosecution had failed to disclose *Brady* material to Fraser's defense counsel. The appeal claimed that the prosecution had only disclosed two of no less than thirty-five lawsuits that had been filed against members of the narcotics team that had arrested Fraser. (Compl. at ¶ 80). Of those thirty-five suits, ten had named UC 84 as a defendant; sixteen named Regina as a defendant; and three named Deltoro as a defendant. (Compl. at ¶¶ 81–83). Most of these lawsuits alleged what Fraser had claimed as his

---

[1] This was not a fact that Fraser alleged in his complaint, but a court may take judicial notice of complaints filed in other public lawsuits in deciding a motion to dismiss. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

defense at trial – that the officers deliberately lied and fabricated stories to support their otherwise unlawful arrests of innocent civilians.

In response to the § 440 motion, ADA Sangermano acknowledged that, prior to trial, a search conducted by the Manhattan DA's Office had found thirteen lawsuits against the officers involved in Fraser's arrest. (Compl. at ¶¶ 84–85). Sangermano claimed that he had disclosed these thirteen lawsuits to Fraser's defense, but Fraser denied that was the case. Yet, regardless of whether these thirteen lawsuits had been disclosed, the DA's Office conceded that it also had constructive knowledge of at least an additional twelve lawsuits filed against Officer Regina that it did not disclose. One of these lawsuits also named UC 84 as a defendant. These lawsuits raised claims based on allegedly false arrests, malicious prosecutions, uses of excessive force, and illegal strip searches. *See People v. Fraser*, Ind. No. 4844/14 at 3 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019).

On December 6, 2019, Justice Robert M. Stoltz of the New York County Supreme Court granted Fraser's motion and vacated his conviction for robbery in the third degree, holding that the State violated *Brady* by failing to disclose the twelve lawsuits for which it had constructive knowledge.[2] Judge Stoltz thus vacated Fraser's robbery conviction, holding that "the suppressed lawsuits were material and that defendant was prejudiced by his inability to cross-examine the officers about instances of misconduct." *Ibid*.

---

[2] Justice Stoltz's opinion begins by mentioning that Fraser claims he discovered "at least 35 civil lawsuits alleging misconduct by UC/84, Regina, and other members of the field team." *People v. Fraser*, Ind. No. 4844/14 at 3 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019). However, Justice Stoltz only specifically details twenty-five of these thirty-five lawsuits: the twelve lawsuits for which the Manhattan DA had constructive knowledge but were not disclosed, and the thirteen lawsuits over which the State and Fraser contest suppression. This discrepancy in the number of lawsuits goes unexplained in Justice Stoltz's opinion. Fraser, in his civil complaint, now claims that the Manhattan DA had constructive knowledge of *twenty-two* (not twelve) lawsuits. (Compl. at ¶¶ 86–87).

The State of New York decided not to retry Fraser. Instead, Fraser entered into a plea agreement where he pled guilty to disorderly conduct – a violation that is not a criminal offense. *See* N.Y. Penal Law § 240.20.

## C. Current Proceedings

Fraser commenced this instant action on June 26, 2020. At the time of filing, Fraser claims that he had uncovered at least thirty-eight lawsuits alleging civil rights violations against the six officers of the narcotics team that had arrested him in 2014 – three more than was considered by Justice Stoltz. (Compl. at ¶ 111).

Fraser alleges five distinct causes of action: § 1983 claims against the individual defendants for (1) denial of liberty and due process (Count I); (2) malicious prosecution (Count II); and (3) denial of a fair trial due to *Brady* (Count III); and *Monell* claims against the City for (4) the NYPD's involvement in the *Brady* violation (Count IV); and (5) the Manhattan DA's involvement in the *Brady* violation (Count V).

On March 1, 2021, the defendants moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). They did not move to dismiss all of the claims, only the counts that implicate *Brady* (Counts III through V). They insist – contrary to the New York court's ruling – that there has been no *Brady* violation that can give rise to any § 1983 or *Monell* claim.

As part of the defendants' motion for judgment on the pleadings, they also moved to stay *Monell* discovery pending the resolution of their motion. This Court has already denied that request for a stay, holding that defendants' failure to move to dismiss the *Monell* claims until March 1, 2021 – which was only 12 weeks away from the discovery deadline – appeared "to have been belatedly made in order to try to avoid producing long-promised *Monell* discovery." (Dkt. No. 36).

For the reasons that follow, the rest of defendants' motion is denied.

## II.    DISCUSSION

### A.  Legal Overview

1.  <u>Standard of Review</u>

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). In deciding such a motion, a court presumes all well-pleaded facts to be true and draws all reasonable inferences in favor of the pleader.

To survive a motion for a judgment on the pleadings, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.* Iqbal, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*. (citing *Twombly*, 550 U.S. at 556).  The complaint "does not need detailed factual allegations," but must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id*. at 570; *Iqbal*, 556 U.S. at 680.

2.  *Brady*

 " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

ensued.' " *Poventud v. City of New York*, 750 F. 3d 121, 133 (2d Cir. 2014) (en banc) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)).

Given that a state post-conviction court has already established that there *was* a *Brady* violation, one might wonder why that decision does not preclude defendants from arguing in this litigation that there has not been a *Brady* violation. But any doctrine of preclusion – whether that be collateral estoppel or law-of-the-case – requires the party against which the preclusion is applied to have been a party in both litigations. For a New York state court decision to have preclusive effect in federal court, "the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (citation omitted).

The defendants, here (the City and the individual officers), were not parties to Fraser's criminal proceedings, and thus had no ability to present their positions. The analysis is fundamentally different: a "State Court's decision does not prevent Defendants from asserting in this proceeding that the facts do not support a finding of a constitutional violation *entitling Plaintiff to damages*." *Poventud v. City of New York*, No. 07-cv-3998 (DAB), 2015 WL 1062186, at *6 (S.D.N.Y. Mar. 9, 2015) (emphasis added).

Federal courts have therefore always independently evaluated the appropriateness of § 1983 claims against individual or municipal defendants, even if a state post-conviction court has held that the *State* had violated *Brady* in obtaining a criminal conviction. *See, e.g., Poventud*, 2015 WL 1062186 at *6; *Anderson v. City of Rockford*, 932 F.3d 494, 500–01 (7th Cir. 2019); *Burge v. St. Tammany Parish*, 336 F.3d 363, 368–69 (5th Cir. 2003).

Several Courts of Appeals have held that, for a police officer to be liable under § 1983 for a *Brady* violation, there needs to be proof that the officer either intentionally suppressed the

evidence or otherwise acted in bad faith. *See, e.g., Jean v. Collins*, 221 F. 3d 656, 663 (4th Cir. 2000) (en banc) (per curiam) (Wilkinson, J. concurring); *Porter v. White*, 483 F. 3d 1294, 1306–07 (11th Cir. 2007); *cf Armstrong v. Daily*, 786 F.3d 529, 539–40 (7th Cir. 2015). This effectively adds an element to the traditional *Brady* analysis, which – in the criminal context – requires a State to disclose exculpatory evidence "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

The Second Circuit has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F. 3d 727, 751 n.23 (2d Cir. 2019); *see also Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2017) (summary order). Ultimately, regardless of whether Fraser needs to plead that the defendant-officers acted intentionally, his complaint survives defendants' motion to dismiss.

### A.  Count III of the Complaint States a § 1983 Claim Against the Individual Defendants for a *Brady* Violation

Count III alleges that the officer-defendants violated their *Brady* obligations by intentionally failing to disclose that they had been sued multiple times for allegedly falsifying evidence in other criminal proceedings. Since Fraser's defense at trial centered on the officers' credibility, he claims that had he known about the lawsuits, he would have used them to impeach the officers' testimonies against him. But since the lawsuits were withheld, it unjustly led to Fraser's conviction and incarceration.

The defendant-officers do not assert a qualified immunity defense at this stage of the litigation. They also do not dispute that the existence of the civil lawsuits could have been used for impeachment purposes, or that their non-disclosure prejudiced Fraser – satisfying the first and third parts of a traditional *Brady* analysis. *See Poventud*, 750 F. 3d at 133.

Instead, they make two arguments contending that the lawsuits were not "suppressed": First, that no civil lawsuit that has been publicly docketed can ever be considered "suppressed" for purposes of *Brady*; and second, that police officers – as a matter of law – do not have an obligation under *Brady* to disclose their involvement in unrelated civil rights lawsuits. (Dkt. No. 33 at 7–8, 12). Neither argument is sufficient.

1.  Public Records Can Be "Suppressed" for Purposes of *Brady*

Defendants rely mostly on an unpublished Second Circuit summary order, *Layton v. Philips*, 340 F. App'x 687 (2d Cir. 2009), as standing for the proposition that almost nothing in the public record can be "suppressed" for purposes of *Brady*. Since the lawsuits against the defendant-officers were civil rights lawsuits filed in federal court, defendants contend that a simple search would have alerted Fraser or his lawyer to their existence. In essence, defendants claim that Fraser's allegations do not state a claim because it was his lawyer's incompetence – not a *Brady* violation – that led to his inability to use the lawsuits as impeachment material.

In *Layton*, an inmate seeking habeas relief alleged that New York had violated *Brady* because the prosecutor failed to disclose "the fact that the victim had filed a civil lawsuit against [the inmate] by the time of the criminal trial." *Id*. at 688. The district court denied Layton's habeas petition, holding that not only was there no reason why Layton would have been unaware of a lawsuit filed against *him*, but also that the absence of the lawsuit from the evidentiary record did not materially affect his receiving a fair trial. *Layton v. Philips*, No. 04-cv-4032 (DRH), 2008 WL 413785, at *6–7 (E.D.N.Y. Feb. 13, 2008).

The Second Circuit affirmed, holding that there was no *Brady* violation because, "Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take

advantage of that evidence." *Layton*, 340 F. App'x at 689 (quoting *United States v. Gonzalez*, 110 F. 3d 936, 944 (2d Cir. 1997)). Since Layton was the defendant in the civil lawsuit, and there was no indication that he had not been properly served, he would have had reason to know of the lawsuit.

These facts show that *Layton* – besides being an unpublished summary order – is wholly inapplicable to the case at hand.

First, unlike Layton, Fraser is not alleging that the suppressed evidence was a lawsuit involving *him*, but rather multiple lawsuits filed by total strangers against the defendant-officers who testified against him. Layton clearly had reason to know of a lawsuit in which he was the defendant; the same is not true for Fraser with respect to the lawsuits filed against the testifying officers.

Second, and more critically, Second Circuit precedent establishes that a "government's duty to produce [exculpatory material]" is not "eliminated by that document's availability in a public court file." *United States v. Payne*, 63 F. 3d 1200, 1209 (2d Cir. 1995). The true standard – also articulated in *Layton*, but conveniently ignored by defendants – is whether the defendant or his counsel "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Payne*, 63 F.3d at 1208 (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)); *see also DiSimone v. Philips*, 461 F.3d 181, 198 (2d Cir. 2006).[3]

---

[3] Many of the other cases that defendants cite to in an attempt to persuade the Court for their incorrect proposition also follow this general rule. *See, e.g., United States v. Esposito*, 834 F.2d 272, 275 (2d Cir. 1987) (no suppression because the litigant "had actual possession of the transcripts prior to trial"); *United States v. Teman*, 465 F. Supp.3d 277, 342–43 (S.D.N.Y. 2020) (noting that the main reason why there was no *Brady* violation was because the government did not have the evidence in its possession, but had "disclosed what it had"); *United States v. Svendsen*, 72 F. Supp.2d 149, 160 (E.D.N.Y. 1999) (noting that the alleged *Brady* material was "irrelevant to Svendsen's defense" anyways).

Thus, whether documents in the public record are "suppressed" for purposes of *Brady* is evaluated under the same metric as any other piece of evidence. Whether Fraser actually knew or should have known about the lawsuits filed against the officers is an issue of fact that will be decided at a later stage of the proceedings. *See, e.g., Rosario v. City of New York*, No. 18-cv-4023 (LGS), 2019 WL 4450685, at *5 (S.D.N.Y. Sep. 16, 2019) (denying motion to dismiss). But when looking solely at Fraser's complaint – as a court must at this stage of the proceedings – he has sufficiently alleged that he did *not* know about the lawsuits, and that the individual officers "suppressed" them by withholding that information from prosecutors.

Fraser's complaint contains detailed allegations against each of the officer-defendants. Fraser alleges that members of the narcotics team of which UC 84, Regina, and Deltoro were members had been named as defendants in no less than 38 lawsuits in total – 23 of which had "alleged that police officers had fabricated evidence." (Compl. at ¶ 112). Of the 38 total lawsuits, Regina "knew that he had been sued at least 14 times"; UC 84 "knew that he had been sued at least eight times"; and Deltoro "knew that he had been sued at least five times." (Compl. at ¶¶ 114, 117, 120). Of these suits, at least two had alleged that Regina made false statements to support otherwise unlawful arrests/prosecutions, but Regina did not disclose them to ADA Sangermano. (Compl. at ¶ 116). Six had alleged that UC 84 had made false statements or fabricated evidence, and three had alleged the same of Deltoro; yet neither UC 84 nor Deltoro had disclosed these lawsuits to Sangermano. (Compl. at ¶¶ 119, 123).

ADA Sangermano's ignorance of these lawsuits resulted in his failure to disclose them to Fraser's defense counsel. And since the main evidence against Fraser was the testimony of these three officers, his inability to impeach their credibility by referencing these lawsuits could have resulted in the guilty verdict from the jury. These allegations are sufficient to state a claim.

2.  <u>Police Officer-Witnesses Have an Obligation to Disclose Potential Impeachment
    Evidence to Prosecutors</u>

In the alternative, defendants argue that the lawsuits could not have been "suppressed"
because – as a matter of law – police officers have no obligation to disclose civil lawsuits unrelated
to their investigation of the defendant.

It is technically true that police officer witnesses have no obligation to disclose anything
directly to a criminal defendant; it is the prosecution's obligation to make that disclosure. But
"When police officers withhold exculpatory or impeaching evidence from prosecutors, they may
be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*."
*Bellamy*, 914 F. 3d at 751; *see also Bermudez v. City of New York*, 790 F. 3d 368, 376 n.4 (2d Cir.
2015); *Poventud*, 750 F. 3d at 128. The question here is whether that obligation extends to
requiring testifying officers to disclose civil lawsuits filed against them that alleged that they had
falsified evidence – whether such lawsuits can be considered "exculpatory or impeaching."
*Bellamy*, 914 F.3d at 751.

The answer is clearly yes.

The Supreme Court established in *Giglio v. United States*, 405 U.S. 150 (1972), that where:

> the Government's case depend[s] almost entirely on [an individual's] testimony;
> without [which] there could have been no indictment and no evidence to carry the
> case to the jury. [The individual's] credibility as a witness [is] therefore an
> important issue in the case . . . and the jury [is] entitled to know of it. *Id*. at 154–55.

If police officers are the main witnesses for the prosecution, then the credibility of those
officers is undoubtedly "an important issue in the case." *Id*. at 155. Similarly, there is no doubt
that multiple allegations that an officer has falsified evidence or testified falsely in other criminal
cases would bear on that officer's "credibility as a witness." *Ibid*.; *see also Milke v. Ryan*, 711 F.3d
998, 1012 (9th Cir. 2013) (holding that the personnel file of a testifying officer detailing that he

had been suspended for sexual misconduct – and that he had lied about it – was impeachment evidence that needed to be disclosed); *cf United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008) (noting that materials relating to an officer's misconduct investigation were favorable to the defense, but that there was no *Brady* violation because there was overwhelming evidence of guilt).

Put simply, for purposes of § 1983, "police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), and evidence that bears on the credibility of testifying officers – if they are key witnesses – constitutes potentially exculpatory evidence under *Giglio*. An officer does not need to disclose the impeachment evidence directly to the defense, but *must* share that information with the prosecution.

Defendants contend that no such obligation exists under New York state law, citing a New York Court of Appeals case, *People v. Garrett*, 23 N.Y.3d 878, 890 (2014).

The facts in Garret are similar to ours. Garrett was convicted at trial in 2000 of depraved indifference murder and felony murder, based in part on a confession obtained by Detective Vincent O'Leary. In December 2009, Garrett moved for post-conviction relief under New York CPL § 440.10, arguing that the prosecution had failed to disclose the existence of a federal civil rights lawsuit against O'Leary – filed before Garrett's trial – that had alleged "that O'Leary coerced the plaintiff . . . into confessing to third-degree arson by repeatedly striking [the plaintiff] in the head with a telephone book while he was handcuffed and physically forcing him to sign a written confession." *Id*. at 883. Since O'Leary had been part of the team that obtained Garrett's confession and had testified at trial, Garrett claimed that the government's nondisclosure of the lawsuit violated *Brady* and *Giglio*.

The New York Court of Appeals disagreed with Garrett, holding that the State has "no affirmative duty to search the dockets of every case in every federal and state court in New York for complaints against their police witnesses." In declining to "construe the [State's] *Brady* obligations so broadly," the Court concluded that " '[I]t is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case.' " *Id*. at 890 (quoting *United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010)). Critical to the Court's holding was its view that "there is a distinction between the nondisclosure of police misconduct 'which has some bearing on the case against the defendant,' and the nondisclosure of such material which has 'no relationship to the case against the defendant, except insofar as it would be used for impeachment purposes.' " *Id*. at 889 (citations omitted).

Unfortunately for defendants, the Court of Appeals' decision has no implication for the § 1983 case currently before this Court.

First, both *Garrett* and *Robinson* – the Fourth Circuit case *Garrett* relied upon – involved post-conviction proceedings that scrutinized a prosecutor's actions, not the actions of police officers for purposes of § 1983. They concerned questions of whether an officer's knowledge could be imputed onto the prosecution, not whether the individual officer had violated any actionable duty under § 1983. As discussed, police officers have a clear, independent duty to share with the prosecution any potentially "exculpatory or impeaching evidence" they possess. *See, e.g., Bellamy*, 914 F.3d at 751. The fact that the impeachment evidence consists of allegations against the testifying officers themselves is immaterial to whether Fraser has sufficiently pled a constitutional violation for § 1983 purposes against the officer defendants.

Second, I am unpersuaded by the "distinction" noted in *Garrett* between allegations of misconduct "which has some bearing on the case against the defendant" and those that apparently have "no relationship" to the defendant "insofar as it would be used for impeachment purposes." As long as the evidence could be used to impeach a key witness, a police officer is obligated to share that information with the prosecutor because "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Payne*, 63 F.3d at 1210 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). It makes no difference whether material directly implicates physical evidence in the case, or whether it impeaches a key witness who happens to be a testifying officer. The distinction in *Garrett* is one that – to my knowledge – no federal court assessing § 1983 claims has ever made. Put simply, police officers who are key prosecution witnesses in a criminal trial are obligated under *Brady* to disclose the existence of civil lawsuits or other allegations of misconduct filed against them that bear on their credibility.

Granted, not *all* evidence that could be used for impeachment purposes will necessarily be disclosed to the defendant. Prosecutors are "charged with the task of determining which evidence" will ultimately be material *Brady* evidence that must be shared with the defense. *Walker*, 974 F.2d at 299. But a *police officer* satisfies his obligations under *Brady* only if the officer turns over all exculpatory evidence in his possession to the prosecutor. *Ibid*.

Here, the defendant officers do not contest that the nondisclosed lawsuits were material to Fraser's case. (Dkt. No. 38 at 2 n.1). And Fraser has alleged that they "had a constitutional duty to inform the prosecution of information known to them that was favorable" to Fraser, but that they "failed to disclose such civil lawsuits to the prosecutor . . . intentionally." (Compl. at ¶¶ 126, 130). The failure to disclose was "material to the outcome of the trial" and "was a substantial and

proximate cause" of Fraser's injuries. (Compl. at ¶¶ 128–29). These allegations are sufficient to survive a motion for judgment on the pleadings. The motion to dismiss Count III is denied.

### B.  Counts IV and V of the Complaint State Claims Against the City

"*Monell* does not provide a separate cause of action . . . it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). To state a claim for municipal liability under *Monell*, a plaintiff must allege: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). Since "*Monell* expressly prohibits *respondeat superior* liability for municipalities . . . a plaintiff must demonstrate that 'through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id*. at 98 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla v. Brown*, 520 U.S. 397, 404 (1997)).

Counts IV and V allege that New York City is liable for the unconstitutional policies of the NYPD and Manhattan DA's Office – specifically, that neither agency required police to disclose, or prosecutors to inquire about, potential impeachment evidence in the form of civil lawsuits against testifying officers.

### 1.  Count IV states a claim for relief based on the policies of the NYPD

A municipality can be liable under *Monell* for the policies of its police department. *See, e.g, Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Count IV states a *Monell* claim based on the NYPD's policy of not making "timely disclosure to prosecutors of material evidence or information favorable to criminal defendants, including evidence or information impeaching the credibility of prosecution witnesses, including

the police officers themselves." (Compl. at ¶ 133). Although "policymaking officials at the NYPD knew that members of the force often acted as essential witnesses in criminal prosecutions and that many of them face, or have faced, lawsuits alleging they engaged in various types of misconduct, including fabricating evidence" and "other acts of dishonesty," the NYPD "adopted no policy . . . requiring such police witnesses to provide such civil lawsuit information to District Attorneys or Assistant District Attorneys." (Compl. at ¶¶ 135–36).

Fraser alleges that the NYPD's policy – really the absence of a policy requiring certain impeachment evidence to be disclosed – resulted in the *Brady* violation in his case, and amounted to "deliberate indifference to the constitutional rights" of citizens who are "prosecuted for alleged criminal activities." (Compl. at ¶ 146). As discussed above, individual officers have a duty to share exculpatory or impeachment evidence with the prosecution. Therefore, a city could be liable if its police department does not have an adequate policy ensuring that officers are aware of such a duty and that such disclosures are consistently made. *Monell* liability exists "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Ibid*.

It remains to be seen whether policymakers at the NYPD truly had such a policy (or lack thereof) or were actually indifferent to the alleged constitutional violations taking place under their watch. But we are not at present dealing with the merits. We are dealing with the pleadings. Looking only at them, Fraser has more than sufficiently alleged a *Monell* claim based on the NYPD's actions. *See, e.g., Buari v. City of New York*, 18-cv-12299 (MKV), 2021 WL 1198371, at

*25 (S.D.N.Y. Mar. 30, 2021) (denying motion to dismiss because plaintiff alleged that the NYPD

failed "to train officers on *Brady* obligations" or to "disclose *Brady* material").

   2.   Count V states a claim for relief based on the policies of the Manhattan District
        Attorney's Office

The Second Circuit recently held that New York City is the proper defendant for

constitutional violations resulting from allegedly unlawful policies enacted by the Queens District

Attorney's Office. *Bellamy*, 914 F.3d at 757. The plaintiff in *Bellamy* was originally convicted of

murder in state court, but the conviction was vacated after newly discovered evidence implicated

another individual as the murderer. *Id*. at 734. Bellamy sued the City, arguing that it was liable

under *Monell* for the actions of the Queens DA, which had failed to disclose that a witness against

Bellamy had been promised $2,800 in exchange for her testimony. Although Bellamy's criminal

conviction had not been vacated based on a *Brady* violation, his § 1983 suit claimed that the DA's

Office had a policy of not disclosing certain types of impeachment evidence to the defense, which

contributed to his wrongful conviction.

   The City argued that it could not be "liable as a matter of law for any constitutional harms

inflicted by the alleged policies of the [Queens DA's] office . . . because those were not policies

for which the City is responsible." *Id*. at 756–57. The district court agreed and dismissed the

lawsuit. The Second Circuit reversed, and allowed the lawsuit to proceed, holding that, "the actions

of county prosecutors in New York are generally controlled by municipal policymakers for

purposes of *Monell*, with the narrow exception . . . being the decision whether, and on what

charges, to prosecute." *Id*. at 759. Because prosecutors' actions are "generally controlled by

municipal policymakers for purposes of *Monell*," *ibid*, "the City is the proper policymaking

authority for purposes of Bellamy's *Monell* claims," *id.* at 761.

Following *Bellamy*, district courts in this Circuit have consistently refused to dismiss *Monell* claims alleging that a county prosecutor's office has sanctioned an unlawful practice. *See, e.g., Galgano v. Cnty. of Putnam*, No. 16-cv-3572 (KMK), 2020 WL 3618512, at *10 (S.D.N.Y. July 2, 2020) (falsifying warrant applications and incentivizing witnesses to fabricate allegations); *O'Hara v. City of New York*, No. 17-cv-4766, 2019 WL 2326040, at *9 (E.D.N.Y. May 31, 2019) (fabricating evidence, intimidating witnesses, and eliciting false testimony); *Newsom v. City of New York*, No. 16-cv-6773 (ILG), 2019 WL 3997466, at *6 (Aug. 23, 2019) (violating *Brady* by withholding evidence).

*Newsom* is particularly instructive. Newsom was arrested and charged with murder for an August 2010 shooting after he arrived at the scene of the crime shortly after it had occurred. Newsom denied his involvement, and the NYPD found evidence exculpating him shortly thereafter – namely, that the shell casings recovered from the scene matched those that had been recovered from two other shootings that were known to have been committed by someone else. *Newsom*, 2019 WL 3997466, at *2. Although the NYPD knew about this evidence by April 2011, the Queens DA continued prosecuting Newsom and did not disclose this information to his lawyer until May 2014, after jury selection already begun. *Ibid*. The judge declared a mistrial, but the DA did not retry Newsom until fall of 2015 and Newsom remained incarcerated during the interim. *Id*. at *4. Newsom was acquitted of the murder at the retrial, and subsequently brought a § 1983 claim against the City based on the actions of the Queens DA and the NYPD.

The district court denied the City's motion to dismiss Newsom's claim based on the Queens DA's *Brady* violation because Newsom had sufficiently alleged that "the City instituted and implemented 'unlawful policies, procedures, regulations, practices and/or customs concerning the continuing obligation to make timely disclosure to the defense' " and that there was " 'deliberate

indifference by policymaking officials at the [QCDA] in its obligation to properly train, instruct, supervise and discipline its employees, including the ADAs involved in the prosecution of the plaintiff's case, with respect to such matters.' " *Id*. at *8 (quoting the Amended Complaint).

The conclusion to be drawn from these cases is that the City can be liable under *Monell* for policies of the Manhattan District Attorney's Office. Thus, the only remaining question in this case is whether Fraser has adequately pled that the office had a "policy or custom" that was unconstitutional. *See, e.g., Bellamy*, 914 F.3d at 761. He has.

The allegations in Fraser's complaint mirror the allegations in *Newsom*. Fraser states that the Manhattan DA had an "unlawful policy . . . for prosecutors to refrain from asking police officer-witnesses about civil suits or allegations of misconduct against them unrelated to the prosecution at hand." (Compl. at ¶ 154). The purpose of the policy (or lack thereof) "was to avoid obtaining actual knowledge of information that such prosecutors would be obligated under *Brady* to disclose" and "signaled to trial prosecutors that the Office was indifferent to disclosure of such information generally and encouraged a lax attitude about disclosing such information even when prosecutors knew about it." (Compl. at ¶¶ 155–56). As a result of this policy, "ADA Sangermano failed to learn about and/or to disclose" the numerous lawsuits filed against the officers who testified against Fraser, leading to his unjust conviction. (Compl. at ¶ 157).

These allegations state a plausible *Monell* claim. Under *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That includes "even evidence that is 'known only to police investigators and not to the prosecutor.' " *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Kyles*, 514 U.S. at 438). A prosecutor is "presumed ... to have knowledge of all information gathered in connection with his office's

investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 437).

The City suggests that prosecutors do not have a duty to learn of unrelated civil lawsuits against testifying police officers, but *Brady* and its progeny do not contain such an exception. As already discussed, when an officer's testimony is critical to the case against the accused, allegations of misconduct against the officer that specifically accuse him of being unreliable or otherwise incredible is impeachment evidence that must be disclosed if material to the case.

A prosecutor is not excused from their "duty to learn of any favorable evidence" just because the witnesses on the stand are police officers. When the primary evidence against the defendant is the testimony of police officers, prosecutors have a duty to inquire about potential impeachment material that reflects on the credibility of those officers. The Constitution does not endorse a "don't ask don't tell" policy with respect to *Brady* material.

As the New York post-conviction court concluded, the lawsuits against the testifying officers would surely have aided Fraser in his trial if he had known about them. Fraser has alleged that the Manhattan DA's Office had an obligation to seek out impeachment evidence, but that because of office policy, it failed to do so. This is enough to state a claim.

## CONCLUSION

For the reasons set forth above, defendants' collective motion for a judgment on the pleadings is denied.

The Clerk of the Court is respectfully directed to remove the motion at Dkt. No. 32 from the Court's list of pending motions.

Dated: April 9, 2021

_____

Chief Judge

BY ECF TO ALL COUNSEL