UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jawaun Fraser, | **AMENDED COMPLAINT** |
| Plaintiff, | Index No. 20-cv-4926 |
| -against- | |
| The City of New York, Undercover Officer Number 84, Detective Matthew Regina, and Detective Jason Deltoro, Individually and as Members of the New York City Police Department, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Jawaun Fraser ("Plaintiff" or "Fraser"), by his attorneys, the Law Offices of Joel

B. Rudin, P.C., respectfully alleges, upon information and belief, as follows:

<u>**NATURE OF ACTION**</u>

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff Jawaun Fraser because he spent two years wrongfully incarcerated based

upon a robbery charge that a team of New York City narcotics officers fabricated.

2.      Plaintiff's damages also resulted from the failure of these police officers, and

prosecutors, in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to

disclose that members of the narcotics team who arrested Fraser had been sued for fabricating

evidence and other constitutional violations at least *38 times.*

3.      A New York State Supreme Court Justice overturned Fraser's conviction on the

basis that civil lawsuit information had been wrongfully withheld from the defense, but not until

he had endured the trauma of his prosecution, two years in state custody, and another year on

strict parole supervision.

4.      The City of New York is liable to Plaintiff for the damages caused by the *Brady* violation because it foreseeably resulted from the unlawful or deliberately indifferent policies, customs, and practices of the New York City Police Department ("NYPD").

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as the events giving rise to the claim occurred in Manhattan.

8.      This action is timely because it was commenced within three years of the time that Fraser's federal causes of action accrued.

9.      Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.     Plaintiff, Jawaun Fraser, is a citizen and resident of the State of New Jersey and the United States. He resides within the District of New Jersey.

11.     Defendant City of New York ("City"), of which New York County is a subdivision, is a municipal corporation of the State of New York and is a resident of the Southern District of New York. The NYPD is an agency of the City.

12.     Defendant Matthew Regina ("Regina") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

13.     Defendant Undercover Officer Number 84 ("UC 84") was at all relevant times an undercover narcotics officer employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

14.     Defendant Jason Deltoro ("Deltoro") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

15.     Defendants Regina, UC 84, and Deltoro will be referred to herein as "the individual defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Fabricated Allegation of Robbery

16.     At about 8 p.m. on October 21, 2014, Plaintiff Jawaun Fraser was walking to a store on the Lower East Side of Manhattan to buy some items for his mother.

17.     Fraser was 18 years old at the time of this incident.

18.     He had recently started working as a paid union apprentice for the Sheet Metal Workers Local 28.

19.     Undercover Officer 84 approached Fraser near Avenue D and 8th Street.

20.     UC 84 was accompanied by a woman and secretly backed up by a team of plainclothes narcotics officers who were part of a "buy and bust operation."

21.     Fraser recognized this woman from the neighborhood as a drug addict.

22.     UC 84 asked to buy narcotics from Fraser.

23.     UC 84 told Fraser that he had money and needed a "fix."

24.     Fraser refused, denying that he was selling drugs.

25.     UC 84 was insistent.

26.     UC 84 told Fraser that he was not a police officer, that he knew Fraser's mother, and that he lived in Fraser's apartment building.

27.     UC 84, still insistent on buying drugs, handed Fraser his photo identification to prove his claim of identity.

28.     Fraser used his iPhone to take a photograph of UC 84's identification.

29.     When Fraser took the photo, UC 84 grabbed his wrist and the ID fell.

30.     Several plainclothes officers from Narcotics Borough Manhattan South, including Detective Regina and Detective Deltoro, then rushed towards Fraser.

31.     Surprised and fearful, Fraser fled.

32.     Regina and other officers with him chased and apprehended Fraser.

33.     They searched Fraser and found that he did not possess any narcotics.

34.     To justify Fraser's arrest, UC 84, Regina, and Deltoro manufactured the false story that Fraser had robbed UC 84 of the latter's driver's license and $20 in marked buy money and that Regina had found UC 84's identification on Fraser's person when he was arrested.

35.     UC 84, Regina, and Deltoro caused various police records to be created documenting this false story.

36.     They did so knowing these records would be transmitted to the Manhattan District Attorney's Office and would be relied on to formulate and pursue criminal charges against Plaintiff, and this was their intent.

37.     Regina and Deltoro created a property voucher and an invoice for a photocopy of UC 84's driver's license, which falsely indicated that the driver's license was arrest evidence that had been found in Fraser's possession.

38.     UC 84 created an expense report for the money that he falsely claimed Fraser stole from him.

39.     UC 84 also wrote a complaint follow-up form, or DD5, giving his false version of events.

40.     Regina swore to an affidavit for a warrant to search Fraser's cell phone that contained the false version of events.

41.     Under penalty of perjury, Regina signed a Criminal Court complaint falsely accusing Fraser of robbery in the second degree.

42.     Regina said in this criminal complaint that the robbery allegation was based upon what he had been told by UC 84.

**Pre-Trial Proceedings**

43.     Fraser was arraigned in the Manhattan Criminal Court on the robbery charge.

44.     Based upon the false allegations of the police, the judge set bail at $2,500 and, in lieu of bail, ordered Fraser detained.

45.     Fraser was held in jail for about three days before making bail and obtaining his release.

46.     As a condition of his pretrial release, besides posting bail of $2,500, Fraser had to check in once a week, and was not allowed to travel outside of New York State.

47.     On October 29, 2014, based upon the "evidence" that the Defendants had fabricated, Fraser was indicted for robbery in the second degree, N.Y. Penal Law 160.10(1).

48.     Regina and UC 84 testified in the grand jury in support of this indictment, repeating the false story they had manufactured.

49.     Fraser retained a private criminal defense attorney to represent him at trial and paid this attorney a total of about $11,000.

50.     Plaintiff appeared in court on his case about a dozen times before trial and then each day during a week-long trial.

51.     Each time, he had to miss work and lost income because he was not paid during his absence from work.

52.     As a result of his arrest and his frequent court appearances for this case, Fraser lost his job.

### The Trial Proceedings

53.     Plaintiff's trial commenced with jury selection on November 17, 2015, in the Supreme Court, New York County.

54.     Assistant District Attorney Gregory Sangermano was the assigned prosecutor.

55.     Before trial, ADA Sangermano provided Fraser's defense counsel with the names and index numbers of two civil rights lawsuits that had been filed against the testifying officers in the United States District Court, Southern District of New York: (1) *Penn v. City of New York*, 10-cv-4907 (RJS); and (2) *Baynes v. City of New York*, 12-cv-5903 (RJS).

56.     UC 84 was a defendant in the *Penn* case.

57.     Both UC 84 and Regina were defendants in the *Baynes* case.

58.     ADA Sangermano did not disclose any additional lawsuits that had been filed against any of the testifying officers.

59.     UC 84 and Regina testified at a suppression hearing and then again at trial.

60.     On each occasion, UC 84 and Regina testified to the fabricated stories they had provided the District Attorney's Office to cause Plaintiff's arrest and prosecution.

61.     Knowing of only the two civil lawsuits against UC 84 and Regina, Plaintiff's criminal defense counsel decided not to cross-examine the officers about them at trial.

62.     UC 84 falsely testified at trial that Fraser had threatened him and forcibly taken his identification card and the $20 in marked buy money.

63.     Detective Regina falsely testified to observing some of these events and that he had found UC 84's driver's license in Fraser's possession.

64.     Detective Deltoro testified that he and other officers moved in to arrest Fraser after UC 84 gave a non-verbal distress signal, falsely claimed that he saw UC 84 and Fraser "grappling," and stated that he participated in the police chase of Fraser.

65.     Deltoro admitted that he later searched the area for the marked $20 bill that UC 84 claimed Fraser had stolen from him but could not find it.

66.     Three other members of the narcotics team were present for all or part of the incident involving Plaintiff and assisted the individual defendants.

67.     These three officers included Undercover Officer 17, who was working as the "ghost" officer, Detective Hoiping Lee, who was assigned to the prisoner van, and Lieutenant John Patane, who supervised the entire buy and bust team. Regina testified that Lee and Patane were the officers who apprehended Fraser.

68.     After a presentation of evidence that lasted one full day and two mornings (including the summations and jury charge), the jury deliberated for a full day.

69.     At one point, the jury sent the trial judge a note indicating that it "appear[ed] to be at a deadlock," leading the judge to read the jury a modified *Allen* charge urging it to try to reach an unanimous verdict.

7

70.     On November 24, 2015, the jury found Fraser not guilty of robbery in the second degree but found him guilty of the lesser-included offense of robbery in the third degree.

71.     After the jury verdict, Fraser was remanded to jail.

72.     Fraser had obtained a new position as a union apprentice while out on bail pending trial, but after he was convicted he lost this job and his spot in the union apprenticeship program.

**Sentencing, Prison, and Reentry**

73.     At sentencing on January 13, 2016, the court sentenced Fraser to a term of two to six years in prison.

74.     Fraser spent about two years in custody, at which point he was released on parole.

75.     Fraser then spent one year under strict parole supervision.

76.     During this time, he had to report regularly to his parole officer, strictly observe a 9 p.m. curfew, refrain from traveling outside of New York City without permission, and attend and pay for a substance abuse program.

77.     He was discharged early from parole supervision for good behavior in 2018.

78.     Fraser was able to rejoin the Sheet Metal Workers Local 28 apprenticeship program, but he was forced to restart this program at the beginning and is presently at a lower pay scale than he would have been had his apprenticeship not been interrupted by his conviction and imprisonment.

**The 440 Motion**

79.     In May 2019, Fraser's assigned appellate counsel, the Center for Appellate Litigation (CAL), moved under New York Criminal Procedure Law § 440.10 to vacate Fraser's conviction.

8

80.     The basis for this motion was that, at the time of the trial, the prosecution, in violation of Fraser's constitutional right to disclosure of evidence favorable to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963), had disclosed only two of the 35 civil lawsuits that CAL discovered had been filed against members of the team of narcotics officers who arrested Fraser.[1]

81.     Of these 35 lawsuits, no less than *ten* named UC 84 as a defendant.

82.     Sixteen of the lawsuits named Regina as a defendant.

83.     Three of these lawsuits named Deltoro as a defendant.

84.     In his response to CAL's 440 motion, ADA Sangermano admitted that, prior to trial, a paralegal for the Manhattan DA's Office had conducted a "*Garrett* search"[2] and found 13 lawsuits against the officers involved in the arrest—11 suits against Regina, one suit against UC 84 (*Penn*), and one suit against both of them (*Baynes*).

85.     However, with the exception of *Penn* and *Baynes*, Sangermano had not disclosed these lawsuits to defense counsel. He disclosed only these two lawsuits to defense counsel.

86.     On December 6, 2019, Justice Robert M. Stoltz of the New York County Supreme Court granted Fraser's motion and vacated his conviction for robbery in the third degree. *See People v. Fraser*, Ind. No. 4844/14 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019), attached as Exhibit B.

87.     Justice Stoltz found that ADA Sangermano's failure to fully disclose the prior civil lawsuits to the defense violated Plaintiff's due process rights under *Brady*.

---

[1] Plaintiff's present counsel has discovered that there were in fact at least *38* lawsuits filed against the members of the Narcotics team who arrested him prior to his criminal trial. A list of these lawsuits is attached as Exhibit A to this complaint, and is incorporated by reference.

[2] This is a reference to *People v. Garrett*, 23 N.Y.3d 878 (N.Y. 2014).

88.     Under the technicalities of New York law, the vacatur of the conviction meant that the third-degree robbery count was dismissed and the prosecution, if it wished to prosecute plaintiff any further for robbery, was required to seek a new indictment from a new grand jury.

89.     The prosecution decided not to do so, and so the robbery charge was terminated in Fraser's favor.

90.     The prosecution required Plaintiff to plead guilty to some offense in order to fully close the case.

91.     In order to end his prosecution, Fraser pleaded guilty to disorderly conduct, N.Y. Penal Law § 240.20, a violation that is not a criminal offense.

**Damages and Injuries**

92.     Plaintiff's injuries and damages include, but are not limited to, his:

a.   Wrongful arrest, prosecution, and conviction for robbery;

b.   Loss of or restrictions on his liberty including three days of incarceration following his initial arraignment, pretrial bail restrictions, and, after his conviction, two years of incarceration followed by a year of parole supervision;

c.   Loss of the services, society, companionship, and consortium of his family and friends;

d.   Past and future mental and emotional suffering;

e.   Fees paid to a private criminal defense attorney; and

f.   Past and future loss or diminution of employment earnings in an amount determined by an economic expert to be over $200,000.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983; Denial of Liberty, Due Process, and a Fair Trial Under the Fourth, Fifth, Sixth, and Fourteenth Amendments by the Individual Defendants)

93.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 92 of this Complaint.

94.     Defendants UC 84, Regina, and Deltoro, individually, acting in concert, and/or aiding and abetting one another, deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, manufactured false evidence against Plaintiff, including the allegations that Fraser had threatened UC 84 and stolen UC 84's identification card and marked $20 bill, and caused such false allegations to be documented in police reports and other police paperwork and in a sworn Criminal Court complaint.

95.     The false evidence was material to Plaintiff's prosecution for robbery in that it was the only evidence of guilt and it was reasonably likely to influence a jury to convict Fraser.

96.     UC 84, Regina, and Deltoro forwarded, caused to be forwarded, or aided and abetted the forwarding of, this false evidence to the Manhattan DA's Office.

97.     UC 84, Regina, and Deltoro knew that the evidence of robbery they had fabricated and caused to be transmitted to the DA's Office was likely to influence the decision by prosecutors whether to prosecute Fraser, the decision by the court concerning whether and on what conditions to release him on bail, the decision by the grand jury whether to indict him, and the decision by a trial jury whether to convict him.

98.     In fact, the fabricated evidence was a substantial and proximate cause of Plaintiff's deprivation of liberty and other injuries, including but not limited to his prosecution,

detention, release on restrictive bail conditions, indictment, conviction, imprisonment in state prison, and time on parole supervision.

99.     The prosecution for robbery caused by the fabricated evidence was terminated in Plaintiff's favor.

100.     The individual defendants are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments by the Individual Defendants)**

101.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 100 of this Complaint.

102.     UC 84, Regina, and Deltoro knowingly, willfully and with actual malice initiated, or caused the initiation and continuation of, Fraser's prosecution for robbery, without probable cause.

103.     They caused Fraser to be deprived of his liberty.

104.     The prosecution for robbery was terminated in Fraser's favor.

105.     The individual defendants' conduct was outrageous and shocking to the conscience.

106.     Their conduct was a substantial and proximate cause of the deprivation of Plaintiff's right to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution, as well as his right to substantive and procedural due process under the Fifth and Fourteenth Amendments.

107.    The individual defendants are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth and Fourteenth Amendments by the Individual Defendants)**

108.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 107 of this Complaint.

109.    At the time of Fraser's trial, the six officers who made up the narcotics team that arrested Fraser had been named as defendants in at least 38 lawsuits alleging civil rights violations.[3]

110.    At least 23 of these suits alleged that police officers had fabricated evidence.

111.    ADA Sangermano disclosed only two of these 38 lawsuits to the defense.

112.    At the time of trial, Regina knew that he had been sued at least 14 times.

113.    He did not disclose any of these lawsuits to the prosecution.

114.    ADA Sangermano was unaware of at least the following two lawsuits against Regina:

   a.    In *Gaymon v. City of New York*, 06-cv-26-RJD-RML (E.D.N.Y.), the plaintiff alleged that Regina and other officers falsely arrested him for possession of marijuana, then falsely told a prosecutor that he had possessed marijuana.

---

[3] As noted above in footnote one, a list of these lawsuits can be found in Exhibit A. This exhibit is incorporated by reference into the complaint.

      b.   In *Bumbrey v. City of New York*, 10-cv-5188-ENV-RML (E.D.N.Y.), the plaintiffs alleged that Regina and other officers falsely arrested them in their home, destroyed their personal property, made false allegations under oath in the criminal complaint, and falsely testified in the grand jury.

115.   At the time of trial, UC 84 knew that he had been sued at least eight times.

116.   He did not disclose any of these lawsuits to the prosecution.

117.   ADA Sangermano was unaware of at least the following six lawsuits against UC 84:

      a.   In *Cook v. City of New York*, 09-cv-10238-CM (S.D.N.Y.), the plaintiff alleged that police officers had falsely arrested him and then falsely told a prosecutor that the plaintiff had possessed and sold "fake" cocaine.

      b.   In *Best v. City of New York*, 11-cv-5611-CM (S.D.N.Y.), the complaint alleged that UC 84 was part of a group of officers who falsely arrested the plaintiff, roughing him up in the process, and then misrepresented to prosecutors that the plaintiff sold and possessed marijuana, signing a false criminal court complaint to this effect.

      c.   In *Parris v. City of New York*, 13-cv-6686-NRB (S.D.N.Y.), the complaint alleged that UC 84 was part of a team of officers that illegally searched plaintiff and then made a false sworn statement that he had sold narcotics.

      d.   In *Bahadur v. City of New York*, 15-cv-978-AJN (S.D.N.Y.), the complaint alleged that UC 84 persistently attempted to purchase drugs from the plaintiff; when plaintiff refused to sell him drugs, UC 84 and another officer punched him and then falsely claimed that the plaintiff tried to strike an officer.

14

e. In *Pieralisi v. City of New York*, 15-cv-3785-RA (S.D.N.Y.), the complaint alleged that UC 84 was part of a team of officers that illegally searched plaintiff and then made a false sworn statement that he had possessed and sold narcotics, even though they had found no contraband during the search.

f. In *Wright v. City of New York*, 15-cv-4498-VSB (S.D.N.Y.), the plaintiff alleged that he was standing with another individual when UC 84 approached and asked to buy drugs; even though he walked away rather than participating in the drug sale, plaintiff was arrested and the police officers prepared false or misleading reports that were forwarded to the district attorney's office.

118. At the time of trial, Deltoro knew that he had been sued at least five times.

119. He did not disclose any of these lawsuits to the prosecution.

120. ADA Sangermano was unaware of any of these five lawsuits against Deltoro.

121. At least three of these suits alleged that the police fabricated evidence:

a. In *Loglisici v. City of New York*, 09-cv-1220-SHS (S.D.N.Y.), the complaint alleged that Deltoro and other officers falsely arrested the plaintiff during a narcotics "buy- and-bust operation" even though he had committed no crime.

b. In *Murray v. City of New York*, Index No. 307520/2009 (Sup. Ct. Bronx Cty.), the complaint alleged that Deltoro and another officer falsely arrested the plaintiff, filed or caused the filing of a felony complaint falsely accusing him of crimes, and provided false or misleading information to prosecutors.

c. In *Nunez v. City of New York*, 09-cv-8789-DLC (S.D.N.Y.), the complaint alleged that Deltoro and other officers falsely arrested the plaintiffs for criminal possession of a weapon and criminal possession of a forged

instrument, even though the plaintiffs had neither a weapon nor a forged instrument.

122.     Under New York law, the defense in a criminal case may cross-examine police officers about the specific allegations contained in unrelated civil lawsuits in order to impeach their general credibility, demonstrate their dishonesty and disrespect for the law, or show a pattern of similar behavior.

123.     Allegations that the police officers involved in this case had previously been accused of fabricating evidence and other dishonest or illegal behavior would have assisted Fraser and his attorney in impeaching their credibility and showing Fraser's innocence and thus was favorable to the defense under *Brady*.

124.     UC 84, Regina, and Deltoro had a constitutional duty to inform the prosecution of information known to them that was favorable to a criminal defendant under *Brady* and potentially material to the outcome of the trial so that the prosecutor could disclose such information to the defense.

125.     This obligation included the civil lawsuits that had been filed against them.

126.     The information they failed to disclose was material to the outcome of the trial because, had such information been timely disclosed, there is a reasonable probability that Plaintiff would have been acquitted of all charges or achieved a more favorable outcome to the trial.

127.     The individual defendants' failure to disclose information about prior civil lawsuits was a substantial and proximate cause of Plaintiff's injuries, including his conviction, incarceration in state prison, and time on parole supervision.

128.    The individual defendants failed to disclose such civil lawsuits to the prosecutor knowingly, willfully, intentionally, recklessly, negligently, or with deliberate indifference to their obligation to do so.

129.    Regina, UC 84, and Deltoro are therefore liable to Fraser, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### FOURTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City of New York for *Brady* Violations by the NYPD)**

130.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 127 of this Complaint.

131.    Prior to Plaintiff's trial, policymaking officials of the NYPD, due to their deliberate indifference to the *Brady* rights of criminal defendants*,* implemented inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the duty of police officers to make timely disclosure to prosecutors of material evidence or information favorable to criminal defendants, including evidence or information impeaching the credibility of prosecution witnesses, such as the police officers themselves.

132.    This disclosure was necessary so that prosecutors could determine whether to provide such information to criminal defendants and their counsel under *Brady* and its progeny*.*

133.    More specifically, policymaking officials at the NYPD knew that members of the force often acted as essential witnesses in criminal prosecutions and that many of them face, or have faced, lawsuits alleging they engaged in various types of misconduct, including fabricating evidence, stealing, other acts of dishonesty, and making arrests without probable cause.

134.    Even though such civil lawsuit allegations may have a crucial bearing on the credibility of such police witnesses, at the time of Fraser's trial in November 2015 the NYPD had adopted no policy, practice, or procedure requiring such police witnesses to provide such civil lawsuit information to District Attorneys or Assistant District Attorneys.

135.    Prior to Plaintiff's trial, the NYPD failed to even train or instruct members of service concerning their *Brady*/*Giglio*[4] obligation to disclose evidence impeaching the credibility of prosecution witnesses such as police officers to prosecutors, and failed to supervise such members to ensure they fulfilled their obligation under the law to make such disclosures.

136.    Although the issue of whether to disclose various forms of impeachment material to prosecutors (including civil lawsuit information) regularly arises, prior to Fraser's trial NYPD policymaking officials issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose such impeachment information to prosecutors.

137.    Instead, in trainings given at the Police Academy, the NYPD instructed officers only that *Brady* material consists of "exculpatory evidence that tends to clear someone's guilt."

138.    The training on *Brady* given to NYPD recruits did not mention *Giglio* or instruct officers that they had a duty to disclose impeachment material to prosecutors.

139.    Moreover, at all times relevant to this case, the NYPD failed to discipline members of service for failing to provide *Brady* material, including impeachment evidence and/or civil lawsuit information, to prosecutors.

140.    As a result of the NYPD's inadequate training, supervisory and disciplinary policies and practices, the individual defendants failed to disclose to prosecutors in Plaintiff's

---

[4] *Giglio v. United States*, 405 U.S. 150 (1972) (holding that, under *Brady*, prosecutors have a due process obligation to disclose information impeaching prosecution witnesses to the defense).

case the existence of the civil lawsuits against them accusing them of fabricating evidence and other dishonest activities, and this was a substantial cause of the prosecutor's failure to fully disclose such information to the defense and of Plaintiff's conviction and resultant injuries.

141.    The Police Commissioner and/or other municipal policymakers knew or should have known that whether to disclose impeachment evidence favorable to a criminal defendant, including civil lawsuits against police witnesses, presents the kind of difficult or non-obvious choice that instruction, training, supervision, and discipline would make less difficult.

142.    The Police Commissioner and/or other municipal policymakers knew or should have known that the failure of police officers to disclose such material impeachment evidence would frequently cause the deprivation of the constitutional rights of criminal defendants.

143.    Under the principles of municipal liability for federal civil rights violations, the Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the constitutional requirements governing the disclosure of *Brady* material.

144.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with their *Brady* obligations.

145.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the due process and fair trial rights of criminal defendants and of other members of the public.

146.    The *Brady* violations in this case were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities by the New York City Police Department.

147.    By virtue of the foregoing, Defendant City is liable, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that its unlawful conduct caused and for attorneys' fees, costs, and expenses.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    For compensatory damages of not less than $6 million;

b.    For punitive damages of not less than $2 million;

c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.    For pre-judgment interest as allowed by law; and

e.    For such other and further relief as this Court may deem just and proper.

Law Offices of Joel B. Rudin, P.C.

By:    _____/s/_____
       Joel B. Rudin
       Matthew A. Wasserman
       Law Offices of Joel B. Rudin, P.C.
       152 West 57th Street, 8th Floor
       New York, New York 10019
       (212) 752-7600
       jbrudin@rudinlaw.com

       *Attorneys for the Plaintiff*

Dated:  New York, New York
        August 24, 2021

20