UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jawaun Fraser,

                    Plaintiff,

          -against-

The City of New York, Undercover Officer
Number 84, Detective Matthew Regina, and
Detective Jason Deltoro, Individually and as
Members of the New York City Police
Department,

                    Defendants.

20-cv-4926 (CM) (OTW)

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

_____

Joel B. Rudin
Matthew A. Wasserman
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**INTRODUCTION** ..............................................................................................1

**BACKGROUND** ...............................................................................................1

    *A.*    *The arrest, prosecution, and 440 proceedings* .....................................1

    *B.*    *The officers' lawsuit disclosures and training* ....................................3

    *C.*    *Procedural history* ..............................................................................4

**ARGUMENT** ....................................................................................................5

I.   A reasonable jury could find that UC 84 and Detective Deltoro violated *Brady v. Maryland* by intentionally or recklessly failing to disclose civil lawsuit information that they knew of to the prosecution (responding to Point I). ...................................................5

    *A.*    *Reckless violations of* Brady *suffice for § 1983 liability.* ...................................6

    *B.*    *Whatever the standard, factual disputes preclude summary judgment.* ............7

II.   A jury could find that Fraser's defense attorney reasonably relied on the prosecution's lawsuit disclosure as being complete (responding to Point II). ...................8

III.   UC 84 and Deltoro violated clearly established law (responding to Point III). ........10

IV.   A jury could find that the City of New York is liable for the *Brady* violation on either a failure-to-train or an unlawful-policy theory (responding to Point IV)...............14

V.   Bifurcating the trial would be contrary to judicial economy and prejudicial to the plaintiff (responding to Point V). ....................................................................................18

VI.   A reasonable jury could find that Detective Deltoro was personally involved in the evidence fabrication and malicious prosecution (responding to Point VI). ......................21

**CONCLUSION** ...............................................................................................**23**

# TABLE OF AUTHORITIES

**Cases**

*Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311 (2d Cir. 1999) .........................................21

*Banks v. Dretke*, 540 U.S. 668 (2004) ...................................................................................10

*Barrett v. Orange Cty. Hum. Rts. Comm'n*, 194 F.3d 341 (2d Cir. 1999).....................................14

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019)...........................................5, 6, 14, 15

*Berger v. Foley*, 1994 WL 191658 (S.D.N.Y. May 16, 1994) .........................................................6

*Berger v. United States*, 295 U.S. 78 (1935) ...............................................................................9

*Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) ...................................................................13

*Brown v. City of New York*, 2016 WL 1611502 (S.D.N.Y. Apr. 20, 2016) ...................................13

*Buntin v. City of New York*, 395 F. Supp. 2d 104 (S.D.N.Y. 2005) ...............................................6

*Carey v. Piphus*, 435 U.S. 247 (1978)........................................................................................21

*D.C. v. Wesby*, 138 S. Ct. 577 (2018)........................................................................................13

*Felix v. City of New York*, 2020 WL 6048153 (S.D.N.Y. Oct. 13, 2020) ...............................18, 20

*Fischl v. Armitage*, 128 F.3d 50 (2d Cir. 1997) .........................................................................24

*Fraser v. City of New York*, 2021 WL 1338795, (S.D.N.Y. Apr. 9, 2021). ..........................4, 5, 6

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ........................5

*Giglio v. United States*, 405 U.S. 150 (1972)....................................................................6, 13, 16

*Hope v. Peltzer*, 536 U.S. 730 (2002)........................................................................................13

*Horn v. Stephenson*, __ F. 4d __, 2021 WL 3776318 (2d Cir. Aug. 26, 2021)......................12, 13

*Hudson v. New York City*, 271 F.3d 62 (2d Cir. 2001)...................................................................6

*Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533 (S.D.N.Y. 2005) ................................................18

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020).............................................................................11

*McCoy v. City of New York*, 2008 WL 3884388 (E.D.N.Y. Aug. 13, 2008) ................................18

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)....................................16

*Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001) .....................................................................13

*Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379 (4th Cir. 2014) ..................................13

*People v. Garrett*, 23 N.Y.3d 878 (2014).......................................................................................14

*Poventud v. City of New York,* 2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) ...............................12

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) .....................................................................21

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ................................................23, 24

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003) ......................................................................10

*Simon v. City of New York*, 893 F.3d 83 (2d Cir. 2018)................................................................12

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ..............................................................................7

*Strickler v. Greene*, 527 U.S. 263 (1999) .....................................................................................6, 9

*Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078 (9th Cir. 2009).....................................7

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...........................................................................................14

*United States v. Agurs*, 427 U.S. 97 (1976)....................................................................................9

*United States v. Kiszewski*, 877 F.2d 210 (2d Cir. 1989) ..............................................................14

*Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008) ...............................................................14

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) ..................................................6, 13, 17

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336 (2d Cir. 2010) .......................................5

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................................5

N.Y. Rules of Prof'l Conduct 1.4 .....................................................................................................7

## INTRODUCTION

The Defendants' motion to dismiss the Plaintiff's *Brady* claims was roundly rejected by this Court. Defendants now move for summary judgment on the *Brady* claims, but their second attempt to dismiss these claims is no more convincing. The Defendants ignore inconvenient facts and admissions while slanting the record in their favor. Viewed under the proper standard, the record is replete with disputes of material fact that must be resolved by a jury, as detailed below.

As for the Defendants' reference in their introduction to Mr. Fraser's parole-hearing transcript and deposition testimony about the same, this material is irrelevant to their present motion for partial summary judgment, which involves an entirely different aspect of the case. Indeed, Defendants admit that issues of disputed fact preclude summary judgment on Plaintiff's evidence-fabrication and malicious-prosecution claims, to which the parole hearing relates, and do not discuss these exhibits in the rest of their brief. They include this material solely to prejudice this Court in its adjudication of unrelated claims. Mr. Fraser will explain his parole hearing and deposition testimony at trial, to the extent defense counsel's bludgeoning of Plaintiff with objectionable questions about his memory of the parole hearings and his opinions about the accuracy of transcripts he had no opportunity at the time to review or correct is allowed at all.

## BACKGROUND

### A. *The arrest, prosecution, and 440 proceedings*

Jawaun Fraser was arrested and prosecuted for purportedly robbing an undercover police officer, Undercover Officer 84 ("UC 84"), of his driver's license and $20 by threatening to assault him. Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts & Stmt. of Add'l Material Facts ("Pl.'s 56.1 Resp.") ¶¶ 1, 77, 78, ECF No. 77. Mr. Fraser's initial assigned counsel, James McQueeney of the Legal Aid Society, was relieved in March 2015—months before trial —when Fraser retained Geoffrey Stewart. *Id.* ¶ 58. Mr. Stewart represented Fraser at a suppression

hearing on November 13, 2015, and then the trial, which started on November 17, 2015. *Id.* ¶¶ 1, 47, 60. At trial, the only evidence inculpating Fraser was police officer testimony—specifically, the testimony of Detective Matthew Regina, Detective Jason Deltoro, and UC 84. *Id.* ¶¶ 3, 76.

Shortly before the suppression hearing, the assigned prosecutor, ADA Gregory SanGermano, provided defense counsel with a list of six possible testifying officers, including Detective Deltoro, Detective Regina, and UC 84. Pl.'s 56.1 Resp. ¶ 61. Employees of the Manhattan District Attorney's Office searched for lawsuits against at least some of these officers, finding one suit against UC 84, one suit against UC 84 and Regina, and 11 suits against Regina (for a total of 13). *Id.* ¶ 65. At the end of the hearing, the day before trial, ADA SanGermano gave the defense information about either two of these cases (if you believe defense counsel) or all 13 of these cases (if you believe SanGermano). *Id.* ¶ 29. It is undisputed that SanGermano disclosed the two lawsuits against UC 84 he knew of (one of which was also against Regina); it is disputed whether he disclosed 11 additional lawsuits against Regina. *See id.* ¶¶ 65, 68, 70.

There were in fact 25 civil rights lawsuits in total naming Detective Deltoro, Detective Regina, or UC 84 as defendants filed prior to Fraser's criminal trial. Pl.'s 56.1 Resp. ¶ 9.[1] Many of these civil suits accused the officers of evidence fabrication or arresting people without probable cause. *See* Am. Compl. Ex. A, at 1–7, ECF No. 64-1 (summarizing the allegations of these lawsuits). Seven of these lawsuits were against UC 84, 14 against Regina, and five against Deltoro (one was against both Regina and UC 84). *Id.* The prosecutor did not disclose to the defense five of the seven lawsuits against UC 84 or any of the five lawsuits against Deltoro. *Compare id.*, *with* Pl.'s 56.1 Resp. ¶¶ 66–68. UC 84 was served with process in at least four of

---

[1] Plaintiff is not including *Bahadur v. City of New York*, 15-cv-978 (S.D.N.Y.) in this count because, although it was filed prior to Fraser's criminal trial, UC 84 was not named as a defendant until the Second Amended Complaint was filed in 2016. Pl.'s 56.1 Resp. ¶ 12.

the undisclosed lawsuits while Deltoro was served in another four. *See* Pl.'s 56.1 Resp. ¶¶ 13, 21, 22. Whether UC 84 was served in a fifth undisclosed lawsuit is disputed. *Id.* ¶ 11.

Mr. Fraser's attorney, Geoffrey Stewart, relied on the prosecution's disclosure of lawsuit information as being complete. Pl.'s 56.1 Resp. ¶ 72. He did not independently search for lawsuits against the testifying officers. *Id.* ¶¶ 73–74. Had he known of more than two lawsuits, he would have used this information to impeach the testifying officers. *Id.* ¶ 75.

Fraser was acquitted of robbery in the second degree, but convicted of robbery in the third degree. *Id.* ¶ 5. He spent approximately two years incarcerated as a result. Am. Compl. ¶ 74, ECF No. 64. In 2019, Justice Stoltz of the New York County Supreme Court vacated this conviction based on the prosecution's failure to disclose information about the lawsuits against testifying officers in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Pl.'s 56.1 Resp. ¶ 6.

## B.   *The officers' lawsuit disclosures and training*

In their deposition testimony, Deltoro and UC 84 did not remember whether they disclosed any information about the lawsuits filed against them before Fraser's trial to the prosecution. Pl.'s 56. 1 Resp.  ¶¶ 38, 42. But circumstantial evidence indicates they did not: ADA Sangermano did not know of any of the five lawsuits filed against Deltoro and knew of only two of the seven lawsuits filed against UC 84. *Compare* Am. Compl. Ex. A, ECF No. 64-1 (listing lawsuits), *with* Pl.'s 56.1 Resp. ¶¶ 65–67. Meanwhile, the only specific training that Regina and UC 84 remember receiving about their duty to disclose civil lawsuit information to the prosecution was a NYPD Legal Bureau Bulletin from 2017, over a year after Fraser's trial— and Deltoro remembers no training on the subject. Pl.'s 56.1 Resp. ¶¶ 101–102.

In fact, the training materials used for police recruits at the NYPD Police Academy did not mention impeachment evidence, *Giglio* material, or that civil lawsuits against police officers can constitute impeachment material. Pl.'s 56.1 Resp. ¶ 98. This training erroneously defined

*Brady* material only as "exculpatory evidence that tends to clear someone's guilt," omitting any mention of impeachment evidence. *Id.* ¶ 97. A Rule 30(b)(6) witness for the City admitted that this training "reflect[ed] official NYPD policy as to the duties of police officers with regard to their *Brady* obligations." *Id.* ¶ 99 (quoting his deposition testimony). While a different NYPD party representative testified that the NYPD had been training officers to disclose impeachment material generally since 2005 and civil lawsuits in particular since 2014, the Defendants failed, despite Plaintiff's specific request, to produce any documentary evidence or training materials substantiating this assertion dated from before Fraser's criminal trial. *Id.* ¶¶ 53–54.

### C.   *Procedural history*

Plaintiff filed the present action on June 26, 2020, bringing claims against Detectives Deltoro and Regina and UC 84 for evidence fabrication, malicious prosecution, and *Brady* violations; he also brought *Monell* claims against the City of New York for the *Brady* violations, based on the policy, custom, or practice of both the Manhattan District Attorney's Office and the NYPD. Compl, ECF No. 1. Over eight months later, in the middle of discovery, the Defendants moved to dismiss the *Brady* claims against the individual officer defendants and the City, and to stay the *Monell* discovery. *See* Notice of Motion, ECF No. 32; Mem. of Law, ECF No. 33.

This Court denied the Defendants' motions to stay *Monell* discovery and for partial judgment on the pleadings. Memo Endorsement, ECF No. 36; Decision & Order, ECF No. 45; *Fraser v. City of New York*, No. 20-CV-04926, 2021 WL 1338795, (S.D.N.Y. Apr. 9, 2021). The parties subsequently completed discovery, and Plaintiff dropped his claim of municipal liability based on the policies of the Manhattan D.A.'s Office. Letter, ECF No. 63. The Defendants' present motion on the remaining *Brady* claims followed. *See* Notice of Motion, ECF No. 67; Mem. of Law in Supp. of Defs.' Mot. for Partial Summ. J. ("Defs.' Mem. of Law"), ECF No. 69. Defendants' motion does not address the evidence-fabrication and malicious-prosecution claims.

**ARGUMENT**

"[S]ummary judgment may not be granted unless . . . 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). In evaluating this, "[a]ll ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Id.*

Here, the Defendants have failed to carry this burden. Resolving all ambiguities in favor of the Plaintiff and drawing all permissible inferences from the factual record in his favor, the Defendants' motion for partial summary judgment rests on a mountain of disputed facts. This Court should decline their invitation to resolve these disputes and instead send the case to trial.

**I.   A reasonable jury could find that UC 84 and Detective Deltoro violated *Brady v. Maryland* by intentionally or recklessly failing to disclose civil lawsuit information that they knew of to the prosecution (responding to Point I).[2]**

As this Court's prior decision explains, "[w]hen police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*." *Fraser*, 2021 WL 1338795, at *7 (quoting *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019)). A police officer "satisfies his obligations under *Brady* only if the officer turns over all exculpatory evidence in his possession to the prosecutor." *Id.* at *9 (citing *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992)). This "obligation extends to requiring testifying officers to disclose civil lawsuits filed against them that alleged that they had falsified evidence." *Id.* at *7. "If police officers are the

_____

[2] Plaintiff is dropping his *Brady* claim against Regina. Since the prosecutor knew of 12 of 14 lawsuits against Regina, we agree any nondisclosure by Regina was insufficiently material.

main witnesses for the prosecution, then the credibility of those officers is undoubtedly 'an important issue in the case.' Similarly, there is no doubt that multiple allegations that an officer has falsified evidence or testified falsely in other criminal cases would bear on that officer's 'credibility as a witness.'" *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 155 (1972)).

A.     **Reckless violations of Brady *suffice for § 1983 liability.***

The Defendants begin their argument by claiming that Plaintiff must show that the individual defendants' failure to disclose *Brady* evidence was intentional, but the case upon which they rely explicitly left this question open. *See Bellamy*, 914 F.3d at 751 n.23.

Basic principles of both constitutional tort law and *Brady* caselaw, however, indicate that intentional violations are not required. Plaintiffs can establish a due-process claim for purposes of § 1983 by showing that a defendant acted either intentionally *or* recklessly. *Buntin v. City of New York*, 395 F. Supp. 2d 104, 108 (S.D.N.Y. 2005) (Kaplan, J.), *aff'd*, 225 F. App'x 28 (2d Cir. 2007); *see also Berger v. Foley*, No. 91 CIV. 2291, 1994 WL 191658, at *1 (S.D.N.Y. May 16, 1994) (Keenan, J.) (collecting cases). In the criminal and habeas context, even negligent or inadvertent *Brady* violations make out a constitutional claim. *See Strickler v. Greene*, 527 U.S. 263, 288 (1999) ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."); *id.* at 282 ("[E]vidence must have been suppressed by the State, either willfully or *inadvertently*." (emphasis added)) And "§ 1983 does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement." *Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001).

If there is a requirement that police officers must intentionally fail to disclose impeachment and exculpatory information to the prosecution, it has to come from somewhere. Yet the Defendants provide no authority or argument for this proposition other than that the Second Circuit has "suggested" such a requirement exists. Defs.' Mem. of Law at 8. A reckless

*Brady* violation is thus enough for § 1983 liability. *See Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009) ("[A] § 1983 plaintiff should not be required to show that officers acted in bad faith in withholding material, exculpatory evidence from prosecutors. Instead, a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."); *see also Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007).

### B. Whatever the standard, factual disputes preclude summary judgment.

Regardless of whether Mr. Fraser is required to show that UC 84 and Deltoro recklessly withheld impeachment evidence or intentionally did so, a reasonable jury can find in his favor.

The Defendants admit that UC 84 was served with process in at least four of the five undisclosed lawsuits against him—the fifth is contested—and Deltoro was served with process in four of the five undisclosed lawsuits against him. Pl.'s 56.1 Resp. ¶¶ 11, 13, 19–22. A reasonable jury can infer from such service that the Defendants were aware of these lawsuits.[3] A reasonable jury can also infer from the settlements of these cases that lawyers from the Law Department must have spoken to Defendants—their clients—prior to settling the case on their behalf. *See* N.Y. Rules of Prof'l Conduct 1.4(a) ("A lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required."). As for the Defendants' reliance on the Law Department's failure to file a notice of appearance for Deltoro in one of the cases where he was served, Defs.' Mem. of Law at 9, counsel's omission does not disprove his knowledge where there is no dispute that he was properly served. The Defendants argue that "any presumptive awareness of the lawsuit would understandably be fleeting" and that

---

[3] The Defendants note that some of the suits were "filed ten years before plaintiff's criminal trial," Defs.' Mem. of Law at 9, but once you subtract Regina from the equation the earliest lawsuit was filed in 2009, six years before the trial. Pl.'s 56.1 Resp. ¶¶ 11, 13, 21, 24.

"none of the cases reflected the type of litigation where the defendants would have been actively involved," *id.*, but these are arguments about inferences to be drawn reserved for a jury.

The Defendants also argue that the evidence "demonstrates that [they] would have told ADA Sangermano that they had previously been sued, approximately how many times and the specifics to the extent that they knew of and/or recalled that information." Defs.' Mem. of Law at 10. But the defendants' self-serving claims about their general practice does not prove what they did in this case—if anything, it tends to show that any omission in this case was deliberate. ADA SanGermano, Deltoro, and UC 84 did not recall whether they discussed the civil lawsuits in this case. Pl.'s 56.1 Resp. ¶¶ 24, 25, 38, 42. It is telling, however, that SanGermano knew of only two of the seven lawsuits against UC 84, from his office's own investigation, indicating that UC 84 did not tell him about the other five (or, perhaps, any at all). *See id.* ¶¶ 26–30, 66, 68. Indeed, one of the cases SanGermano did know of is a case where Defendants claim UC 84 was not served, suggesting UC 84 was not the source of this information. *See id.* ¶¶ 11, 68. Similarly, given that Sangermano admittedly did not know of *any* of the lawsuits against Deltoro, a jury could infer this was because Deltoro never disclosed the lawsuits to him. *See id.* ¶¶ 11, 13, 67.

## II.   A jury could find that Fraser's defense attorney reasonably relied on the prosecution's lawsuit disclosure as being complete (responding to Point II).

The Defendants admit that Mr. Fraser's defense attorneys did not know about the lawsuit information that was not disclosed by the officers to the prosecution yet argue, without citing any authority, that his "criminal defense attorneys should have known about the lawsuits." Defs.' Mem. of Law at 11. This attempt to divert attention from the officers' failure to disclose impeachment evidence ignores crucial context about when Fraser's first attorney was relieved, binding caselaw establishing that the defense can rely on the prosecution to live up to its *Brady* obligations, and the difficulties of searching for lawsuit information against undercover officers.

As an initial matter, the Defendants' reference to Fraser's "criminal defense attorneys"—plural—is a red herring. Fraser's first attorney from the Legal Aid Society was relieved when Fraser retained counsel in March 2015, approximately eight months before the hearing and trial. Pl.'s 56.1 Resp. ¶¶ 1, 58–60. The prosecutor in this case did not provide the defense with a list of possible testifying witnesses until shortly before the suppression hearing, and did not provide the defense with information about lawsuits against testifying officers until the end of the hearing, the day before trial. *Id.* ¶¶ 61, 63. Surely, it is not the Defendants' position that the prosecution can meet its *Brady* obligations on the eve of trial, but a busy public defender is required to search for impeachment evidence against testifying police officers—without knowing exactly who they are—many months before a criminal case is scheduled for hearing and a trial.

As for the Defendants' claim that Fraser's trial attorney should have known about the civil lawsuit information because he had access to PACER, the implicit premise is that he should not have trusted in the completeness of the prosecution's *Brady* disclosure. This turns on its head the fundamental tenet of the criminal legal system (and of *Brady* caselaw) that it is "the prosecutor's obligation to serve the cause of justice." *United States v. Agurs*, 427 U.S. 97, 111 (1976); *see also, e.g.*, *Strickler*, 527 U.S. at 281 (referring to "the special role played by the American prosecutor in the search for truth in criminal trials"); *Berger v. United States*, 295 U.S. 78, 88 (1935). The law is that "conscientious counsel *can* rely on prosecutors to live up to their obligations." *Shih Wei Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003) (emphasis in original). The defense need not "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).

Whether the prosecutor disclosed only two lawsuits—as defense counsel claims—or 13 lawsuits—as the prosecutor claims—it is undisputed that he failed to disclose five of the seven

lawsuits against UC 84 or any of the five lawsuits against Deltoro. Pl.'s 56.1 Resp. ¶¶ 66–67. As discussed above, defense counsel was entitled to rely on this disclosure as complete. And it is undisputed that he did so. Pl.'s 56.1 Resp. ¶ 72. In counsel's words, "once I was given that material, I thought . . . that it was a complete disclosure as to any and all witnesses that the People were calling. . . . [W]hen he turned over documents regarding police officer lawsuits, I did kind of assume that this was all there was." Deposition of Geoffrey Stewart, , pp. 23:7– 23:14, 24:2–24:13, Francolla Decl. Ex. H, ECF No. 70-8. When the prosecutor handed over some of the information about lawsuits against testifying officers the day before Fraser's criminal trial, it came with an implicit promise to the defense that "that this [is] all there [is]."

If that weren't enough to defeat the Defendants' argument, this case comes with another factual twist. It can be nearly impossible to find lawsuits against undercover officers on PACER "because there is no standardized naming convention." Pl.'s 56.1 Resp. ¶ 103. Indeed, in the seven lawsuits filed against him prior to Fraser's criminal trial, UC 84 was named seven different ways. *Id.* ¶ 104. A search of PACER for "Undercover Officer 84" would not have found any of these lawsuits. *Id.* ¶ 105. Thus, even assuming that Fraser's counsel had a duty to distrust the prosecution's disclosure and conduct his own independent search of PACER, such a search likely would not have unearthed any of the five undisclosed civil rights actions against UC 84.

Accordingly, this Court should hold that no reasonable jury could find that Fraser's counsel should have known about the undisclosed lawsuit information and preclude the Defendants from submitting this defense to the jury. At the very least, whether the defense "should have known" is a question of disputed fact for the jury.

### III.    UC 84 and Deltoro violated clearly established law (responding to Point III).

The individual defendants contend they are entitled to qualified immunity because it was not clearly established that they had to know and disclose their entire lawsuit history. Defs.'

Mem. of Law at 12–14. But, taking the facts in the light most favorable to Plaintiff, it is enough

to defeat qualified immunity that, as Defendants admit, it was clearly established that "police

officers could not intentionally withhold *Brady* evidence from the prosecution" and an "officer's

civil lawsuit history would be considered *Brady* information." *Id.* at 12. The Defendants also

distort Plaintiff's position: he does not argue, of course, that officers have a duty to "know[] the

entirety of their civil lawsuit histories" or "search the dockets of every case in every federal and

state court in New York," *id.* at 12, 13; instead, officers must disclose lawsuits they know of.

"[W]hen an official raises qualified immunity as a defense, the court must consider

whether: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly

established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir.

2020) (cleaned up). "In determining whether a right is clearly established," courts in this Circuit

"can consider Supreme Court decisions and [Second Circuit] decisions, as well as 'a consensus

of cases of persuasive authority.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  In

making this determination and defining the "right at issue," courts must "strik[e] a balance

between defining the right specifically enough that officers can fairly be said to be on notice that

their conduct was forbidden, but with a sufficient measure of abstraction to avoid a regime under

which rights are deemed clearly established only if the precise fact pattern has already been

condemned." *Simon v. City of New York*, 893 F.3d 83, 96–97 (2d Cir. 2018) (cleaned up).

Judge Batts's decision in *Poventud v. City of New York* demonstrates how this inquiry

applies to allegations that police officers violated their *Brady* obligations. After noting that the

plaintiff alleged an officer violated *Brady* by failing to disclose the results of an identification

procedure, Judge Batts held that "it was clearly established . . . that the Government has a duty to

disclose in a timely fashion exculpatory and impeachment evidence and that police officers

satisfy this duty by turning over exculpatory evidence to prosecutors." No. 07-CV-3998, 2015 WL 1062186, at *8 (S.D.N.Y. Mar. 9, 2015). Accordingly, she rejected the defendants' "attempt to avoid a finding that the law was clearly established by defining Plaintiff's constitutional right to [have the officer] prepare a DD5 or otherwise document the photo identification procedure" as "too narrow" a definition. *Id.* at *9. The question was whether it was clearly established that the defendant officers had a *Brady* obligation, not whether courts had previously held that the failure to document or disclose the exact category of information at issue violated *Brady*.

The Second Circuit recently adopted a similarly broad approach. In *Horn v. Stephenson*, the defendant, a firearms examiner, argued that he was entitled to qualified immunity because it was not clearly established that such an examiner had a duty to disclose exculpatory evidence to the prosecution. __ F. 4d __, 2021 WL 3776318, at * 5 (2d Cir. Aug. 26, 2021). The Circuit disagreed, holding that "a police forensic examiner, whether an analyst or technician fulfilling any of the roles associated with forensic analysis, in 1999 reasonably would have understood that he or she was required to turn over exculpatory information to the prosecutor." *Id.* Noting "[i]t is well settled that the absence of precedent involving 'fundamentally similar' facts is not fatal to a finding that the law is clearly established," *Horn* rejected the defendant's proposed interpretation of the clearly-established law requirement as "requir[ing] officials to parse the factual nuances of *Brady* and its progeny." *Id.* (quoting *Hope v. Peltzer*, 536 U.S. 730, 741 (2002)).

Other courts to deal with the issue have also defined the clearly established constitutional right under *Brady* as the right to have police officers disclose exculpatory and impeachment evidence to the prosecution. *See, e.g., Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 400–01 (4th Cir. 2014) (holding that police officers violated clearly-established law by

12

withholding *Brady* material); *Newsome v. McCabe*, 260 F.3d 824, 825 (7th Cir. 2001) (same); *Blake v. Race*, 487 F. Supp. 2d 187, 216 n.21 (E.D.N.Y. 2007) (Bianco, J.) (same).

Defendants rely primarily on qualified-immunity cases involving Fourth Amendment claims, *see* Defs.' Mem. of Law at 14, where greater specificity is required. *See D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("We have stressed that the specificity of the rule is especially important in the Fourth Amendment context." (cleaned up)). In Fourth Amendment cases involving excessive force or search and seizure, police officers are typically tasked with making split-second decisions. *See, e.g.*, *Brown v. City of New York*, No. 13-CV-1018, 2016 WL 1611502, at *8 (S.D.N.Y. Apr. 20, 2016) (Forrest, J.) (noting that officers had only "seconds to make a judgment" about their use of force). In cases like this one involving *Brady* violations, on the other hand, defendants have months to contemplate the proper course of action. Under such circumstances, it is enough that it was clearly established in 2015 that (a) police officers had a duty to disclose impeachment and exculpatory evidence they knew of to the prosecution and (b) the lawsuits against them were impeachment evidence. *See Giglio*, 405 U.S. at 155 (holding that evidence impeaching the credibility of a key prosecution witness must be disclosed under *Brady*); *Walker*, 974 F.3d at 299 (holding that the police have a *Brady* obligation to disclose impeachment and exculpatory evidence to the prosecution); *see also United States v. Kiszewski*, 877 F.2d 210, 215–16 (2d Cir. 1989) (requiring in camera examination of FBI agent's personnel file to review whether complaints against him were material in the sense of *Brady*/*Giglio*); *People v. Garrett*, 23 N.Y.3d 878, 886 (2014) (holding that the allegations against a police officer in a civil lawsuit "were favorable to defendant as impeachment evidence").

To the extent the Defendants contest that they knew about the undisclosed lawsuits or claim they disclosed all the civil rights lawsuits they are aware of to the prosecution, *see* Defs.'

Mem. of Law at 12, these are issues of disputed fact that go to whether there was a constitutional violation and must be resolved by a jury. *See* Point I(A)(2), *supra*. Defendants do not get to assume the facts they would like in raising a qualified-immunity defense on summary judgment. The evidence must still be taken "in the light most favorable to the opposing party" when determining whether the Defendants violated clearly-established law. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted). This Court should therefore hold that, if Plaintiff proves his case as to the individual *Brady* violations, UC 84 and Deltoro violated clearly-established law and prevent the Defendants from submitting a qualified-immunity defense to a jury.

**IV.     A jury could find that the City of New York is liable for the *Brady* violation on either a failure-to-train or an unlawful-policy theory (responding to Point IV).**

The Defendants also argue that Mr. Fraser's "claim against the City fails as a matter of law." Defs.' Mem. of Law at 15–16. Yet again, this argument depends on disputed facts.

The Defendants first argue that if the Plaintiff's *Brady* claim against the individual defendants fail, so must his claim against the City, *id.* at 15, but this does not follow. A *Monell* claim requires an underlying constitutional violation, but not individual liability. *Barrett v. Orange Cty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999); *see also Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008). If a jury lets the individuals off the hook based upon insufficient proof of knowledge or intent, the City can still be held liable for a deficient policy or training which caused the officers to lack awareness of their disclosure obligations or to be indifferent to them. The Second Circuit's decision in *Bellamy* establishes that an inadvertent or negligent *Brady* violation can suffice for *Monell* liability if it was caused by the deliberate indifference to such violations by a municipal policymaker. 914 F.3d at 756, 761–62. *Bellamy* reinstated a *Monell* claim against the City for "a *Brady* violation that was caused by a deliberate information barrier imposed by the [Queens District Attorneys' Office] that purposefully kept

14

prosecutors unaware of the full benefits received by witnesses in its witness protection program."
*Id.* at 756. The deliberate indifference of policymakers was enough for this claim to go forward
to a jury even though the prosecutor did not know about the withheld information and thus could
not have intentionally violated *Brady*. *Id.* at 761–62. Applying these principles here, a reasonable
jury could find that the City is liable because, although the defendants did not act intentionally, a
substantial cause of the officers' failure to disclose impeachment information to the prosecution
was an unlawful municipal policy or deliberate indifference to the need for adequate training.

As for the Defendants' argument that "plaintiff only paints a small aspect of the relevant
picture" as to the NYPD's training, Defs.' Mem. of Law at 15–16, it is the Defendants who omit
critical evidence. The Defendants claim that the NYPD began training its officers to disclose
impeachment evidence generally in 2005 and lawsuit information in particular in 2014. *Id.* But
the only evidence for these assertions is the deposition testimony of a party representative.
Despite specific follow-up requests, the Defendants failed to produce any training materials or
documentary evidence from before Fraser's criminal trial in 2015 that supports these claims.
Pl.'s 56.1 Resp. ¶¶ 53–54. The only NYPD training materials from before Fraser's trial that they
did produce, from the Police Academy, defined *Brady* material solely as "exculpatory evidence
that tends to clear someone's guilt." *Id.* ¶ 97. This training at the NYPD Police Academy did not
mention impeachment evidence, *Giglio* material, or that civil lawsuits against police officers can
constitute impeachment material. *Id.* ¶ 98. And the officers involved in this case do not recall
receiving any training on their duty to disclose lawsuit information other than a NYPD Legal
Bureau Bulletin from 2017. *Id.* ¶¶ 101–102. A reasonable jury could conclude from this evidence
(or lack thereof) that the NYPD did not train officers to disclose impeachment material generally
or lawsuit information in particular prior to Fraser's trial. Or a reasonable jury could conclude

that any training on the duty to disclose impeachment evidence or lawsuit information consisted of, at most, some stray comments by instructors—and that such training was inadequate.

The evidence described above, if credited by a jury, could support two separate theories of *Monell* liability: unlawful policy and deficient training. As to the unlawful policy, the NYPD trained its recruits at the Police Academy that *Brady* material included only "exculpatory evidence that tends to clear someone's guilt," and not impeachment material. Pl.'s 56.1 Resp. ¶¶ 97, 98. And a NYPD party representative responded, "Yes, I believe so," when asked whether the training given at the Police Academy "reflect[s] official NYPD policy as to the duties of police officers with regard to their *Brady* obligations." *Id.* ¶ 99; July 7, 2021 Fed. R. Civ. P. 30(b)(6) Deposition of Sergeant Gregory McNally, pp. 18:17–19:2, annexed to Rudin Decl. as Ex. 13, ECF No. 78-13. This admission establishes that the improper training reflected a facially unlawful policy and supports a claim for municipal liability. *See Giglio*, 405 U.S. at 155; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

On this evidence, a jury could also find the City liable for a policy of inadequate training. To establish the "deliberate indifference to the constitutional rights of citizens" requisite for such a failure-to-train claim, a plaintiff must show three things. *Walker*, 974 F.2d at 297. First, "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* Second, "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* And, third, "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298. In *Walker*, the Second Circuit held that allegations that the district attorney's office had failed to train its employees on their *Brady* obligations made out such a claim. *Id.* at 300.

Here, a reasonable jury could conclude that the record supports all three elements. First, the jury could find that municipal policymakers knew or should have known that police officers would be confronted with the question of what impeachment information about themselves to disclose to the prosecution because officers are sued or have complaints filed against them all the time. Second, the jury could conclude that the question of what kinds of material need be disclosed to the prosecution is the type of "difficult choice . . . that training or supervision will make less difficult." They, like the *Walker* court, could reject that "the *Brady* standard was so obvious or easy to apply as to require, as a matter of law, no training or supervision. Indeed, [a jury could find that] the evidence withheld in this case, though clearly *Brady* material, was not of the sort that one would obviously turn over, absent some knowledge of *Brady*." *Id.* at 300. Deltoro, for instance, made clear the need for additional training when he denied that lawsuits against him would impeach his credibility. Pl.'s 56.1 Resp. ¶ 39. Finally, a jury could conclude that the wrong choice by police officers as to whether to disclose impeachment evidence would frequently cause the deprivation of the constitutional rights of criminal defendants.

To be clear: far from such a failure-to-train claim being dependent on the outcome of a claim against the individual officers, it is an alternative theory of liability. If the jury finds the Defendants were fully aware of their disclosure obligations at the time of Fraser's trial—as they claim (but Plaintiff contests), *see* Pl.'s 56.1 Resp. ¶ 55—then the jury likely would reject that inadequate training caused any failure to disclose. If, on the other hand, the jury finds that the officers were unaware of their *Brady* obligations at the time—and therefore did not intentionally withhold any evidence from the prosecution—the jury could still find that a failure to train caused the nondisclosure and find the City liable. Similarly, a jury could find the City liable for failure to train if they find that the officers were generally aware of their *Brady* obligations, but

drew the lesson from their inadequate training that disclosing impeachment material like lawsuits to the prosecution wasn't important or necessary. The point is that the resolution of these questions depends on disputed facts; a reasonable jury could come out either way on this record.

## V. Bifurcating the trial would be contrary to judicial economy and prejudicial to the plaintiff (responding to Point V).

The question of whether to "order separate trials" is committed to this Court's "broad discretion," but "the presumption is that all claims in a case will be resolved in a single trial." *Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533, 549 (S.D.N.Y. 2005) (Conner, J.) (cleaned up); *accord Felix v. City of New York*, No. 16-CV-5845, 2020 WL 6048153, at *6 (S.D.N.Y. Oct. 13, 2020) (Nathan, J.). "The moving party bears the burden of justifying bifurcation, and separate trials are the exception rather than the rule." *McCoy v. City of New York*, No. 07-cv-4143, 2008 WL 3884388, at *1 (E.D.N.Y. Aug. 13, 2008) (Orenstein, M.J.) (cleaned up). Defendants have failed to show why an exception to the rule that all claims should be tried together applies here.

Bifurcation would serve neither judicial economy nor convenience. As an initial matter, a jury finding for the individual officer defendants on the *Brady* claim would not necessarily "eliminate the need to litigate the second issue," Defs.' Mem. of Law at 17 (citation omitted), the Defendants' principal argument for judicial economy. To be sure, there is a requirement of an underlying constitutional violation for *Monell* liability. But, as discussed above, the Second Circuit made clear in *Bellamy* that an inadvertent or negligent *Brady* violation by an individual actor can suffice for *Monell* liability if it is paired with deliberate indifference by a municipal policymaker. Because this is an alternative theory of liability, the *Monell* part of the trial would be necessary even if the jury finds for the individual defendants on the *Brady* claims.

Holding two trials, moreover, would entail substantial overlap and duplication. All the evidence about the nondisclosure of the civil lawsuits would have to be introduced twice. The

jury or juries would have to be charged twice on *Brady* and *Giglio*. If there are two separate juries empaneled, this Court will have to conduct two overlapping voir dires. And if there is one jury, the Court will presumably have to voir dire on issues relating to municipal liability anyway. If this Court agrees with us that a jury could find the individual officer defendants not liable but the City liable, and thus both phases of trial are necessary, bifurcation would be wildly wasteful.

Even if this Court holds that a finding for the individual officers on the *Brady* claim would preclude a trial on the *Monell* claim, as Defendants argue, any potential time savings would be minimal. While it is true that proposed trial exhibits 51 to 76 "exclusively pertain to his claim against the City," Defs.' Mem. of Law at 18, Plaintiff intends to use exhibits 51 to 74 solely to show that training materials used at the Police Academy at all relevant times defined *Brady* material exclusively as "exculpatory evidence that tends to clear someone's guilt." These exhibits are training materials from various years containing the same incomplete and inaccurate definition of *Brady*. Assuming Defendants do not contest the authenticity of these documents, which they produced in discovery, Mr. Fraser will not seek to bore the jury by lingering on them. He may not even need to introduce all the exhibits if the witness agrees they all contain the same definition. In any event, the point can likely be made in a few minutes of direct examination.

Indeed, there are few *Monell* cases that involve as short a presentation of evidence as this case. While many *Monell* cases involve lengthy testimony or exhibits, detailing the failure of policymakers to correct constitutional violations over the course of many years, Plaintiff's *Monell* theory is comparatively clear cut: the NYPD's own training materials demonstrate either an unlawful policy or a failure to train, and Defendants' claims that the NYPD trained officers on impeachment material are unsubstantiated by documentary evidence or other objective proof. It is likely that the *Monell* evidence can be conveyed to the jury in several hours of testimony.

While there are cases going both ways on the question of bifurcation, Plaintiff is unaware of any case where a Court bifurcated the *Monell* phase of a trial involving *Monell* evidence as simple as this one. Any potential time savings are dwarfed by the likely duplication of effort and expense. *See Felix*, 2020 WL 6048153, at *6 (noting that any "gains in judicial efficiency are likely to be outweighed by the efforts required to schedule and prepare for separate trials.").

Bifurcation would be potentially prejudicial to Plaintiff. If there are two separate phases or trials, bifurcation would allow the Defendants to try to escape liability by arguing inconsistent theories. The individual defendants would be able to argue at a first phase or trial that they are not liable because they lacked the requisite mental culpability, possibly due to inadequate training or policy. Then the City could argue at a second phase, either before the same or a different jury, that the training was sufficient but the officers were to blame for their own mistakes. Allowing the defendants to escape liability through such a divided trial would defeat § 1983's purpose: "to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Restivo v. Hessemann*, 846 F.3d 547, 585 (2d Cir. 2017) (quoting *Carey v. Piphus*, 435 U.S. 247, 253 (1978)).

Bifurcation would also interfere with Mr. Fraser's right to receive monetary and moral redress for his injuries—precisely what § 1983 protects. *See id.* Plaintiff is entitled to have a jury consider whether the City itself is ultimately responsible for his injuries and to seek compensation accordingly. But if the individual liability and *Monell* parts of the case were tried in front of two separate juries, presumably the first jury would deliberate on damages without ever hearing of the City's role. And even if a first jury found in his favor on the *Brady* claims against the individual defendants and awarded him damages, this would not eliminate the need for a trial on the *Monell* claim. It is Plaintiff's right "to seek symbolic vindication from the

20

municipality as well as the individual official for violation of constitutional rights." *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 321 (2d Cir. 1999). Even if he could recover only nominal damages from the City, he would still have the right to a trial on his *Monell* claim. *Id.*

Moreover, a divided trial before the same jury, as the Defendants appear to be proposing, Defs.' Mem. of Law at 18, would be prejudicial to Plaintiff were the jury to be instructed that, depending upon their verdict, there might be no need for a second phase or trial. In normal times, this might incentivize jurors to find for the Defendants so they can go home, and thus prejudice Plaintiff; in the time of COVID, the temptation for jurors to find for the Defendants so that they can avoid further potential exposure will be substantial, and the prejudice to Plaintiff greater.

Finally, the Defendants' claim that the "individual defendants will be significantly prejudiced by the likely evidence that would be presented against the City," Defs.' Mem. of Law at 18, is unconvincing. Perhaps it would prejudice the jury to hear evidence of "other reversed convictions" as the Defendants claim, *id.* at 19, but Plaintiff intends to introduce none. As for the lawsuit evidence, it will already be used as a basis to impeach the testifying Defendants' credibility—just as it would have been used at the criminal trial had it been disclosed—and also admitted to prove the *Brady* violation by Deltoro and UC 84. The court can deal with any undue prejudice to Defendants through an appropriate instruction. The rest of the *Monell* evidence, dealing with training and policy, would not prejudice the Defendants, and would likely largely come in anyway, on individual liability, for the issue of the Defendants' awareness of their *Brady* responsibilities. The Court should therefore deny the Defendants' request for bifurcation.

## VI.   A reasonable jury could find that Detective Deltoro was personally involved in the evidence fabrication and malicious prosecution (responding to Point VI).

The Defendants also argue that Mr. Fraser does not "adequately allege [Deltoro's] personal involvement" in the evidence-fabrication and malicious-prosecution claims. Defs.'

Mem. of Law at 19–20. But drawing all reasonable inferences for Plaintiff and resolving all factual ambiguities in his favor, a reasonable jury can find that Deltoro was aware that his fellow officers made up a false story to justify Fraser's arrest, yet failed to correct their lies and instead filled out paperwork labeling a photocopy of UC 84's driver's license—which he knew Regina did not find on Fraser—as "arrest evidence." A reasonable jury could thus find Deltoro liable for either acting in concert or failing to intervene.

The Defendants erroneously claim that "to the extent that plaintiff disputes Detective Regina's contention that he was found in possession of UC 84's fake identification, there is no evidence to establish that Detective Deltoro was present when Detective Regina took possession of it—however that may have occurred." Defs.' Mem. of Law at 20. But undisputed evidence establishes that Detective Deltoro was standing nearby when Detective Regina searched Mr. Fraser yet did not see Regina recover UC 84's identification from Fraser's person. Pl.'s 56.1 Resp. ¶¶ 91, 93. The record also establishes that Detective Deltoro invoiced a photocopy of this driver's license as arrest evidence despite testifying that he did not note on the property voucher where the identification was found because he did not see Regina recover the ID. *Id.* ¶¶ 94–95. This is significant because Regina's testimony about finding UC 84's identification in Fraser's pockets is essentially the only corroborating evidence for UC 84's story that Fraser threatened him, then took $20 and his ID; no other officer heard Fraser's supposed threats of violence, despite UC 84 wearing a transmitting device, and no other officer said they saw Fraser put the ID in his pockets, despite multiple officers keeping an eye on what was happening. *See id.* ¶¶ 77–87.

A reasonable jury could conclude from this evidence that Deltoro knew that Regina did not find UC 84's identification in Fraser's pockets because he saw Regina search Fraser, but still maintained a "blue wall of silence" and misleadingly labeled the ID as "arrest evidence." A

reasonable jury could also infer from Deltoro's history of working with these same officers every day on the same field team, *id.* ¶ 96, and the litany of allegations in lawsuits accusing UC 84 and Regina of evidence fabrication, that Deltoro knew UC 84 and Regina had a history of making up evidence against people accused of crimes, and he agreed to further this scheme here by helping to prepare false arrest documents. A jury could thus find Deltoro liable for evidence fabrication on a theory that he acted together with UC 84 and Regina to concoct a false story about Fraser's guilt and cause a prosecution to be based on it. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (holding that district court erred in granting summary judgment on § 1983 conspiracy claims where a jury could find that the defendant "knowingly took part . . . in the distribution of" false evidence and, together with another officer, "lied about the circumstances surrounding [the plaintiff's] arrest"). In the alternative, a jury could find Deltoro knew that UC 84 and Regina were falsely accusing Fraser of robbery, but failed to intervene by coming forward and telling the truth. *See id.* at 129 ("A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." (internal quotation marks and citation omitted)).

Either acting in concert or failing to intervene is sufficient to meet § 1983's requirement of personal involvement. *Fischl v. Armitage*, 128 F.3d 50, 57 (2d Cir. 1997) (holding that it would be sufficient to show the personal involvement of a correctional officer defendant in an attack on plaintiff by his fellow prisoners if the officer either "opened the cell door for the inmates himself" or "was in the vicinity of the ongoing attack and, despite [the plaintiff's] shouts, knowingly did nothing to stop it"). The claims against Deltoro should go to a jury.

## CONCLUSION

For the foregoing reasons, the Defendants' motion for partial summary judgment and for bifurcation should be denied except as to the *Brady* claim against Detective Regina.

Respectfully submitted,

/s/ Joel B. Rudin
Joel B. Rudin
Matthew A. Wasserman
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

DATED:      New York, New York
            September 29, 2021