UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jawaun Fraser,

                Plaintiff,

    -against-

The City of New York, Undercover Officer
Number 84, Detective Matthew Regina, and
Detective Jason Deltoro, Individually and as
Members of the New York City Police
Department,

                Defendants.

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT
OF UNDISPUTED FACTS AND
STATEMENT OF ADDITIONAL
MATERIAL FACTS PURSUANT
TO LOCAL CIVIL RULE 56.1
INCLUDING DEFENDANTS'
RESPONSE**

20-cv-4926 (CM)(OTW)

Pursuant to Local Civil Rule 56.1, the Plaintiff responds as follows to the Defendants'
statement of undisputed material facts as to which the Defendants contend there is no genuine
issue to be tried and submit their own statement of additional material facts:[1]

## Defendants' Statement of Material Facts and Plaintiff's Response

1.    Plaintiff was arrested on October 21, 2014, and his subsequent criminal trial
stemming from that arrest began on November 17, 2015.  See Fraser v. City of N.Y., No. 20-cv-
04926 (CM), 2021 U.S. Dist. LEXIS 69324, at *3-5 (S.D.N.Y. Apr. 9, 2021).

**Response No. 1**: Undisputed.

---

[1] Just like the Defendants note in footnote one of their Local Rule 56.1 statement, the
Plaintiff adopts the responses set forth herein only for purposes of the present motion for summary
judgment and reserves the right to present different and/or conflicting facts at trial. See Local Civil
Rule 56.1(c) (providing that uncontroverted statements of fact are "deemed to be admitted *for
purposes of the motion*" (emphasis added)); *Salus v. Sivan*, 534 F. Supp. 2d 430, 431 (S.D.N.Y.
2008) ("[A]ll [uncontroverted] statements of fact contained in defendant's Rule 56.1 Statement are
deemed admitted for purposes of this motion (albeit not for trial).").

2.      New York County Assistant District Attorney Gregory Sangermano ("ADA Sangermano") was the assigned prosecutor.  See Plaintiff's Amended Complaint, ¶ 54.

**Response No. 2**: Undisputed.

3.      Defendants Undercover Officer Number 84 ("UC 84"), Detective Matthew Regina and Detective Jason Deltoro were among the witnesses who testified during plaintiff's criminal trial.  Id. at ¶¶ 59 and 64.

**Response No. 3**: Undisputed.

4.      UC 84 and Detective Regina also testified before the Grand Jury and as part of a suppression hearing prior to plaintiff's criminal trial.  Id. at ¶ 59.

**Response No. 4**: Undisputed.

5.      On November 24, 2015, the jury found plaintiff guilty of robbery in the third degree and not guilty of robbery in the second degree.  Id. at ¶ 70.

**Response No. 5**: Undisputed.

6.      On December 6, 2019, Justice Robert M. Stolz of the New York County Supreme Court vacated plaintiff's conviction on the grounds that the People had constructive or institutional knowledge of civil lawsuits filed against Detective Regina and UC 84 that they failed to disclose to plaintiff's criminal defense attorney prior to plaintiff's criminal trial in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).  Id. at Ex. "B," pp. 5-6.

**Response No. 6**: Undisputed.

7.      The People's failure to disclose the existence of civil lawsuits to plaintiff's criminal defense attorney was the only <u>Brady</u> violation that the Court found.  <u>Id.</u>, generally.

**Response No. 7**: Undisputed.


8.      Plaintiff ultimately pled guilty to Disorderly Conduct (N.Y. Penal Law § 240.20). <u>Id.</u> at ¶ 91.

**Response No. 8**: Undisputed.


9.      At the time of plaintiff's criminal trial UC 84, Detective Regina and Detective Deltoro were named as defendants in a total of 26 civil lawsuits including one case where both UC 84 and Detective Regina were named as defendants.  <u>Id.</u> at Ex. "A," pp. 1-7.

**Response No. 9**: Undisputed.


10.     UC 84 was named as a defendant in eight civil lawsuits.  <u>Id.</u> at pp. 5-7.

**Response No. 10**: Undisputed.


11.     In two of those eight lawsuits he was never served with process.  <u>See</u> <u>Cook v. City of New York, et al.</u>, 09 CV 10238 (CM) (S.D.N.Y.), Civil Docket Sheet, generally; <u>Penn v. City of New York, et al.</u>, 10 CV 4907 (RJS) (S.D.N.Y.). Civil Docket Sheet, generally.

**Response No. 11**: Disputed. In *Cook*, a summons was issued as to the City of New York, Detective Jose Valentin, and UC 84. *See Cook*, 09-cv-10238 (S.D.N.Y.) (unnumbered docket entry dated Dec. 16, 2009). While there is no record that the summons was served on UC

84, there is also no docket entry indicating that it was served on the City. Yet an attorney appeared on behalf of the City and later settled the claims against "all defendants." *Id.*, ECF Nos. 3, 10. A reasonable jury could infer from this that UC 84 was properly served along with the City, but for whatever reason the plaintiff's attorney failed to note the service of these summonses on the ECF docket.

In *Penn*, similarly, a summons was issued as to UC 84, UC 11, Detective Valentin, and the City, but there is no record that any summonses were ever served on any party. *See Penn*, 10-cv-4907 (S.D.N.Y.) (unnumbered docket entry dated June 23, 2010). An attorney appeared on behalf of the City of New York, however, and later entered into a stipulation of settlement, which noted in the case caption that UC 84 was a named defendant. *Id.*, ECF Nos, 3, 12. Again, a reasonable jury could conclude from this information that UC 84 was properly served along with the City, but the plaintiff's attorney simply failed to note the service of this summons on the ECF docket.[2]

12.     In one of those eight lawsuits, he was not added as a defendant until September 23, 2016 – a little more than 10 months after plaintiff's criminal trial finished.  See Bahadur v. City of New York, et al., 15 CV 978 (AJN) (S.D.N.Y.), Civil Docket Sheet, Entry # 32.

**Response No. 12**: Undisputed.

---

[2] While the docket sheets in these cases were not attached to the Francolla Declaration, Plaintiff is not objecting to their use on summary judgment—and will use them himself— because they are the kind of court records  this Court can take judicial notice of on a summary-judgment motion. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleadings); *Fraser v. City of New York*, No. 20-CV-04926 (CM), 2021 WL 1338795, at *2 & n.1 (S.D.N.Y. Apr. 9, 2021) (taking judicial notice of when cases settled); *Akran v. United States*, 997 F. Supp. 2d 197, 203 (E.D.N.Y. 2014) (taking judicial notice of court records in related proceeding), *aff'd*, 581 F. App'x 46 (2d Cir. 2014); *see generally* Fed. R. Evid. 201.

13.     Of the five lawsuits where UC 84 was served with process and had a formal appearance entered on his behalf – ADA Sangermano was aware of one prior to plaintiff's criminal trial.  See People's Response to Defendant's C.P.L. 440 Motion, People v. Fraser, Ind. No. 4844/2014 ("People's 440 Response"), annexed to the Declaration of Brian Francolla, dated September 15, 2021 ("Francolla's Decl.") as Ex. "A," ¶ 12.

Response No. 13: Undisputed that ADA SanGermano was aware of *Baynes v. City of New York*, 12-cv-5903 (S.D.N.Y.), but not *Best v. City of New York*, 11-cv-5611 (S.D.N.Y.), *Parris v. City of New York*, 13-cv-6686 (S.D.N.Y.), *Pieralisi v. City of New York*, 15-cv-3785 (S.D.N.Y.), or *Wright v. City of New York*, 15-cv-4498 (S.D.N.Y.).

14.     Detective Regina was named as a defendant in 14 civil lawsuits.  See Plaintiff's Amended Complaint, Ex. "A," pp. 2-5.

Response No. 14: Undisputed.

15.     In four of those lawsuits he was never served with process.  See Drennon, et al., v. City of New York, et al., 05 CV 2486 (CBA) (KAM) (E.D.N.Y.), Civil Docket Sheet, generally; Hogarth v. City of New York, et al., 05 CV 4850 (RJD) (RML) (E.D.N.Y.), Civil Docket Sheet, generally; Gaymon v. City of New York, et al., 06 CV 00026 (RJD) (RML) (E.D.N.Y.), Civil Docket Sheet, generally; Walker v. City of New York, et al., 12 CV 00385 (CBA) (LB) (E.D.N.Y), Civil Docket Sheet, generally.

Response No. 15: Undisputed.

16.     In five of those lawsuits service was accepted on his behalf according to the Civil Docket Sheet, but counsel never formally appeared on his behalf.  See Butler v. City of New York, et al., 09 CV 2559 (ILG) (VVP) (E.D.N.Y.), Civil Docket Sheet, generally; Boyd, et al., v. City of New York, et al., 10 CV 2096 (SLT) (RML) (E.D.N.Y.), Civil Docket Sheet, generally; Molina v. City of New York, et al., 10 CV 1370 (VM) (S.D.N.Y.), Civil Docket Sheet, generally; Bumbrey, et al., v. City of New York, et al., 10 CV 5188 (ENV) (RML) (E.D.N.Y.), Civil Docket Sheet, generally; Hacksaw v. City of New York, et al., 10 CV 6005 (BMC) (E.D.N.Y.), Civil Docket Sheet, generally;

**Response No. 16**: Undisputed.


17.     Of the remaining five lawsuits where Detective Regina was served with process and had a formal appearance entered on his behalf – ADA Sangermano was aware of all five prior to plaintiff's criminal trial.  See Plaintiff's Amended Complaint, Ex. "A," pp. 2-5; People's 440 Response, Francolla's Decl., Ex. "A," ¶ 12.

**Response No. 17**: Undisputed.


18.     ADA Sangermano was aware of every lawsuit filed naming Detective Regina as a defendant prior to plaintiff's criminal trial.  Id.

**Response No. 18**: Disputed. ADA SanGermano was aware of 12 of the 14 lawsuits naming Detective Regina as a defendant prior to Fraser's criminal trial. *Compare* Am. Compl. Ex. A(II), ECF No. 64-1 (listing 14 lawsuits against Regina), *with* People's 440 Resp. ¶ 12, Francolla Decl. Ex. A, ECF No. 70-1 (listing 12 lawsuits against Regina ADA SanGermano was aware of).

19.     Detective Deltoro was named as a defendant in 5 civil lawsuits.  See Plaintiff's Amended Complaint, Ex. "A," pp. 1-2.

**Response No. 19**: Undisputed.


20.     In one of those lawsuits he was never served with process.  See Green v. Doe, et al., 11 CV 9690 (PGG) (S.D.N.Y.), Civil Docket Sheet, generally.

**Response No. 20**: Undisputed.


21.     In one of those lawsuits service was accepted on his behalf according to the Civil Docket Sheet, but counsel never formally appeared on his behalf.  See A.T. v. City of New York, et al., 12 CV 4146 (JSR) (S.D.N.Y.), Civil Docket Sheet, generally.

**Response No. 21**: Undisputed that counsel never filed a formal notice of appearance for Detective Deltoro. But the docket sheet indicates that "the parties" reached a settlement agreement. *A.T. v. City of New York*, 12-cv-4146 (S.D.N.Y.), ECF No. 19.


22.     Of the three lawsuits where Detective Deltoro was served with process and had a formal appearance entered on his behalf – ADA Sangermano was not aware of any prior to plaintiff's criminal trial.  See Plaintiff's Amended Complaint, Ex. "A," pp. 1-2; People's 440 Response, Francolla's Decl., Ex. "A," ¶ 12.

**Response No. 22**: Undisputed that ADA SanGermano was unaware of *Loglisci v. City of New York*, 09-cv-1220 (S.D.N.Y.), *Murray v. City of New York*, Index No. 307520/2009 (NY Sup. Ct. Bronx Cty.), and *Nunez v. City of New York*, 09-cv-8798 (S.D.N.Y.).

23.     In sum, out of the 26 civil lawsuits filed against the defendants prior to the commencement of plaintiff's criminal trial, ADA Sangermano was unaware of seven where the individual defendants in this case had both been served with process and formally appeared.  See ¶¶ 12, 16 and 21, supra.

       **Response No. 23**: Undisputed (on the assumption that the Defendants meant to cite to paragraphs 13, 17, and 22 of their 56.1 statement).

24.     ADA Sangermano does not recall whether he asked any of the individual defendants about their civil lawsuit history.

       **Response No. 24**: Undisputed.

25.     ADA Sangermano does not recall if any of the individual defendants volunteered any information pertaining to their civil lawsuit history.  See May 4, 2021 Deposition of ADA Sangermano, annexed to Francolla's Decl. as Ex. "B," pp. 99: 24 – 107: 19; 113: 4 – 120: 12; 131: 5 – 141: 11; 146: 22 – 147: 10; 169: 16 – 171: 11.

       **Response No. 25**: Undisputed.

26.     ADA Sangermano's practice prior to November 2015 was to initiate a search for any civil lawsuits filed against police officers he anticipated calling as witnesses in a criminal trial. Id.

       **Response No. 26**: Undisputed that this was ADA SanGermano's testimony about his general practice. Disputed that he did so for all potential witnesses before Fraser's trial. He did not specifically recall whether he directed the *Garrett* searcher to look for lawsuits against all

testifying officers. SanGermano Dep. Tr. 119:24–120:6, Francolla Decl. Ex. B, ECF No. 70-1. And a reasonable jury could find that he did not do so because ADA Sangermano did not know or disclose information about *any* lawsuits against Lieutenant John Patane and Detective Hoiping Lee, who were listed as potential witnesses, or Undercover Number 17 ("UC 17") and Detective Deltoro, who testified at trial. *See* Pl.'s Stmt. of Add'l Material Facts ¶¶ 61, 62, 67 *infra*.

27.    Specifically, he would provide a list of the potential police officer witnesses to staff within his office who were referred to as "Garrett searchers."  Id.

**Response No. 27**: Undisputed that this was ADA SanGermano's general practice. Disputed that he did so for anyone other than Detective Regina and UC 84 in this case, for the reasons given in Response No. 26 above.

28.    Garrett searchers had access to relevant databases that contained civil lawsuit information and were trained on how to navigate those particular databases in order to locate any civil lawsuits filed against police officers whose information they were provided.  Id.

**Response No. 28**: Undisputed.

29.    The assigned Garrett searcher would provide ADA Sangermano with any information responsive to his request and he in turn would provide that information to the defense. Id.

**Response No. 29**: Undisputed that the assigned *Garrett* searcher provided ADA Sangermano with responsive information. Disputed that ADA SanGermano provided all the information found by the *Garrett* searcher to the defense in Fraser's criminal case. Specifically,

9

while ADA SanGermano admits to knowing of 13 lawsuits (and claims he disclosed all 13), Fraser's defense attorney Geoffrey Stewart says he was only provided with information about two of these lawsuits. *Compare* People's 440 Resp. ¶¶ 12, Francolla Decl. Ex. A, ECF No, 70-1, *and* SanGermano Dep. Tr. 133:24–134:4, Francolla Decl. Ex. B, ECF No. 70-1, *with* Stewart Dep. Tr. 19:5–19:10, Francolla Decl. Ex. H, ECF No. 70-8.

30.     ADA Sangermano's practice at the time of plaintiff's criminal trial was to conduct a search for all civil lawsuits filed against a police officer he anticipated calling at trial prior to meeting with that particular officer.  Id.

        **Response No. 30**: Undisputed that this was ADA SanGermano's testimony about his general practice. Disputed that he did so before Fraser's trial for all officers for the same reasons as given in Response No. 26 above.

31.     This was so he could discuss the specifics of any lawsuits he discovered with the particular police officer.  Id.

        **Response No. 31**: Undisputed that this was his testimony. Disputed that ADA SanGermano in fact searched for lawsuits against all testifying officers, as discussed in Response No. 26 above.

32.     In his experience, police officers are typically unaware that they are being sued until they are deposed so they are often not aware of how many times they have been sued, if they have been sued at all or whether a case where they have been sued has been resolved.  Id.

        **Response No. 32**: Undisputed that this was his testimony. Disputed that ADA

SanGermano can properly testify about what information police officers typically know or don't know. *See* Fed. R. Evid. 602 (requiring personal knowledge). Local Civil Rule 56.1(d) requires that each statement of fact "must be followed by citation to evidence that would be admissible."

33.     In his experience, even where a police officer is aware that they have been sued, they are often unaware of the specific case name or docket number.  Id.

**Response No. 33**: Undisputed that this was his testimony. Disputed that ADA SanGermano can properly testify about what information police officers typically know or don't know. *See* Fed. R. Evid. 602 (requiring personal knowledge). Local Civil Rule 56.1(d) requires that each statement of fact "must be followed by citation to evidence that would be admissible."

34.     In his experience, even where a police officer is aware that they have been sued, they are often unaware of what the underlying case is about since it is common for a police officer to be sued over an incident in which they had little to no involvement.  Id.

**Response No. 34**: Undisputed that this was his testimony. Disputed that ADA SanGermano can properly testify about what information police officers typically know or don't know. *See* Fed. R. Evid. 602 (requiring personal knowledge). Local Civil Rule 56.1(d) requires that each statement of fact "must be followed by citation to evidence that would be admissible."

35.     For these reasons, DANY's policy was for their personnel to perform the Garrett searches themselves rather than rely exclusively on police officers to provide the accurate universe of civil lawsuit information when there was a likelihood that they would be unable to do so.   See

June 24, 2021 F.R.C.P. 30(b)(6) Deposition of William Darrow, annexed to Francolla's Decl. as Ex. "C," pp. 46: 20 – 57: 4.

      **Response No. 35**: Undisputed that it was DANY's policy for their employees to perform *Garrett* searches. Disputed that any non-expert witness has personal knowledge of the "likelihood" of police officers knowing the "accurate universe of civil lawsuit information." *See* Fed. R. Evid. 602; Local Civil Rule 56.1(d).

36.    Detective Regina recalls being asked by ADA Sangermano whether he had been sued. <u>See</u> April 27, 2021 Deposition of Detective Matthew Regina ("Regina's Dep."), annexed to Francolla's Decl. as Ex. "D," pp. 57: 5 – 61: 14; 67: 11-22.

      **Response No. 36**: Undisputed.

37.    Detective Regina responded that he had been sued maybe "ten times, maybe more," but that he did not remember the specifics of each lawsuit – many of which he believed stemmed from the execution of search warrants. <u>Id.</u>

      **Response No. 37**: Undisputed.

38.    Detective Deltoro did not remember the specifics of his conversation with ADA Sangermano. <u>See</u> April 22, 2021 Deposition of Detective Jason Deltoro ("Deltoro's Dep."), annexed to Francolla's Decl. as Ex. "E," pp. 96: 14 – 100: 24; 109: 21 – 114: 6.

      **Response No. 38**: Undisputed.

39.     His practice at the time of plaintiff's trial was to disclose to the assigned ADA any lawsuits where he was named as a defendant that he was aware of at the time of the meeting.  Id.

**Response No. 39**: Disputed. Detective Deltoro testified that he knew he had to "disclose everything," but he then said that he had "no problems with my credibility" and answered "no" when asked if he "consider[ed] a lawsuit filed against you something that might affect your credibility." Deltoro Dep Tr. 96:14–100:3, Francolla Decl. Ex. E, ECF No. 70-5. Finally, he said he would disclose lawsuit information "[i]f *they asked*, yes, and if I remembered." *Id.* at 100:4–100:6 (emphasis added).

40.     There were instances where he was not aware of lawsuits naming him as a defendant because he had never actually been served.  Id.

**Response No. 40**: Undisputed.

41.     There were also instances where he no longer remembered the existence of a lawsuit he was a party to due to the passage of time and/or his limited involvement in the underlying incident.  Id.

**Response No. 41**: Undisputed.

42.     UC 84 does not remember the specifics of his conversation with ADA Sangermano. See April 29, 2021 Deposition of UC 84 ("UC 84's Dep."), annexed to Francolla's Decl. as Ex. "F," pp. 207: 6 – 215: 14; 219: 13 – 222: 6; 225: 17 – 226: 5; 308: 13 – 312: 6.

**Response No. 42**: Undisputed.

43. His practice at the time of plaintiff's criminal trial was to tell the assigned ADA how many times he had been sued so that the ADA could then determine an accurate universe.  Id.

**Response No. 43**: Disputed. UC 84 testified in the cited pages about what he tells prosecutors when they ask him about lawsuits but not about his practices *at the time of Fraser's criminal trial*. Instead, he testified that he remembered prosecutors had asked him about his lawsuits, but added, "I don't know when in time. I just remember being asked by prosecutors." UC 84 Dep. Tr. 211:3–211:10, Francolla Decl. Ex. F, ECF No. 70-6.

44. There were instances where he was not aware of lawsuits naming him as a defendant because he had never actually been served.  Id.

**Response No. 44**: Disputed that UC 84 was not served with the complaint for any lawsuit filed prior to Fraser's criminal trial. See Response No. 11, *supra*. Further disputed that UC 84 has personal knowledge that he was not served in any specific case. *See* Fed. R. Evid. 602; Local Civil Rule 56.1(d). UC 84 testified only that there were "one or two" complaints that "I feel like I have not received." UC 84 Dep. Tr. 225:24–226:5, Francolla Decl. Ex. F, ECF No. 70-6.

45. There were also instances where he no longer remembered the existence of a lawsuit he was a party to due to the passage of time and/or his limited involvement in the underlying incident.  Id.

**Response No. 45**: Undisputed.

46. Plaintiff's original criminal defense attorney, James McQueeney, Esq., had the ability to look up the defendants for any civil lawsuit history during his representation of plaintiff.

See May 12, 2021 Deposition of James McQueeney, Esq., annexed to Francolla's Decl. as Ex. "G," pp. 26: 19 – 30: 9.

       **Response No. 46**: Disputed. Mr. McQueeney testified that he had never done such a search, did not know how to do such a search, and would have had to ask an investigator for assistance. *See* May 12, 2021 Deposition of James McQueeney ("McQueeney Dep. Tr."), annexed to the Declaration of Joel Rudin ("Rudin Decl."), as Ex. "1," pp. 21:22–22:12, 28:20–29:2. But undisputed that other individuals in Mr. McQueeney's organization could perform such a search.


47.    Plaintiff's subsequent criminal defense attorney, Geoffrey Stewart, Esq., who represented plaintiff during his criminal trial, also had the ability to look up the defendants for any civil lawsuit history.  See May 19, 2021 Deposition of Geoffrey Stewart, Esq., annexed to Francolla's Decl. as Ex. "H," pp. 10: 11 – 27: 3.

       **Response No. 47**: Undisputed that Mr. Stewart represented Fraser at trial and that he had the ability to search PACER. Disputed that he had the ability to find all the lawsuits filed against UC 84, given the difficulties in finding lawsuits against undercover officers on PACER discussed below. *See* Pl.'s Stmt. of Add'l Material Facts ¶¶ 103–105, *infra*; *see also* Declaration of Matthew Wasserman, dated September 29, 2021 ("Wasserman Decl."), annexed to Rudin Decl. as Ex. "16," ¶¶ 16–21.


48.    The initial search on Pacer for the defendants' lawsuit histories could be accomplished in as little as five minutes. Id.

       **Response No. 48**: Disputed. There are difficulties in searching for lawsuits against

undercover officers, as discussed below, which potentially make such searches more time-consuming. Pl.'s Stmt. of Add'l Material Facts ¶¶ 103–105, *infra*; Wasserman Decl. ¶¶ 16–21.

49.     Mr. Stewart's typical practice at the time of plaintiff's criminal trial would be to perform such a search.  Id.

**Response No. 49**: Undisputed.

50.     Mr. Stewart would typically try to do so even if he received Garrett disclosures from an ADA in order to double check whether the lawsuit history was complete.  Id.

**Response No. 50**: Disputed. Mr. Stewart did not testify about what he would "typically try to do" if he received a *Garrett* disclosure at the time of Fraser's criminal trial; rather, he testified that when he received a *Garrett* disclosure, he "would like to say that [he] always" double-checked the accuracy of the disclosure but he did not always do so. Stewart Dep. Tr. 23:1–23:6, Francolla Decl. Ex. H, ECF No. 70-8.

51.     Mr. Stewart does not recall if he performed a search of the defendants' respective lawsuit histories in advance of plaintiff's criminal trial.  Id.

**Response No. 51**: Undisputed that Mr. Stewart has no independent recollection of whether he performed such a search. Disputed as misleading insofar as it omits his present belief that he did not do so, based on a review of his case files and his PACER account records. Stewart Dep. Tr. 25:13–26:7, Francolla Decl. Ex. H, ECF No. 70-8 ("Q: And all of that would further support your belief that you did not, in fact, do any of these searches for the officers? A: Correct.").

52.     Mr. Stewart did confirm that according to PACER he did not perform such a search.

Id.

    **Response No. 52**: Undisputed.


53.     Since before 2005, the NYPD has been training members of service about their obligation to disclose impeachment information about themselves to the prosecution.  See July 28, 2021 F.R.C.P. 30(b)(6) Deposition of Katie Flaherty, annexed to Francolla's Decl. as Ex. "I," pp. 7: 8 – 32: 16.

    **Response No. 53**: Disputed. While Ms. Flaherty testified that officers were trained about their obligation to disclose impeachment evidence to the prosecution since before 2005, despite specific requests, the Defendants have not produced any training materials or other documentary evidence predating Fraser's criminal trial discussing the obligation of police officers to disclose impeachment information. *See* Wasserman Decl. ¶¶ 3–9, Rudin Decl. Ex. 16. And the training materials used for recruits at the NYPD Police Academy did not mention impeachment evidence at any point prior to October 2019. Pl.'s Stmt. of Add'l Material Facts ¶¶ 97–98, *infra*. A reasonable jury could conclude from this that NYPD officers either weren't trained about their general obligation to disclose impeachment information to the prosecution prior to the time of Fraser's trial, or that any training they received on the subject was minimal and inadequate.


54.     The NYPD began training members of service to affirmatively disclose their civil lawsuit histories to the prosecution beginning in 2014.  Id.

    **Response No. 54**: Disputed. While Ms. Flaherty testified that this training began in

2014, the Defendants have not produced any evidence of this training such as PowerPoints or written materials that predates Mr. Fraser's criminal trial in 2015, despite specific follow-up requests for training materials from 2014 or 2015 at Ms. Flaherty's deposition and then in writing. Flaherty Dep. Tr. 20:24–21:3, Francolla Decl. Ex. I, ECF No. 70-9; Wasserman Decl. ¶¶ 3–9, Rudin Decl. Ex. 16. Further, the NYPD had no written policy dealing with the duty to disclose lawsuit information to the prosecution until 2017 and did not train recruits at the Police Academy about the duty to disclose impeachment evidence generally or lawsuits specifically at any relevant time. Pl.'s Stmt. of Add'l Material Facts ¶¶ 97–98, 100, *infra*. A reasonable jury could infer from this evidence—or lack thereof—that no such training took place prior to Fraser's trial in 2015.

55.     The individual defendants were generally aware of these obligations at the time of plaintiff's criminal trial. See Regina's Dep., Francolla's Decl., Ex. "D," pp. 57: 5 – 61: 14; 67: 11-22; Deltoro's Dep., Francolla's Decl., Ex. "E," pp. 96: 14 – 100: 24; 109: 21 – 114: 6; UC 84's Dep., Francolla's Decl., Ex. "F," pp. 207: 6 – 215: 14; 219: 13 – 222: 6; 225: 17 – 226: 5; 308: 13 – 312: 6.

**Response No. 55**: Disputed. While Detective Regina testified that he had been aware of his obligation to disclose impeachment evidence to the prosecution for "as far as I remember," *see* April 27, 2021 Deposition of Matthew Regina ("Regina Dep. Tr."), annexed to Rudin Decl. as Ex. "2," pp. 67:11–67:22,[3] Regina's other deposition testimony establishes that he

---

[3] While this transcript page is included in the deposition excerpt attached to the Francolla Declaration, Plaintiff's counsel has also attached it as an exhibit to his own declaration because the following cited pages are not included in the excerpts attached to the Francolla Declaration. He has done the same for other deposition transcripts where the Defendants included some, but not all, of the testimony that he cites as exhibits. Though this results in some duplication, this way the Court need not go back and forth from one declaration to another to follow the citations.

was not aware of these obligations at the time of Fraser's criminal trial in November 2015. Regina testified at his deposition (in 2021) that his understanding of the "*Brady* rule" was that it meant that all lawsuits involving him "have to be turned over," that he was trained about this "a couple of years ago," and that he thought he had heard of the *Brady* rule through a NYPD Legal Bureau Bulletin. *Id.* at 62:2–63:17. He later confirmed that the Legal Bureau Bulletin he was referring to was dated January 25, 2017, over a year after Fraser's criminal trial in 2015. *Id.* at 69:11–71:4. He also testified that this was the only training he had received from the NYPD about his "obligation to disclose prior lawsuits to the prosecution or the defense." *Id.* at 72:8–72:17.

As for Detective Deltoro, the cited pages do not establish that he knew he had to "affirmatively disclose" his civil lawsuit history to the prosecution at the time of Fraser's criminal trial either. He testified that he knew he had to "disclose everything," but he also testified that he had "no problems with my credibility" and answered "no" when asked if he "consider[ed] a lawsuit filed against you something that might affect your credibility." *See* April 22, 2021 Deposition of Jason Deltoro ("Deltoro Dep. Tr."), annexed to Rudin Decl. as Ex. "3," pp. 96:14–100:3. Then he said he would disclose lawsuit information "[i]f *they asked*, yes, and if I remembered." *Id.* at 100:4–100:14 (emphasis added). Furthermore, he did not remember if the NYPD had ever trained him on whether he is "required to disclose lawsuits to the prosecution." *Id.* at 100:25–101:5.

Finally, the cited testimony establishes that UC 84 remembered that prosecutors had asked him about lawsuits, but not whether he had been asked before or only after Fraser's trial. *See* April 29, 2021 Deposition of Undercover 84 ("UC 84 Dep. Tr."), annexed to Rudin Decl. as Ex. "4," pp. 211:3–211:10. And when he was asked what training he had received on disclosing lawsuits to the prosecution, UC 84 remembered only the Legal Bureau Bulletin disseminated in 2017, over a year after Fraser's criminal trial. *Id.* at 215:16–217:20.

56.     NYPD training at the Police Academy represents a starting off point for issues that are covered and such training is then expanded upon as a police officer begins their career.  See July 7, 2021 F.R.C.P. 30(b)(6) Deposition of Sergeant Gregory McNally, annexed to Francolla's Decl. as Ex. "J," pp. 47: 25 – 55: 22; 76: 23 – 77: 11.

Response No. 56: Undisputed.

57.     The training provided at the Police Academy is not limited solely to the words written within the associated materials and does include elaboration from the particular instructor. Id.

Response No. 57: Undisputed, with the caveat that there is no testimony or other evidence about the substance of any elaboration that occurred during Police Academy training.

## Plaintiff's Statement of Additional Material Facts

58.     Mr. Fraser's first criminal defense attorney, James McQueeney of the Legal Aid Society, represented Mr. Fraser until sometime in March 2015, when Mr. Fraser retained Geoffrey Stewart. McQueeney Dep. Tr. 25:22–26:25, 31:4–31:8, Rudin Decl. Ex. 1.

Response No. 58: Undisputed.

59.     Mr. McQueeney no longer represented Mr. Fraser by the time that his criminal case was first scheduled for hearing and trial. Id. at 31:9–31:12.

Response No. 59: Undisputed.

60.     The suppression hearing in Fraser's criminal case started on November 13, 2015. See November 13, 2015 Hearing Transcript, annexed to Rudin Decl. as Ex. "5,"  p. 2.

**Response No. 60:** Undisputed.

61.     Shortly before the hearing, ADA SanGermano provided defense counsel with a list of potential witnesses that included Detective Regina, Detective Deltoro, UC 84, UC 17, Lieutenant Patane, and Detective Lee. *See* May 4, 2021 Deposition of Gregory SanGermano ("SanGermano Dep. Tr."), annexed to Rudin Decl. as Ex. "6," pp. 50:19–53:9; List of Witnesses and Names Likely to be Mentioned at Trial, annexed to Rudin Decl. as Ex. "7."

**Response No. 61:** Disputed.  The cited record does not definitively establish when the list was provided other than ADA Sangermano stating that "I probably would have provided it prior to the suppression hearing."  Assuming he did provide the list prior to the suppression hearing, there is nothing in the cited record that speaks to how close in time that production was made.  Last, this assertion is misleading insofar as the cited record does not establish that the individuals listed were "potential witnesses."  Rather, they were identified in a document entitled "List of Witnesses and Names likely to be Mentioned at Trial."  Neither Lt. Patane nor Detective Lee were in fact called as witnesses at the trial.

62.     In addition to Detective Regina, Detective Deltoro, and UC 84, UC 17 also testified at Fraser's criminal trial. *See* SanGermano Dep. Tr. 47:5–47:14, Rudin Decl. Ex. 6.

**Response No. 62:** Undisputed, except note that the cited record does not support this assertion.

63.     ADA SanGermano provided printouts of information about civil lawsuits against testifying officers to the defense at the end of the suppression hearing in Fraser's criminal case, on November 16, 2015, the day before the trial started. *See* November 16, 2015 Hearing Transcript, annexed to Rudin Decl. as Ex. "8,"pp. 105–06; Stewart Dep. Tr. 15:24–16:3, Francolla Decl. Ex. H, ECF No. 70-8.

**Response No. 63:** Undisputed that ADA SanGermano provided the material to Mr. Stewart in the manner described, but dispute that the cited record definitively establishes that the production occurred that day as opposed to ADA SanGermano simply noting a prior production on the record.  It is unclear when specifically in time the production was made from the cited record.

64.    ADA SanGermano did not create a list or otherwise memorialize which lawsuits he provided to the defense in this case; the only record he kept of what lawsuit information he disclosed was the copy of the paperwork in his file. SanGermano Dep. Tr. 141:13–141:17, 146:23–147:6, Francolla Decl. Ex. B, ECF No. 70-2.

**Response No. 64:** Undisputed.

65.    The *Garrett* searchers provided ADA Sangermano with information about 13 lawsuits against the testifying officers: one against UC 84 only, one against UC 84 and Regina, and 11 against Regina only. People's 440 Resp. ¶ 12, Francolla Decl. Ex. A, ECF No. 70-1.

**Response No. 65:** Undisputed.

66.    ADA Sangermano did not disclose information about the following five lawsuits in which UC 84 was a defendant because he did not know about them: *Cook v. City of New York*, 09-cv-10238 (S.D.N.Y.), *Best v. City of New York*, 11-cv-5611 (S.D.N.Y.), *Parris v. City of New York*, 13-cv-6686 (S.D.N.Y.), *Pieralisi v. City of New York*, 15-cv-3785 (S.D.N.Y.), and *Wright v. City of New York*, 15-cv-4498 (S.D.N.Y.). *See* People's 440 Resp. ¶ 12, Francolla Decl. Ex. A, ECF No. 70-1 (listing the 13 lawsuits that ADA SanGermano was aware of).

**Response No. 66:** Undisputed.

67.    ADA SanGermano did not disclose information about any of the lawsuits filed prior to Fraser's trial against Detective Deltoro, UC 17, Lieutenant Patane, or Detective Lee

because he was not aware of any civil suits against these four officers. *See* People's 440 Resp.

¶ 12, Francolla Decl. Ex. A, ECF No. 70-1 (listing 13 lawsuits against Regina and/or UC 84 that

ADA SanGermano was aware of prior to Fraser's criminal trial); *id.* ¶ 23 (admitting that ADA

SanGermano was unaware of lawsuits against Detective Deltoro and UC 17).

> **Response No. 67:** Disputed to the extent this assertion pertains to Lt. Patane who

is not referenced in ¶ 23 nor did he testify at the criminal trial.  Otherwise undisputed.

68.     The prosecution provided Mr. Stewart with records relating to only two lawsuits

against testifying officers: *Penn v. City of New York.*, 10-cv-4907 (RJS) (S.D.N.Y.) and *Baynes*

*v. City of New York*, 12-cv-5903 (RJS) (S.D.N.Y.). Stewart Dep. Tr. 19:5–19:10, Francolla Decl.

Ex. H, ECF No. 70-8; *see* Affirmation in Support of Defendant's C.P.L. 440 Motion, *People v.*

*Fraser*, Ind. No. 4844/2014 ("Fraser 440 Aff."), annexed to Rudin Decl. as Ex. "9," ¶ 77.

> **Response No. 68:** Disputed.  As plaintiff notes in Response No. 29, <u>supra</u>,

opposing counsel in plaintiff's criminal prosecution dispute the amount of lawsuits that were

actually disclosed.

69.     Geoffrey Stewart, Mr. Fraser's criminal defense attorney at the time of trial, put

the printouts provided to him by ADA SanGermano in his physical case file, and kept the hard

copies in his file. Stewart Dep. Tr. 16:8–16:16, Francolla Decl. Ex. H, ECF No. 70-8.

> **Response No. 69:** Undisputed that Mr. Stewart testified as such, but note that his

basis for that assertion is the same as ADA SanGermano's basis for believing that a larger

amount of lawsuits were disclosed (<u>see</u> Response No. 68).

70.     Mr. Stewart had printouts of court records relating to those two lawsuits—and no

other materials relating to lawsuits against testifying officers—in his case file. *See* Stewart Dep.

Tr. 16:8–16:16, 19:5–19:10, Francolla Decl. Ex. H, ECF No. 70-8.

**Response No. 70:** <u>Id.</u>

71.     UC 84 was a defendant in both *Penn* and *Baynes,* and Regina was a defendant in *Baynes. See Penn v. City of New York et al.,* 10-cv-4907 (RJS) (S.D.N.Y), ECF No. 10; *Baynes v. City of New York et al.,* 12-cv-5903 (RJS) (S.D.N.Y.), ECF Nos. 1, 3, 9, 11.

**Response No. 71:** Undisputed.

72.     Mr. Stewart relied on the prosecution's disclosure of lawsuit information as being complete. Stewart Dep. Tr. 23:7–23:14, 24:2–24:13, Francolla Decl. Ex. H, ECF No. 70-8 ("[O]nce I was given that material, I thought . . . that it was a complete disclosure as to any and all witnesses that the People were calling. . . . [W]hen he turned over documents regarding police officer lawsuits, I did kind of assume that this was all there was").

**Response No. 72:** Undisputed, except note that the cited record also makes clear that Mr. Stewart believed that the People would typically provide complete disclosures as they understood their obligations in that regard.[4]

73.     Mr. Stewart reviewed his PACER account records for the time of Fraser's criminal trial, which show that he did not search PACER for lawsuits against any officers in this case. Stewart Dep. Tr. 24:21–25:5, Francolla Decl. Ex. H, ECF No. 70-8.

**Response No. 73:** Undisputed.

74.     Mr. Stewart also reviewed his case files. He has no notes or records relating to lawsuits against testifying officers in this case, which he would have had if he had searched for lawsuits against them. Stewart Dep. Tr. 25:21–26:7, Francolla Decl. Ex. H, ECF No. 70-8.

**Response No. 74:** Undisputed that he so testified.

---

[4] In <u>People v. Garrett</u>, 23 N.Y.3d 878, 890 (2014), the New York Court of Appeals held that the State has "no affirmative duty to search the dockets of every case in every federal and state court in New York for complaints against their police witnesses."

75.     Had Mr. Stewart known about more than two lawsuits against testifying officers, he would have used that information to impeach the credibility of the testifying officers. *See* May 19, 2021 Deposition of Geoffrey Stewart ("Stewart Dep. Tr."), annexed to Rudin Decl. as Ex. "10," pp. 40:17–40:20, 41:24–42:24, 44:12–44:17.

**Response No. 75:** Undisputed that he so testified.

76.     The only inculpatory evidence against Mr. Fraser at trial was police testimony. There was no physical evidence and the only testimony from a civilian witness introduced at trial was the testimony of a computer forensic analyst, who testified that he was unable to access Mr. Fraser's iPhone because it was password protected. Fraser 440 Aff. ¶¶ 32–40, Rudin Decl. Ex. 9.

**Response No. 76:** Disputed only insofar as physical evidence did exist in the form of UC 84's identification which was recovered from plaintiff.

77.     UC 84 testified that, while he was trying to buy drugs as part of a buy-and-bust operation, Mr. Fraser approached him aggressively, accused him of being a police officer, and demanded that he show identification. *Id*. ¶¶ 13–17, 33.

**Response No. 77:** Undisputed.  Defendants further note that this testimony was largely corroborated by the woman UC 84 was attempting to buy drugs from, Diane Smith, as well as plaintiff himself during two of his parole board hearings.  <u>See</u> June 28, 2021 Deposition of Diane Smith ("Smith's Dep."), annexed to the October 5, 2021 Declaration of Brian Francolla ("Francolla's Decl.") as Exhibit "A," pp. 6: 20 – 21: 3; Exhibits K and L annexed to the September 15, 2021 Declaration of Brian Francolla.

78.     UC 84 further testified that Fraser, together with a group of other individuals, threatened to assault him if he did not provide Fraser with his money and identification; when UC 84 complied, Fraser used his cell phone to take a photograph of this driver's license (which

had UC 84's real photo but a fictitious name), and pocketed the money and ID. *Id.* ¶ 18.

**Response No. 78:** Undisputed.

79.   UC 84 was wearing a "Kel" device at the time of his interaction with Mr. Fraser,

which is a one-way transmitter worn by undercover police officers that transmits audio to a

single receiver. UC 84 Dep. Tr. 39:3–40:8, 108:2–109:24, Rudin Decl. Ex. 4.

**Response No. 79:** Undisputed.  Defendants further note that the cited record

establishes that the "Kel" is an inherently unreliable piece of equipment when used in the field.

80.   The narcotics team checked that this Kel device was working prior to going out in

the field on October 21, 2014, and then made sure it was turned on and working when UC 84

exited his unmarked car to go try to buy drugs. *Id.* at 108:16–109:24.

**Response No. 80:** Undisputed.

81.    The Kel receiver was in the "leader car," where Lieutenant Patane was sitting

while UC 84 was speaking with Mr. Fraser. *Id.* at 108:6–108:15; May 25, 2021 Deposition of

John Patane ("Patane Dep. Tr."), annexed to Rudin Decl. as Ex. "11," pp. 62:3–63:8.

**Response No. 81:** Undisputed.

82.   Lieutenant Patane testified that the Kel device was not working, and that he could

not hear any conversation between UC 84 and Mr. Fraser. Patane Dep. Tr. 58:3–58:8, 65:19–

66:5, Rudin Decl. Ex. 11.

**Response No. 82:** Undisputed.  Defendants note for clarity that the Kel device

was operational, but not transmitting while in the field.  See Response Nos. 79-80.

83.   No other officer heard the interaction between Mr. Fraser and UC 84. Regina

Dep. Tr. 32:19–32:21, Rudin Decl. Ex. 2; Deltoro Dep. Tr. 45:18–46:6, Rudin Decl. Ex. 3.

**Response No. 83:** Undisputed.  Defendants further note that Diane Smith did hear

the initial interaction between plaintiff and UC 84 largely corroborating UC 84's account of that interaction.  See Smith's Dep., Francolla's Decl., Exhibit "A," pp. 6: 20 – 21: 3.

84.     UC 84 is the only officer who testified about his conversation with Mr. Fraser and the supposed threats made by Mr. Fraser. *Compare* UC 84 Dep. Tr. 99:4–99:15, Rudin Decl. Ex. 4, *with* Regina Dep. Tr. 32:19–32:21, Rudin Decl. Ex. 2, Deltoro Dep. Tr. 45:18–46:6, Rudin Decl. Ex. 3, *and* Patane Dep. Tr. 65:19–65:22, Rudin Decl. Ex. 11.

**Response No. 84:** Undisputed.

85.     Lieutenant Patane "didn't see the undercover interacting with any individuals." *Id.* at 62:21–62:23, 70:9–70:12.

**Response No. 85:** Undisputed.

86.     Detective Deltoro testified that he saw UC 84 make a "distress signal," and then moved in and subsequently chased Mr. Fraser. Deltoro Dep. Tr. 33:18–34:7, Rudin Decl. Ex. 3.

**Response No. 86:** Undisputed.

87.     Detective Regina testified to essentially the same thing. Regina Dep. Tr. 20:21–20:25, 39:4–40:23, Rudin Decl. Ex. 2.

**Response No. 86:** Undisputed.

88.     Detective Regina also testified that when he caught up to Mr. Fraser, he searched Fraser. *Id.* at 43:22–44:23.

**Response No. 88:** Undisputed.

89.     When asked at his deposition what he found in his search of Fraser, however, Detective Regina omitted any mention of UC 84's driver's license. *Id.* at 151:8–151:13 ("Q: And when you searched the black male [Fraser], what did you find in his pockets? A: He had personal property of the cell phones and U.S. currency. Q: That's it? A: Yes.").

**Response No. 89:** Undisputed that Detective Regina so testified in the cited portion of the record.

90.    It was only after his counsel specifically asked him about UC 84's driver's license that Detective Regina "remembered" finding it in Fraser's pockets. *Id.* at 154:2–154:18.

**Response No. 90:** Disputed.  The cited record does not support plaintiff's characterization nor the inference made regarding the fact that the undersigned asked the question rather than plaintiff's counsel.

91.    Detective Deltoro, Detective Lee, and Lieutenant Patane were all standing nearby when Regina searched Fraser. *Id.* at 46:15–46:17, 48:14–48:21, 156:19–156:23; Patane Dep. Tr. 78:23–79:14, Rudin Decl. Ex. 11.

**Response No. 91:** Undisputed.

92.    Lieutenant Patane saw Detective Regina search Fraser. Patane Dep. Tr. 78:17–78:22, Rudin Decl. Ex. 11.

**Response No. 58:** Disputed.  This assertion is misleading.  Lieutenant Patane testified that he saw Detective Regina conducting the search of plaintiff generally, but not that he literally witnessed Detective Regina placing his hands into plaintiff's pockets.

93.    Yet no officer saw Detective Regina find UC 84's driver license in Fraser's pockets. Deltoro Dep. Tr. 73:25–74:2, 81:13–81:17, Rudin Decl. Ex. 3; Patane Dep. Tr. 80:23–81:2, Rudin Decl. Ex. 11.

**Response No. 93:** Undisputed that no officer literally saw the moment where Detective Regina removed UC 84's driver license from plaintiff's pocket, but dispute that any officer was in a position to do so at that exact moment.

94.    Detective Deltoro later invoiced a photocopy of UC 84's driver's license as arrest

evidence in Fraser's criminal case. Deltoro Dep. Tr. 77:22–78:13, 80:18–80:23, Rudin Decl. Ex. 3; *see* Property Clerk Invoice No. 1000567423, annexed to Rudin Decl. as Ex. "12."

      **Response No. 94:** Undisputed.

95.     Deltoro did not note on the invoice where this driver's license was found because it was his practice not to write this information down unless he personally saw where an item had been found. Deltoro Dep. Tr. 81:4–81:17, Rudin Decl. Ex. 3.

      **Response No. 95:** Disputed that the cited record establishes what Detective Deltoro's practice was in that regard, but undisputed that he did so in this case.

96.     At the time of Fraser's arrest, Deltoro, UC 84, and Regina had all been working as part of the same narcotics field team for years and typically worked with each other every day. *Id.* at 28:3–28:11; UC 84 Dep. Tr. 81:11–81:23, Rudin Decl. Ex. 4; Regina Dep. Tr. 15:23–17:22, Rudin Decl. Ex. 2.

      **Response No. 96:** Undisputed.

97.     The training given to police recruits at the NYPD Police Academy from January 2005 to July 2019 defined *Brady* material only as "exculpatory evidence that tends to clear someone's guilt." *See* July 7, 2021 Fed. R. Civ. P. 30(b)(6) Deposition of Sergeant Gregory McNally ("McNally Dep. Tr."), annexed to Rudin Decl. as Ex. "13," pp. 53:24–54:8.

      **Response No. 97:** Undisputed that the *training materials* given to recruits during that period defined <u>Brady</u> in that way.  <u>Id.</u> at 54: 9-12 for fuller context.

98.     The training given to police recruits at the NYPD Police Academy prior to October 2019 did not mention impeachment evidence, *Giglio* material, or that civil lawsuits against police officers can constitute impeachment material. *Id.* at 64:7–65:11.

      **Response No. 98:** Disputed.  Construing this assertion to pertain to written

material given to police recruits at the NYPD Police Academy prior to October 2019, beginning in January of 2017 those training materials included as mandatory reading Legal Bureau Bulletin Volume 47, No. 1, which covered those topics. See July 7, 2021 F.R.C.P. 30(b)(6) Deposition of Sergeant Gregory McNally, annexed to Francolla's Decl. as Exhibit "B," pp. 44: 17 – 45: 11; see also Cover Page from the January 2017 Student Guide pertaining to Court Appearances, annexed to Francolla's Decl. as Exhibit "C."

99.     The training given at the NYPD Police Academy "reflect[s] official NYPD policy as to the duties of police officers with regard to their *Brady* obligations." *Id.* at 18:17–19:2.

**Response No. 99:** Disputed insofar as this assertion suggests that the NYPD policy is limited to the language contained in recruit training materials.

100.     The NYPD had no written materials or written policy discussing the obligation of police officers to disclose lawsuits to the prosecution prior to January 25, 2017, when it distributed a Legal Bureau Bulletin dealing with the "cross-examination of police officers." Flaherty Dep. Tr 28:25–29:12, Francolla Decl. Ex. I, ECF No. 70-9; *see also* NYPD Legal Bureau Bulletin, "Cross-Examination of Police Witnesses," dated January 25, 2017 ("Legal Bureau Bulletin"), annexed to Rudin Decl. as Ex. "14."

**Response No. 100:** Undisputed.  Defendants note, however, that the NYPD did have a policy discussing the obligation of police officers to disclose lawsuits to the prosecution – it just was not memorialized in writing until January 25, 2017.  See ¶¶ 53-54, supra.

101.     This Legal Bureau Bulletin is the only specific training that Detective Regina and UC 84 remember receiving from the NYPD about their duty to disclose lawsuit information to the prosecution. Regina Dep. Tr. 72:8–72:17, Rudin Decl. Ex. 2; UC 84 Dep. Tr. 215:16–217:20, Rudin Decl. Ex. 4.

**Response No. 101:** Undisputed.

102.    Detective Deltoro does not recall receiving any training from the NYPD about his duty to disclose lawsuit information to the prosecution. Deltoro Dep. Tr. 100:25–101:5, Rudin Decl. Ex. 3.

**Response No. 102:** Undisputed.

103.    It can be difficult to find lawsuits filed against undercover officers because there is no standardized naming convention. *See* May 11, 2021 Fed. R. Civ. P. 30(b)(6) Deposition of Mary Matuszak ("Matuszak Dep. Tr."), annexed to Rudin Decl. as Ex. "15," 27:4–27:17 ("[U]ndercovers are difficult to search because . . . there's no standard way to refer to an undercover."); *see also* Wasserman Decl. ¶¶ 16–21, Rudin Decl. Ex. 16.

**Response No. 104:** Undisputed that this witness felt that way.

104.    For example, in the lawsuits filed prior to Fraser's criminal trial, UC 84 was named as a defendant in the following ways: "UC0084" (*Cook*); "Undercover # C0084" (*Penn*); "Undercover # 84" (*Baynes*); "Undercover Officer # C0084" (*Best*); "Police Officer Undercover # 84" (*Parris*); "P.O. # C0084" (*Pieralisi*); and "Undercover Officer # 84" (*Wright*). *See* Compl., *Cook v. City of New York*, 09-cv-10238 (CM) (S.D.N.Y.), ECF No. 1; Am. Compl., *Penn v. City of New York*, 10-cv-4907 (RJS) (S.D.N.Y), ECF No. 10; Am. Compl., *Baynes v. City of New York*, 12-cv-5903 (RJS) (S.D.N.Y.), ECF No. 9; Compl., *Best v. City of New York*, 11-cv-05611 (CM) (S.D.N.Y.), ECF No. 1; Compl., *Parris v. City of New York*, 13-cv-06686 (NRB) (S.D.N.Y.), ECF No. 1; Compl., *Pieralisi v. City of New York*, 15-cv-03785 (RA) (S.D.N.Y.), ECF No. 1; Compl., *Wright v. City of New York*, 15-cv-04498 (VSB) (S.D.N.Y.), ECF No. 1.

**Response No. 104:** Undisputed that the attorneys suing UC 84 in those particular cases chose to refer to UC 84 in those ways.

105.    To find records for UC 84 on PACER, you have to type in all the relevant permutations of his name; typing in "Undercover Officer 84" in the field for "last name" would not find *any* of these cases because it is not an exact match. *See* Wasserman Decl. ¶¶ 16–21, Rudin Decl. Ex. 16.

    **Response No. 105:** Undisputed that using that particular search term in that particular field on PACER would not identify any of these cases.

106.    Recognizing the difficulties in searching for lawsuits against undercovers, at an unknown point in time the Manhattan District Attorney's Office ("DANY") came up with a list of various permutations of undercover names to help *Garrett* searchers. Matuzsak Dep. Tr. 27:18–29:5, Rudin Decl. Ex. 15.

    **Response No. 106:** Undisputed.

107.    This list was included in a subsection on "UC searches" in a section entitled "miscellaneous problems and reference" in an internal DANY manual for *Garrett* searchers on "best practices" for using Westlaw from 2017. Wasserman Decl. ¶¶ 13–15, Rudin Decl. Ex. 16.

    **Response No. 107:** Undisputed.

108.    This manual was not in effect at the time of Fraser's criminal trial because DANY did not start using Westlaw to search for civil lawsuit information against testifying officers until after November 2015. Matuzsak Dep. Tr. 24:5–24:13, Rudin Decl. Ex. 15.

    **Response No. 108:** Undisputed.

109.    There is no information about searching for undercovers in any DANY manual for *Garrett* searchers dated prior to Fraser's criminal trial. Wasserman Decl. ¶¶ 13, 15, Rudin Decl. Ex. 16.

**Response No. 109:** Undisputed.

Dated:  New York, New York
         October 4, 2021

**GEORGIA M. PESTANA**
CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-3527

/s/

By: _____
     Brian Francolla
     *Senior Counsel*
     Special Federal Litigation Division

cc:    Joel Barry Rudin, Esq. (by ECF)
       Law Offices of Joel B. Rudin
       200 West 57th Street, Suite 900
       New York, New York 10019